UNITED STATES DISTRICT COURT FOR

THE NORTHERN DISTRICT OF OHIO

TOLEDO DIVISION

---

ADIA A. WASHINGTON,

       Plaintiff,

  vs          Case No:  3:18-cv-02008

WEINBERG MEDIATION GROUP, LLC
and JTM CAPITAL MANAGEMENT, LLC,

       Defendants.

---

Examination Before Trial of MICHAEL HYLA, held

pursuant to Rule 30(b)(6) of the Federal Rules of

Civil Procedure, in the law offices of LIPPES

MATHIAS WEXLER FRIEDMAN LLP, 50 Fountain Plaza,

Buffalo, New York, on Friday, November 1, 2019, at

11:10 A.M. before JULIA MATTERS, Notary Public.

Job No. 31057



UNITED STATES DISTRICT COURT FOR

THE NORTHERN DISTRICT OF OHIO

TOLEDO DIVISION

_____

ADIA A. WASHINGTON,

      Plaintiff,

      vs          Case No:  3:18-cv-02008

WEINBERG MEDIATION GROUP, LLC
and JTM CAPITAL MANAGEMENT, LLC,

      Defendants.

_____

Examination Before Trial of MICHAEL HYLA, held

pursuant to Rule 30(b)(6) of the Federal Rules of

Civil Procedure, in the law offices of LIPPES

MATHIAS WEXLER FRIEDMAN LLP, 50 Fountain Plaza,

Buffalo, New York, on Friday, November 1, 2019, at

11:10 A.M. before JULIA MATTERS, Notary Public.

Job No. 31057

1    APPEARANCES:

2

3    SULAIMAN LAW GROUP, LTD.
     BY:   TEDDY HATZIDIMITRIADIS, ESQ.
4    2500 South Highland Avenue, Suite 200
     Lombard, Illinois 60148
5    Phone Number:   (630) 575-8181
     E-mail:   thatz@sulaimanlaw.com
6    Appearing for the Plaintiff.

7    LIPPES MATHIAS WEXLER FRIEDMAN LLP
     BY:   BRENDAN H. LITTLE, ESQ.
8    50 Fountain Plaza, Suite 1700
     Buffalo, New York 14202
9    Phone Number:   (716) 853-5100
     E-mail:   blittle@lippes.com
10   Appearing for Defendant, JTM Capital Management.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX TO EXHIBITS

 2                  (Retained by Reporter)

 3

 4    Exhibits                                    Page

 5    Exhibit A - Notice of Deposition              5

 6    Exhibit B - JTM's Response to RFAs            5

 7    Exhibit C - JTM's Response to ROGs            5

 8    Exhibit D - JTM's Response to RFPs            5

 9    Exhibit E - Collection Services Agreement     5

10    Exhibit F - Account Notes                     5

11    Exhibit G - Miscellaneous                     5

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          INDEX TO WITNESS

2

3    MICHAEL HYLA                                      Page

4        EXAMINATION BY MR. HATZIDIMITRIADIS:            5

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Whereupon, the following stipulations
 2    were entered into by both parties.)
 3
 4              It is hereby stipulated by and between
 5    counsel for the respective parties that the oath of
 6    the Referee is waived, filing and certification of
 7    the transcript are waived, and that all objections,
 8    except as to the form of the questions, are reserved
 9    until the time of trial.
10
11              (Whereupon, Seven Documents were then
12    received and marked as Exhibits A through G, for
13    identification.)
14
15    M I C H A E L   H Y L A, 17 Thornwood Drive,
16    Cheektowaga, New York 14227, after being duly called
17    and sworn, testified as follows:
18
19    EXAMINATION BY MR. HATZIDIMITRIADIS:
20
21    Q. All right.  Good morning to everybody.  This is the
22       deposition of JTM Capital Management, LLC, pursuant to
23       Rule 30 of the Federal Rules of Civil Procedure.  This
24       deposition is being conducted telephonically by
25       agreement of the parties.  This is the deposition for
```

1    the Northern District of Ohio, case labeled Adia A.

2    Washington versus Weinberg Mediation Group, LLC, and

3    JTM Capital Management, LLC, case number 18-2008.

4         And I know you just stated your name for the

5    record, but one more time could you please state your

6    first and last name for the record?

7  A. Yes, it's Michael Hyla.

8  Q. Okay.  And do you mind if I call you Mike?

9  A. Sure, no problem.

10 Q. Great.  And Mike, have you ever been deposed before?

11 A. Yes.

12 Q. How many times do you believe you have been deposed?

13 A. A couple times, two.

14 Q. Were those two times in your capacity as a corporative

15   representative of JTM?

16 A. Yes.

17 Q. So you're familiar with how a deposition works from a

18   procedural standpoint, is that accurate?

19 A. Yes.

20 Q. Okay.  Before we move forward, I just want to run over

21   some preliminary things.  I don't anticipate this

22   lasting very long, but if you need to take a break at

23   any point, Mike, feel free to do so.  Only thing is,

24   if I ask a question that is pending that you please

25   answer that question before you take that break.  And

1    to make Julia's life a little bit easier, please wait

2    until I'm done asking my full question before you

3    respond so we can have a clear record here.

4         So before we proceed, do you have any other

5    questions about anything that I just mentioned?

6  A. No, not at all.

7  Q. Okay.  Great.  And Mike, right now as you sit there in

8    that conference room are you under the influence of

9    any drugs or alcohol?

10 A. No, I am not.

11 Q. And I don't need to know the exact medication, but are

12    you currently taking any prescription medication that

13    might impair your ability to tell the truth today?

14 A. No, not at all.

15 Q. Okay.  And to save us some time, I would ask you about

16    where you went to high school, college and all of

17    that, but if you could briefly give me a rundown about

18    your educational history, that would be appreciated.

19 A. Sure.  I went to Cleveland-Hill High School, graduate

20    in 1979, and then attended Erie Community College,

21    graduated in 1981, and then for a brief time attended

22    the University of Buffalo, but did not graduate.

23 Q. Okay.  What was your degree in from Erie Community

24    College?

25 A. Business management.

1   Q. Okay.  Have you ever been charged with any crimes,

2      Mike?

3   A. No, I have not.

4   Q. Have you ever been arrested?

5   A. No, I have not.

6   Q. Have you ever personally sued a debt collector before?

7   A. No, I have not.

8   Q. Have you personally ever received a phone call from a

9      debt collector?

10          MR. LITTLE:  This is outside of the scope of the

11      30(b)(6) notice, this is not on the topic list, his

12      answer is not going to bind the company, he can

13      answer, but Teddy, I ask that we kind of stick to the

14      topic list.  He is here to testify in his corporate

15      capacity, not about his personal experiences.

16          MR. HATZIDIMITRIADIS:  Understood.

17          MR. LITTLE:  You can answer.

18          THE WITNESS:  Yes, I have.

19   BY MR. HATZIDIMITRIADIS:

20   Q. Okay.  And then I will move ahead.  Mike, what is your

21      current position at JTM?

22   A. I'm currently the vice president of compliance.

23   Q. And how long have you been the vice president of

24      compliance?

25   A. One year and ten months.

1   Q. Okay.  I guess, I will ask a series of questions.  How

2      long have you been employed by JTM?

3   A. Two years and ten months.

4   Q. Okay.  And again, I don't want to ask you too many

5      detailed questions, but if you could, take me through

6      a day-to-day rundown as to your daily tasks, that

7      would be greatly appreciated?

8   A. Well, my day consists of anything from responding to

9      consumer complaints, responding to RFI's or RFP's for

10     potential issuers to sellers, performing audits,

11     agency audits.

12  Q. And when you say RFP and RFI, can you at least sound

13     out those words for me?

14  A. A Request For Proposal or Request For Information.

15     When an issuer is trying to assess a potential buyer.

16  Q. Okay.  Do you also assist in responding to discovery

17     requests in cases in which JTM has been sued?

18  A. Yes, I do.

19  Q. Do you know if you had responded and assisted in

20     responding to the discovery requests in this matter

21     for which you are testifying for today?

22  A. Yes, I did.

23  Q. Okay.  And prior to coming to this deposition today,

24     did you do anything to prepare?

25  A. I spoke with my attorney and reread the account notes,

1   the placement notes.

2   Q. Okay.  And now, I'm going to ask Julia to hand you

3      what's been marked as Exhibit A.  And Mike, if you

4      could please look through that and let me know when

5      you're done.

6   A. Okay.

7   Q. Have you ever seen this document before?

8   A. Yes, I have.

9   Q. And based on this document is it your understanding

10     that JTM has designated you as its corporate witness

11     for the topics that are outlined here on pages 2 and

12     3?

13  A. Yes.

14  Q. So are you comfortable testifying as to the seventeen

15     topics that are on this exhibit?

16  A. Yes, I am.

17  Q. Okay.  Great.  Now, Mike, if you could please answer,

18     and this might sound like a broad question, but if you

19     could do your best that would be appreciated, what

20     would you say JTM is?

21          MR. LITTLE:  Form.

22          THE WITNESS:  We are a passive debt buyer.

23          MR. HATZIDIMITRIADIS:  So I mean, what type of

24     services does JTM provide?

25          MR. LITTLE:  Form.  Go ahead, you can answer, if

1    you know.

2         THE WITNESS:  We purchase debt and we outsource

3    it to agencies and law firms to collect.

4         MR. HATZIDIMITRIADIS:  Does JTM have any other

5    business operations other than the collection of debt?

6         THE WITNESS:  No.

7         MR. LITTLE:  Form.  Misconstrues his testimony.

8         MR. HATZIDIMITRIADIS:  Okay.  And again, Mike, I

9    forgot to run through this one too.  Your attorney may

10   object to some of the questions that I may be asking,

11   so if you can please let him get that objection on the

12   record before you speak, because he will instruct you

13   whether or not to answer.

14        THE WITNESS:  Sure.

15        MR. LITTLE:  Ted, and there is, like, a second

16   or two delay with the phone, so we will -- I don't

17   know whose fault that is, if anyone's fault, but sorry

18   about that.

19        MR. HATZIDIMITRIADIS:  Sure, sure.  We will get

20   through this together.

21        MR. LITTLE:  Yeah.

22   BY MR. HATZIDIMITRIADIS:

23   Q. Okay.  Mike, you said that JTM purchases debt,

24      correct?

25   A. Correct.

1    Q. What kind of debts does JTM purchase?

2    A. It's a wide variety of outstanding debt directly from

3       the issuer.

4    Q. I guess, my question is more specific as to what types

5       of debts, as far as, are they utility debts, are they

6       telecommunication debts, things of that nature, so

7       with that, kind of what type of debts does JTM

8       collect?

9    A. Typically credit card, retail card, credit union, some

10      auto.

11   Q. Okay.  Does JTM have a website?

12   A. Yes, they do.

13   Q. Can you give me that website name?

14   A. I believe, it's JTMCM.com.

15   Q. Are you aware as to whether or not JTMCM.com as of

16      today, is that website fully functional?

17            MR. LITTLE:  If you know.

18            THE WITNESS:  To the best of my belief, yes.

19            MR. HATZIDIMITRIADIS:  Okay.  Would you have any

20      reason to doubt me if I said that on August 31st,

21      2017, which was the date in which my client filed her

22      complaint, the website JTMCM.com/index stated that JTM

23      specializes in delinquent account receivables

24      management for a variety of industries.

25            MR. LITTLE:  Object to the form.  If you know or

1   you don't know.

2        THE WITNESS:  I personally haven't looked at the

3   website in a very long time, so I have no recollection

4   if it does or doesn't.

5        MR. HATZIDIMITRIADIS:  Well, as you sit here

6   today, can you answer the question as to whether JTM

7   does specialize in delinquent account receivables

8   management for a variety of industries?

9        MR. LITTLE:  Object to the form.  You can

10  answer.

11       THE WITNESS:  Yes, it is what we do.

12       MR. HATZIDIMITRIADIS:  Is account receivables

13  management another term for debt collection?

14       MR. LITTLE:  Object to the form.

15       THE WITNESS:  Yes, it is.

16       MR. HATZIDIMITRIADIS:  So would it be safe to

17  say, that JTM's business purpose is the collection of

18  debt?

19       MR. LITTLE:  Object to the form.

20       THE WITNESS:  My personal opinion, no.

21       MR. HATZIDIMITRIADIS:  Well, did you not just

22  admit that account receivables management and debt

23  collection are synonymous?

24       MR. LITTLE:  Object to the form.

25       THE WITNESS:  It's the term that the whole

1     industry goes by.

2         MR. HATZIDIMITRIADIS:  So earlier you had said

3     that it is true that JTM specializes in delinquent

4     account receivables management, so then by logic if

5     you're saying that account receivables management and

6     debt collection are synonymous, isn't it accurate to

7     say that JTM specializes in debt collection?

8         MR. LITTLE:  Object to the form.  Totally

9     mischaracterizes his testimony.  Go ahead and answer.

10        THE WITNESS:  I would say the ARM industry,

11    there's a term of account receivables management

12    covers the whole industry, including the sellers and

13    issuers regardless of the function that you perform

14    within the industry, and within the industry itself,

15    within the account receivables management industry,

16    JTM is solely a debt buyer, a passive debt buyer.

17        MR. HATZIDIMITRIADIS:  Does JTM make any money

18    off of any other industry besides the acquisition and

19    servicing of debt?

20        MR. LITTLE:  Form.

21        THE WITNESS:  No.

22 BY MR. HATZIDIMITRIADIS:

23 Q. How many accounts, if you know, does JTM purchase per

24    year on average?

25 A. I don't have that information.

1    Q. Do you have a rough estimate, is it over a thousand?

2            MR. LITTLE:  Object to the form.  If you know.

3        Don't guess or speculate.

4            THE WITNESS:  I can't guess or speculate on it.

5            MR. HATZIDIMITRIADIS:  I mean, can you at least,

6        is it over five hundred accounts?

7            MR. LITTLE:  Same objection.

8            THE WITNESS:  I would have to speculate.

9            MR. HATZIDIMITRIADIS:  So is it over five

10       accounts?

11           MR. LITTLE:  Object to the form.  He indicated

12       he would have to speculate, he doesn't know the

13       answer.

14           MR. HATZIDIMITRIADIS:  I understand that, but if

15       he has an idea that it is over X-amount, he can

16       testify as such.  I'm not expecting an exact answer.

17       I know that -- so again, would you say that it is

18       over --

19           MR. LITTLE:  Teddy, hold on.  His response is, I

20       would have to speculate, so I don't know where we go

21       with that.  If you want to ask a different question.

22           MR. HATZIDIMITRIADIS:  Understood.  Well, let me

23       give you an analogy, Brendan.  If I know outside it's

24       snowing, I'm pretty sure I can state with confidence

25       it is under seventy degrees outside.  So in this

1    situation, I'm currently asking, as the vice president

2    of compliance for a debt purchaser, he should have an

3    idea as to whether or not JTM purchases over five

4    hundred accounts per year?

5         MR. LITTLE:  Okay.  Well, whether he has an idea

6    or not, he is here to testify as to what he knows or

7    doesn't know.  He can give you estimates, if he can,

8    that's fine, but if his response is I would have to

9    speculate, he is not going to answer the question.  So

10   you can ask a question if he has an estimate, and if

11   he can give it, fine, great, but if his response is, I

12   would be speculating, he can't give that response.

13        MR. HATZIDIMITRIADIS:  Fair enough.  Mike, can

14   you please estimate as to how many accounts JTM

15   purchases per year?

16        MR. LITTLE:  If you can.

17        THE WITNESS:  I couldn't begin to.  I'm not

18   operations, I'm only compliance.

19  BY MR. HATZIDIMITRIADIS:

20  Q. Okay.  Are you aware as to how many accounts it

21     currently owns?

22  A. The number of accounts, no, I'm not aware of that.

23  Q. Okay.  When an account is purchased by JTM, is that

24     account already in default upon purchase?

25  A. Yes.

```
 1   Q. Does JTM ever purchase accounts that are not in
 2      default?
 3   A. No.
 4   Q. And to your knowledge, does Adia A. Washington, who is
 5      the plaintiff in this matter, does she have any
 6      account for which JTM is collecting upon?
 7          MR. LITTLE:  Object to the form.  I don't know
 8      if I understand the question.
 9          THE WITNESS:  I don't understand.  Other than
10      this account?
11   BY MR. HATZIDIMITRIADIS:
12   Q. I'm asking, how many accounts does Adia A. Washington
13      have with JTM?
14   A. Just the one account.
15   Q. Okay.  Are you aware as to when JTM purchased this
16      account?
17   A. I have seen it in the notes, so without referring to
18      the notes I can't tell you off the top of my head.
19   Q. Okay.  We will get to that.  So by virtue of
20      purchasing the account, it would make sense to me that
21      JTM then owns that debt, correct?
22   A. Correct.
23   Q. Does JTM ever place phone calls to customers?
24   A. No.
25   Q. Does JTM ever send collection letters to customers?
```

1    A. No, we do not.

2    Q. Does JTM contract with third-parties to place

3       telephone calls to consumers?

4    A. Yes, we do.

5    Q. And what is the purpose of those calls?

6            MR. LITTLE:  What calls?

7            MR. HATZIDIMITRIADIS:  Well, he just admitted

8       that JTM contracts with a third-party to place phone

9       calls to consumers, so my question is, those phone

10      calls that are placed to those consumers, what are the

11      purposes of those phone calls?

12           MR. LITTLE:  So if I understand correctly, calls

13      made by the third-party agencies to the consumers,

14      what is the purpose of those calls?

15           MR. HATZIDIMITRIADIS:  Correct.

16           THE WITNESS:  To collect on the debt.

17   BY MR. HATZIDIMITRIADIS:

18   Q. Does JTM contract with the third-party to send

19      collection letters to consumers?

20   A. Yes.

21   Q. And I would assume the purpose of those collection

22      letters is also to collect upon a debt, correct?

23   A. Yes.

24   Q. Okay.  All right.  Well, my next line of questions

25      deals with a lot more technical components as to the

1    system that JTM uses when it purchases a debt, but I

2    don't want to get too far into that, I briefly want to

3    touch on that, Mike.  So when JTM purchases a debt how

4    do you guys import that information into your system?

5  A. I don't have that knowledge.

6  Q. Are you aware as to what kind of data is included when

7    you purchase a new account?

8        MR. LITTLE:  Generally?

9        MR. HATZIDIMITRIADIS:  Yeah, sure.

10       THE WITNESS:  Typically, name, address, social

11    security number, the information on the debt, phone

12    numbers that were provided to the issuer, the address

13    that was provided to the issuer, and general payment

14    information.

15  BY MR. HATZIDIMITRIADIS:

16  Q. Okay.  Does JTM run scrubs on those pieces of

17    information?

18  A. Yes, we do.

19  Q. Does JTM compel its agent to also run scrubs on that

20    information?

21        MR. LITTLE:  Form.

22       THE WITNESS:  Yes, we do.

23  BY MR. HATZIDIMITRIADIS:

24  Q. Okay.  If we can briefly look at Exhibit F.

25  A. Yep.

1   Q. Okay.  Have you seen this document before?

2   A. Yes, I have.

3   Q. And were these account notes that you referenced to

4      earlier that you took a look at before coming in

5      today?

6   A. Correct.

7   Q. Now, this Exhibit F, how is this document generated?

8   A. This is a screen capture off of my computer onto

9      Microsoft Paint.

10  Q. And I guess, my question earlier was, what program or

11     what system does this document -- is this document

12     generated from?

13  A. Our operating system is Beam.

14  Q. That's B-E-A-M as in Mary?

15  A. Correct.

16  Q. So when data comes in from -- strike that.  When JTM

17     purchases a debt is the entity from which it purchases

18     considered a client?

19  A. It's considered a seller.

20  Q. Okay.  I just honestly wanted to establish the term.

21     So when data comes in from a seller and it's imported

22     into JTM's system, what does JTM typically do

23     thereafter?

24  A. I'm not sure I understand that.  Could you be a little

25     more specific?

1    Q. So when JTM purchases an account from a seller, the

2       data is imported to the JTM system, does JTM begin

3       collecting right away, does it contract with a

4       third-party, I'm looking for the timing as to when it

5       decides what to do with the purchase of that debt?

6       Again, I could give you the floor and you can explain

7       that.

8           MR. LITTLE:  Object to the form.  You can

9       answer.

10          THE WITNESS:  Once the account is in the system,

11      the accounts, they receive a bankruptcy, a deceased,

12      and a SCRA scrub, and anything that does not pass

13      through that scrub is removed, and at that point it is

14      placed with a collection agency.

15   BY MR. HATZIDIMITRIADIS:

16   Q. And is that contract -- I'm sorry.  Strike that.  I

17      would imagine that JTM has a contract with that

18      collection agency, correct?

19   A. Correct.

20   Q. Is that contract entity prior to the acquisition of

21      the debt or after the acquisition of the debt?

22   A. I'm sorry.  Repeat that.

23   Q. So the contract between JTM and the debt collector

24      that it assigns the debt to, is that contract entered

25      into prior to when JTM acquires the debt?

1              MR. LITTLE:  Form.

2              THE WITNESS:  The debt that we place with that

3        agency?

4              MR. HATZIDIMITRIADIS:  Correct.

5              THE WITNESS:  The contracts are signed prior to

6        any placements going to that agency.

7    BY MR. HATZIDIMITRIADIS:

8    Q. So would you have multiple contracts -- I'm sorry.

9        Would JTM have multiple contracts with the same debt

10       collector?

11   A. No.

12   Q. So JTM and a debt collector don't create a new

13       contract every time JTM assigned a debt to that debt

14       collector, is that fair?

15   A. Correct.

16   Q. Are these contracts between JTM and its agent, are

17       they modified at any point?

18   A. No.

19   Q. Okay.  And again, I know I just called them an agent,

20       is it fair to call those debt collectors that JTM

21       assigned purchased debts to, are those agents of JTM?

22             MR. LITTLE:  Object to the form.

23             THE WITNESS:  You could call them that if you

24       would like.

25   BY MR. HATZIDIMITRIADIS:

1    Q. Well, I guess, let's flip to Exhibit E.  Mike, are you

2       familiar with this document?

3    A. Yes, I am.

4    Q. What is this document?

5    A. It's a standard collection service agreement that we

6       have with every agency.

7    Q. Okay.  So now I just heard you call it an agency, are

8       you referring to a debt collector?

9    A. I'm referring to the collection agencies that we

10      outsource to.

11   Q. Okay.  So in this Exhibit E, is it fair to say, that

12      JTM outsourced a debt to Weinberg Mediation Group?

13          MR. LITTLE:  You're talking about the subject

14      debt at issue or debt generally?

15          MR. HATZIDIMITRIADIS:  What's at issue in

16      Exhibit E.

17          MR. LITTLE:  Well, there is no debt at issue in

18      Exhibit E.

19   BY MR. HATZIDIMITRIADIS:

20   Q. Well, it says -- okay.  My apologies.  I will

21      rephrase.  So based on Exhibit E, is it your

22      understanding that JTM and Weinberg Mediation Group

23      entered in a collection services agreement?

24   A. Yes.

25   Q. And based on this document is Weinberg Mediation Group

1    an agent of JTM?

2         MR. LITTLE:  Object to the form.  Calls for a

3    legal conclusion.  If you know the answer, you can

4    answer, if not then --

5         THE WITNESS:  I don't understand the term agent.

6  BY MR. HATZIDIMITRIADIS:

7  Q. Okay.  And if you can please read for me, do you see

8    where it says, recitals?

9  A. Yes.

10 Q. I will actually read it for the record.  This

11   collection services agreement is made effective as of

12   July 7th, 2017, in parentheses, effective date, by and

13   among JTM Capital Management, a Delaware limited

14   liability company with an address at 6400 Sheridan

15   Drive, Suite 138, Williamsville, New York, 14221, in

16   parentheses, the company, and Weinberg Mediation

17   Group, a limited liability company with an address of

18   6000 North Bailey Avenue, Suite 2C, and parentheses,

19   the agency, do you see that, Mike?

20 A. Yes.

21 Q. So what I just said, in parentheses, the company, does

22   that refer to JTM Capital Management in this instance?

23 A. Correct.

24 Q. When I said, in parentheses, the agency, does the

25   agency refer to Weinberg Mediation Group?

1    A. Correct.

2    Q. Okay.  Now, if you could please read for me under

3       recitals, could you please read for me that first line

4       where it starts with whereas?

5    A. Whereas, the agency is engaged in the business of debt

6       collection wherein it assists its customers in the

7       collection and administration of nonperforming

8       accounts receivable and -- do you wish for me to

9       continue?

10   Q. Sure.  You could read that next one.

11   A. Whereas, the company wishes to retain the agency to

12      collect debt on certain accounts and the agency is

13      desirous of providing such services.  Now therefore,

14      in consideration of the premises, mutual covenants,

15      conditions, representations and warranties stated

16      below, the company and the agency hereby agree as

17      follows.

18   Q. Okay.  So based on what you just read, what is your

19      understanding as to what this agency is?

20   A. It's a collection agency servicing accounts that we

21      have provided for them.

22   Q. Okay.  So again, would you say that Weinberg Mediation

23      is an agent in this context?

24           MR. LITTLE:  Object to the form, if you know.

25           THE WITNESS:  I'm going to say no.

1    BY MR. HATZIDIMITRIADIS:

2    Q. All right.  Mike, how would you define what an agency

3       is?

4    A. They're a collection agency, exactly that, a company

5       that collects debt.

6    Q. Is that your definition of the term?

7    A. Yes.

8    Q. Okay.  But again, in this instance, Weinberg would be

9       -- I'm sorry.  JTM is the company and Weinberg is the

10      agent, at least in the context of this collection

11      agreement, is that fair?

12   A. Agency.

13   Q. Okay.  That's fair.  We will move on.  If we could go

14      back to exhibit -- we were looking at Exhibit F.  And

15      I'm sorry for jumping around.  If we can go back to

16      that real quick.

17             And you got that in front of you, Mike?

18   A. Yep.

19   Q. So when JTM purchases an account how does JTM decide

20      which debt collection company it will use to assign

21      the debt to?

22   A. I don't have that information.

23   Q. Do you know who would have that information?

24   A. Members of the operational staff.

25   Q. And do you manage that staff?

1   A. No, I do not.

2   Q. Okay.  There are certain types of debts, as we

3      explained earlier, there is telecommunication debts,

4      there is medical debts, et cetera, are certain types

5      of debts assigned to one debt collector over another?

6   A. I don't have that answer.

7   Q. Would that answer be with the operational staff?

8   A. Correct.

9   Q. Okay.  So if we can look at Exhibit F, based on this

10     document, Mike, can you determine as to which debt

11     collection agencies JTM assigned this debt to?

12  A. Yes.

13          MR. LITTLE:  Do you want him to name them?

14          MR. HATZIDIMITRIADIS:  No, no, I'm sorry.

15  BY MR. HATZIDIMITRIADIS:

16  Q. Okay.  Was Weinberg, which we mentioned earlier, do

17     you see them anywhere in this exhibit?

18  A. Yes, but their name had changed.

19  Q. Okay.  What was their name previously?

20  A. Their name, actually at the time this was printed, was

21     Global Management Group -- or Global Mediation Group.

22     My apologies.

23  Q. Okay.  So did they become Weinberg after that or

24     before that?

25  A. No, they became -- they were originally Weinberg, they

1     became Global.

2     Q. Do you know approximately when that occurred?

3     A. Approximately December '18 or January '19, somewhere

4        in that area, if I remember correctly.

5     Q. Okay.  And I'm seeing -- I'm looking through Exhibit

6        F, I see that there is -- correct me if I'm wrong, but

7        do you see on the entry dated 6/11/2018 at twelve

8        a.m., do you see where it says added to queue, Amherst

9        Q?

10    A. Correct.

11    Q. What is Amherst Q?

12    A. That is our placement queue.

13    Q. Okay.  Is that not a collection agency?

14    A. No, no, that is the original location of our company

15       and it's always been that name.

16    Q. Okay.  How about if we go to 1/2/2018,

17       twelve-seventeen p.m., do you see where it says,

18       beamed out to ZZ Account Discovery Systems?

19    A. Yep.

20    Q. What does that mean?

21    A. On January 2nd of 2018, the account was assigned to

22       Account Discovery Systems.

23    Q. Is Account Discovery Systems a debt collection agency?

24    A. They were, yes.

25    Q. So does JTM contract with multiple agencies to collect

1    upon the same debt?

2          MR. LITTLE:  Form.

3          THE WITNESS:  Yes.

4  BY MR. HATZIDIMITRIADIS:

5  Q. And are all of those debt collection agencies that are

6     collecting upon that same debt, are they collecting on

7     it at the same time?

8  A. No.

9  Q. How does JTM determine when to -- strike that.  In

10    this instance in Exhibit F, do you also see the name

11    Consumer Solutions Group anywhere?

12 A. Yes.

13 Q. I guess, I'll refer to it, says, 5/30/2017 at

14    twelve-seventeen, do you see that?

15 A. Yes.

16 Q. And is Consumers Solutions Group another debt

17    collection agency?

18 A. Yes.

19 Q. So based on Exhibit F, how many debt collection

20    agencies did JTM contract with to collect upon the

21    debt?

22 A. This specific debt?

23 Q. Yes.

24 A. Total of four different agencies.

25 Q. Okay.  Are you aware as to why JTM stopped using one

1       agency and then went onto start using another?

2               MR. LITTLE:  Concerning this specific account?

3               MR. HATZIDIMITRIADIS:  Correct.

4               THE WITNESS:  That's an operational strategy.  I

5       don't have that answer.

6    BY MR. HATZIDIMITRIADIS:

7    Q. Okay.  Who was the last debt collection agency that

8       JTM used to collect upon this specific debt, the most

9       recent, I will say?

10   A. It was with Weinberg at the time that we received the

11      lawsuit.

12   Q. Okay.  And just one more question on this exhibit.  If

13      we look at -- it's the first page, the last entry 9/5

14      -- I apologize.  I apologize.  Strike that.  It's the

15      entry on the last page that says, 9/5/2018 at

16      four-twenty-eight p.m.

17   A. Yes.

18   Q. Do you see where it says, Letter, next to that?

19   A. Yes.

20   Q. And in the comments section -- I think, actually

21      again, does JTM enter in the comments that are on the

22      right column?

23   A. In the right column, the large open area?

24   Q. Well, I mean, there are three columns, I'm seeing the

25      dates, I'm seeing placement history, letter, extract

1   data, things of that nature, and then the column right

2   next to it where it has some notes, that is the column

3   that I'm referencing.

4   A. Yes.

5   Q. Is that one filled out by JTM?

6   A. Correct.

7   Q. Okay.  And in that same entry that we were just

8      looking at where it says, requested JTM dunning

9      balance in full, what does that mean?

10  A. That is me requesting a copy of the initial dunning

11     letter that was sent to the consumer from the agency.

12  Q. When JTM contracts with these collection agencies to

13     collect on the debt, is there a clause in those

14     contracts in which the collection agency has to notify

15     JTM when it sends out a dunning letter?

16  A. To notify JTM, no.

17  Q. Does JTM have access to the account notes of its

18     collection agencies -- I will rephrase that.  Does JTM

19     have access to the account notes of the debt

20     collection agencies in which it contracts with?

21  A. Direct access?

22  Q. I mean, I guess, if you can explain what type of

23     access, that would probably make our lives easier.

24  A. JTM has no direct access of any notes with any

25     agencies that we contract with.  JTM does have the

1      ability to request notes from that agency.

2  Q. So JTM does not have the unilateral ability to just go

3      into a debt collection agency's account notes and see

4      what is going on with that particular account, is that

5      fair?

6  A. You are correct.

7  Q. Okay.  And when JTM contracts with these third-party

8      collection agencies to collect on the debt, what

9      information does JTM give to these third-parties?

10         MR. LITTLE:  Generally?

11         MR. HATZIDIMITRIADIS:  Yeah, sure.

12         THE WITNESS:  In regards to the debt itself, as

13     I stated earlier, the name, the address, the phone

14     numbers provided by the original issuer, account

15     information, general payment information, if it is

16     provided.

17         MR. HATZIDIMITRIADIS:  And is there a system

18     that JTM and these third-party collection agencies use

19     to communicate with one another?

20         MR. LITTLE:  A system, meaning like, a certain

21     software or e-mail?

22  BY MR. HATZIDIMITRIADIS:

23  Q. Yeah, I will rephrase it.  How does JTM communicate

24     with its third-party collection agencies?

25  A. In regards to general communication or providing

1      information?

2   Q. If you can give me the answers to both, that would be

3      great.

4   A. General communication is through e-mail.  Any

5      information with account level information in it is

6      provided through an SFTP site, a secured web portal.

7   Q. And the program or the system that you referenced

8      earlier, Beam, that doesn't have anything to do with

9      the communication between JTM and its collection

10     agencies?

11  A. Correct.

12  Q. Okay.  To your knowledge, does Weinberg send letters

13     to customers in its attempt to collect upon debts

14     owned by JTM?

15  A. I can confirm they are required to.

16  Q. Are you aware as to whether or not that occurred in

17     reference to the account in question here?

18  A. That's exactly why the comment that you asked me about

19     is on there, I was requesting the copy of the letter

20     to show that they did send it.

21  Q. Okay.  And to your knowledge, does Weinberg place

22     phone calls to consumers in its attempt to collect

23     upon debts owned by JTM?

24  A. Yes.

25  Q. During these phone calls, if you know, does Weinberg

1    ever reference the name JTM?

2  A. They should.

3  Q. Is this per agreement between Weinberg and JTM?

4  A. What is -- what we contract them to do is to abide by

5    the Fair Debt Collection Practices Act and any

6    associated state laws, and part of that is to state

7    who the current account holder is both on the phone

8    and in the letter.

9  Q. And can you explain the compensation structure between

10    Weinberg and JTM?

11  A. It is a percentage of the collections made.

12  Q. Does Weinberg charge JTM a fee?

13  A. No.

14  Q. Does JTM charge Weinberg a fee?

15  A. No.

16  Q. So let's say, Weinberg is able to collect a certain

17    sum of money from a consumer, how much of that money

18    is Weinberg required to give JTM?

19  A. It varies from placement to placement.

20  Q. So in the instant matter dealing with Weinberg, how

21    much of the money was Weinberg required to give JTM

22    with this account?

23       MR. LITTLE:  When you say the instant matter,

24    you mean the instant account that we're talking about

25    at issue in the lawsuit?

1             MR. HATZIDIMITRIADIS:  Correct.

2             THE WITNESS:  I don't have that information.

3    BY MR. HATZIDIMITRIADIS:

4    Q. Okay.  We will get to that eventually.  I would

5       imagine as the vice president of compliance, Mike,

6       you're familiar with the Fair Debt Collection

7       Practices Act, correct?

8    A. Yes, I am.

9    Q. Do you believe that a debt collection agency who is

10      collecting upon a debt owned by JTM is a debt

11      collector under the FDCPA?

12            MR. LITTLE:  Object to the form.  Calls for a

13      legal conclusion.

14            THE WITNESS:  That the collect agency is?

15            MR. HATZIDIMITRIADIS:  Correct.

16            THE WITNESS:  Yes.

17            MR. HATZIDIMITRIADIS:  Does JTM ever provide

18      training materials to its collection agencies?

19            THE WITNESS:  No.

20            MR. HATZIDIMITRIADIS:  Are you aware of any

21      instances other than the instant lawsuit in which JTM

22      was sued under the FDCPA?

23            MR. LITTLE:  Object to the form.

24            THE WITNESS:  Yes.

25            MR. HATZIDIMITRIADIS:  And again, if you can

1      estimate, do you know how many times approximately?

2              MR. LITTLE:  That the company has ever been sued

3      or the company has been sued since he has been with

4      the company?

5              MR. HATZIDIMITRIADIS:  The company in its entire

6      history, how many times has it been sued under the

7      FDCPA, if he knows?

8              THE WITNESS:  The entire company, I have no idea

9      for the history of the company.

10  BY MR. HATZIDIMITRIADIS:

11  Q. How about in your two years and ten months of working

12      there?

13  A. For FDCPA violations?

14  Q. Correct.

15  A. Again --

16  Q. Is it more than five?

17  A. I would have to say right about that.

18  Q. Okay.  Do you believe that JTM is a debt collector for

19      purposes of the FDCPA?

20              MR. LITTLE:  Object to the form.

21              THE WITNESS:  No, I do not.

22  BY MR. HATZIDIMITRIADIS:

23  Q. Why don't you believe so?

24  A. Because we make no direct action to contact a consumer

25      or attempt to collect it.

1    Q. Okay.  Are you aware of any instances in which a JTM

2       collection agency was sued under the FDCPA for conduct

3       related to a debt owned by JTM?

4            MR. LITTLE:  Object to the form.  When you say

5       JTM debt collection agency, you mean, third-parties

6       contracted by JTM to collect accounts?

7            MR. HATZIDIMITRIADIS:  Correct.

8            MR. LITTLE:  So I believe his question is, are

9       you aware that JTM has been sued because its

10      third-party debt collector was purportedly violating

11      the FDCPA?

12           THE WITNESS:  That JTM has been sued?

13           MR. LITTLE:  Yes, for the action of its

14      third-party debt collector.

15           THE WITNESS:  All those, the five or however

16      many, are all on the action of the agency, yes.

17           MR. HATZIDIMITRIADIS:  Okay.  In any of those

18      five or so cases did JTM reprimand that collection

19      agency?

20           MR. LITTLE:  I'm sorry.  That's assuming that

21      the claims had merit, right?

22           MR. HATZIDIMITRIADIS:  Well, I'm just asking

23      generally.  In any of those five cases, I'm not sure

24      if they're the same debt collectors in some of them or

25      if they're different, I'm asking in any of those cases

1  did JTM reprimand that collection agency in any way?

2       THE WITNESS:  Can you define reprimand?

3       MR. HATZIDIMITRIADIS:  I mean, did JTM change --

4  did JTM discontinue using certain debt collection

5  agency services after that collection agency was sued?

6       MR. LITTLE:  Form.  I'm going to object outside

7  of the scope of the 30(b)(6) notice, so any response

8  he gives will not bind the company.  You can answer if

9  you know.

10      MR. HATZIDIMITRIADIS:  I'm going to combat that

11 one, Brendan.  This one actually does go to the heart

12 of the agency, if the company has control to sever

13 ties then obviously that establishes the agency, so

14 that is where I'm --

15      MR. LITTLE:  Sure.  Which topic number are you

16 talking about?

17      MR. HATZIDIMITRIADIS:  We got to go there, let's

18 do it.  I mean, we can go generally as to all the

19 interrogatories, request for production, request for

20 admission, this is general stuff, Brendan.  We're

21 trying to -- the FDCPA, debt collector issue is the

22 main issue here, so that is what I'm going towards.

23      MR. LITTLE:  Well, my objection stands.  I don't

24 see a topic that it references, so you can ask the

25 question, and my position is his response doesn't bind

1    the company to the extent that he knows and we can

2    hash it out later.

3         MR. HATZIDIMITRIADIS:  No, no, understood.  And

4    I will point to topic one.  But anyway, we can move

5    on.  I will rephrase the question because I'm not sure

6    if it was answered.

7         Does JTM ever stop doing business with a

8    third-party collections agency because of conduct

9    committed by that third-party collections agency?

10        MR. LITTLE:  I'm going to object to the form.

11   And also, it's outside of the scope of the 30(b)(6)

12   notice, his answer is not going to bind the company.

13   You can answer, if you know.

14        THE WITNESS:  Yes, we have.

15        MR. HATZIDIMITRIADIS:  And pursuant to the

16   agreement entered into by JTM and the third-party

17   collection agencies, JTM has the ability to sever ties

18   with the collection agency as a result of the

19   collection agency's conduct?

20        THE WITNESS:  Yes.

21        MR. HATZIDIMITRIADIS:  Has there ever been an

22   instance where a collection agency has been found to

23   violate the FDCPA, but JTM has continued to use that

24   collection agency to collect upon the debt it owns?

25        MR. LITTLE:  Object to the form.  Outside the

1   scope of the 30(b)(6) notice.  You can answer if you

2   know.

3       THE WITNESS:  Yes.

4       MR. HATZIDIMITRIADIS:  Are all agreements

5   between JTM and a third-party collection agency

6   substantially similar to the agreement that we were

7   looking at on Exhibit E?

8       THE WITNESS:  Every agreement is identical.

9       MR. HATZIDIMITRIADIS:  Does JTM allow its

10  third-party collection agencies to harass consumers?

11      MR. LITTLE:  Object to the form.

12      THE WITNESS:  No, we do not.

13      MR. HATZIDIMITRIADIS:  Is there language in the

14  collection services agreement of these third-party

15  agencies that prevent these agencies from doing so?

16      MR. LITTLE:  Object to the form.  The agreement

17  speaks for itself.  You can answer.  If you want to

18  look at Exhibit E, you can.

19      THE WITNESS:  Well, we require them to abide by

20  the FDCPA, which outlines that.

21      MR. HATZIDIMITRIADIS:  Would you say that JTM

22  has control over the manner in which the third-party

23  collection agencies can collect upon the debt?

24      MR. LITTLE:  Object to the form.  Calls for

25  legal conclusion.  You can answer if you know.

1           THE WITNESS:  We don't get involved in the

2       operations of the agency, no.

3   BY MR. HATZIDIMITRIADIS:

4   Q. But you did mention earlier that JTM can sever a

5       relationship based on that debt collection agency's

6       conduct, correct?

7   A. Correct.

8   Q. So by virtue of that, would you agree that JTM does

9       have a form of control over these third-party

10      collection agencies?

11          MR. LITTLE:  Object to the form.

12          THE WITNESS:  No, I would say that has the

13      ability to control the -- just the actual agreement

14      itself, not control of the agency.

15  BY MR. HATZIDIMITRIADIS:

16  Q. Okay.  And earlier you had mentioned that JTM does not

17      have access to its collection agency account notes,

18      correct?

19  A. Direct access, correct.

20  Q. When would JTM request access to a third-party

21      collection agency's account notes?

22  A. After I have been notified of the issue.

23  Q. So is it only when an issue arises that JTM looks into

24      the collection account notes of the third-party

25      collection agency?

1   A. No, we also access them during an annual audit.

2   Q. Okay.  And earlier when you said issue arises, what do

3      you mean by that?

4   A. If I receive a lawsuit, if I receive a regulatory

5      complaint on the agency, if I receive a consumer

6      complaint on the agency, if the issuer receives a

7      complaint on the agency.

8   Q. Does JTM have any say as to what goes into the letters

9      its third-party collection agency sends consumers?

10   A. We just require that they abide by the FDCPA.

11   Q. And those letters presumably list JTM within them,

12      correct?

13   A. Correct.

14   Q. But JTM does not have any other control over the

15      content of the letter?

16   A. Other than items that are specifically outlining the

17      FDCPA, like, the validation notice or the

18      Mini-Miranda, no.

19   Q. Does JTM have different requirements with certain

20      third-party collection agencies as to what has to be

21      included in the letters those third-party collection

22      agencies send to consumers?

23   A. No, nothing varies from agency to agency.

24   Q. So even if that collection agency is collecting in a

25      different state it is still the same letter that is

1    sent out?

2        MR. LITTLE:  Object to the form.

3        THE WITNESS:  Unless state law mandates

4    something different, such as disclosures.

5        MR. HATZIDIMITRIADIS:  Okay.  If a third-party

6    collection agency violates -- strike that.  If a

7    third-party collection agency that is contracted with

8    JTM violates a federal state or local law could JTM be

9    subject to a lawsuit?

10        MR. LITTLE:  Objection.  Calls for speculation.

11   If you can answer that.  But that's a hypothetical.

12        THE WITNESS:  I -- I -- I -- I don't know.  I'm

13   not an attorney.

14        MR. HATZIDIMITRIADIS:  Okay.  Well, has JTM

15   taken any steps to insulate itself from liability with

16   these third-party collection agencies?

17        MR. LITTLE:  Object to the form.  You can

18   answer, if you understand the question.

19        THE WITNESS:  Other than requesting

20   indemnification in our contracts, no.

21   BY MR. HATZIDIMITRIADIS:

22   Q. Does JTM ever reward any of the third-party collection

23      agencies?

24   A. No.

25   Q. So let's say Weinberg collects the most amount of

1     money out of all the third-party collection agencies

2     who are collecting on JTM accounts, would JTM treat

3     Weinberg any differently from the other third-party

4     collection agencies thereafter?

5  A. No.

6  Q. Is there ever any circumstances in which a third-party

7     agency would be rewarded over another collection

8     agency?

9  A. We reward no agency.

10  Q. If one collection agency is more successful than

11     another would you place more accounts with that more

12     successful collection agency going forward?

13         MR. LITTLE:  Object to the form.  Calls for an

14     improper hypothetical.  Outside the scope of the

15     30(b)(6) notice.  His answer may not bind the company.

16     You can answer, if you know.

17         THE WITNESS:  No, I don't.  Again, that is an

18     operational question.

19  BY MR. HATZIDIMITRIADIS:

20  Q. Do all third-party collection agencies that have been

21     contracted with JTM, are they all collecting on the

22     same number of accounts?

23  A. I don't know the volume of accounts placed with any

24     agency.

25  Q. In your capacity as the vice president of compliance

1    of JTM would you believe that every single third-party

2    collection agency who has contracted with JTM collects

3    on the same identical number of accounts?

4         MR. LITTLE:  Object to the form.  Asked and

5    answered in a prior question, if you have a different

6    answer.

7         THE WITNESS:  No, I have no idea.

8  BY MR. HATZIDIMITRIADIS:

9  Q. Does JTM still have a relationship with Weinberg?

10 A. No.

11 Q. Why is that?

12 A. Partly for performance, partly for this lawsuit.

13 Q. Are you aware that Weinberg representatives refer to

14    themselves as mediators?

15 A. No, I am not.

16 Q. Have you ever been aware of any instances with which a

17    Weinberg representative threatened legal action upon a

18    consumer?

19         MR. LITTLE:  Generally or this consumer?

20         MR. HATZIDIMITRIADIS:  Both.  If you know both.

21         THE WITNESS:  To the best of my recollection,

22    no.

23 BY MR. HATZIDIMITRIADIS:

24 Q. And for this particular case, you are not aware of

25    that?

1  A. No, I'm not.

2  Q. In this specific case what steps did JTM take to

3     monitor Weinberg's collection activities?

4         MR. LITTLE:  Before it was aware of the lawsuit

5     or afterwards?

6         MR. HATZIDIMITRIADIS:  I'm saying during the

7     collection of the accounts, so before the lawsuit.

8         MR. LITTLE:  So from the time that JTM placed

9     the account with Weinberg up until the time it was

10    aware of the lawsuit, what did JTM do to monitor

11    Weinberg's activities?

12        MR. HATZIDIMITRIADIS:  Correct.

13        THE WITNESS:  Through monthly call monitoring.

14        MR. LITTLE:  But he is asking for this specific

15    account.

16        THE WITNESS:  On this specific account?

17        MR. LITTLE:  Yeah, what did you do to monitor

18    for this specific account, if anything.

19        THE WITNESS:  Oh, I'm talking general.

20        MR. LITTLE:  So make sure you clarify that.

21        THE WITNESS:  For this specific account,

22    probably nothing.

23 BY MR. HATZIDIMITRIADIS:

24 Q. Is there a reason why you just said that generally you

25    would do a monthly monitor on an account, but in this

1      instance you did not?

2   A. We do random sampling, so I said probably not because

3      it would depend on whether this account came up in the

4      random sampling or not.

5   Q. And do you specifically listen to those call

6      recordings?

7   A. Myself, no.

8   Q. And who does listen to those recordings?

9   A. We have a compliance administrator who handles that

10     procedure.

11  Q. Okay.  Let's go back.  And I'm actually -- I have

12     maybe half hour max left.  Do you think you will

13     people able to tough it out for the next hour?

14  A. Oh, yeah, I'm fine.

15  Q. All right.  Great.  So if you can go back to Exhibit E

16     one more time.

17  A. Okay.

18  Q. And again, Mike, we said this is the collection

19     services agreement between JTM and Weinberg, correct?

20  A. Right.

21  Q. Did you sign this document?

22  A. Yes, that is my signature.

23  Q. And you did say that this is the same agreement that

24     is used with all third-party collection agencies, is

25     that why there is a fill in the blank on the first

1     paragraph on the first page?

2 A. Correct.

3 Q. Now, if we can go to the page that is labeled on the

4     bottom right, JTM 0003, please.  And there is a

5     paragraph that is labeled 2.3.1 that is titled

6     collection of account, do you see that?

7 A. Yes.

8 Q. Okay.  And towards the middle of that paragraph, if

9     you look on the left side, it begins with, the agency

10     shall continually disservice, do you see that?

11 A. Yes.

12 Q. I'm going to read that one sentence and ask you a

13     question about that.  So it says, the agency shall

14     continually service each account placed by the

15     company, make a reasonable number of telephone calls,

16     take updated consumer location and contact

17     information, and attempt regular contact with

18     consumers to effectuate collection, and parentheses,

19     in compliance with all compliance regulations.  Do you

20     see that sentence?

21 A. Yes.

22 Q. Okay.  Now, the phrase reasonable number of telephone

23     calls, how would you define what a reasonable number

24     of telephone calls is?

25         MR. LITTLE:  Form.  You can answer.

1              THE WITNESS:  I would state that it is as long
2      as it's not a volume with intent to harass.
3  BY MR. HATZIDIMITRIADIS:
4  Q. And does JTM leave that up to a third-party collection
5      agency?
6  A. Yes.
7  Q. But JTM can monitor the volume of phone calls through
8      a monthly recording, correct?
9  A. No, we monitor the calls themselves, specific calls.
10  Q. Is that in every -- is that in every situation?
11              MR. LITTLE:  Form.
12              THE WITNESS:  I don't understand what you mean
13      by every situation.  We do it with every agency.
14  BY MR. HATZIDIMITRIADIS:
15  Q. So every account?
16  A. No, they're random.
17  Q. I guess, I will ask it one more time so we have a
18      clear record.  So does JTM monitor the monthly call
19      volume for every collection agency that it is
20      collecting upon JTM's purchased debts?
21  A. The monthly call volume, no.
22  Q. Is that random?
23              MR. LITTLE:  Object to the form.  I think you
24      got to explain what you mean when you say monthly
25      monitoring, monthly auditing, what happens.

1    BY MR. HATZIDIMITRIADIS:

2    Q. Well, earlier, Mike, you mentioned that there is a

3       random selection of accounts that undergo a monthly

4       recording check, if you will, is that accurate?

5    A. Correct.

6    Q. Does the same thing occur with the volume of calls?

7    A. No.

8    Q. So does JTM ever monitor the volume of calls that a

9       third-party collection agency makes?

10   A. No.

11   Q. And is there a reason as to why it does not?

12   A. I don't have a reason for that, no.

13   Q. If we flip to the next page, page 4.  There is a

14      section title 2.4.2, no subcontracting of services.

15      Do you see that?

16   A. Yes.

17   Q. So I think I have done a lot of reading, I will save

18      the reading for everyone, but can you just explain

19      what that clause means?

20   A. When we assign accounts to an agency they do not have

21      the ability to reassign them to another agency.

22   Q. So does this mean that JTM controls who its

23      third-party collection agencies can engage as a

24      subcontractor?

25              MR. LITTLE:  Can you repeat that, please?

1  BY MR. HATZIDIMITRIADIS:

2  Q. Does this mean that JTM can control who its

3     third-party collection agency can engage as a

4     subcontractor?

5  A. We don't allow subcontractors, so we can't control

6     something that we don't allow.

7  Q. Well, that is not what the clause says.  I guess, now

8     we might have to -- there is a sentence in there that

9     says, in the event that the agency engages a

10    subcontractor to perform any of the services under

11    this agreement, after receiving the company's prior

12    written consent, the agency shall require in writing

13    that such other person or entity to abide by the same

14    conditions, obligations and warranties imposed upon

15    and assumed by the agency in this agreement, without

16    limitation.  Do you see that?

17 A. I see that.

18 Q. Has they ever been an instance in which a collection

19    agency has engaged a subcontractor to perform any

20    services with respect to accounts owned by JTM?

21 A. No.

22 Q. Well, then why is this clause even in the agreement?

23         MR. LITTLE:  Object to the form.

24         THE WITNESS:  I couldn't tell you.  I did not

25    create the agreement.

1  BY MR. HATZIDIMITRIADIS:

2  Q. Why doesn't JTM allow third-party collection agencies

3     to engage a subcontractor?

4  A. Because we want to know who is collecting our

5     accounts.

6  Q. Okay.  If we look at the bottom of that page where it

7     says, 2.6 title and authority, do you see that?

8  A. Yep.

9  Q. What is blanket settlement standards, what does that

10    mean?

11 A. It means when a file is placed with the agency there

12    is a certain level of settlement percentage that the

13    agency can automatically offer, whether it's eighty

14    percent, sixty percent, but something less than

15    balance in full to close the debt.

16 Q. So does that vary from collection agency to collection

17    agency?

18 A. Not from agency to agency, from portfolio to

19    portfolio.

20 Q. Okay.  What types of debts does Weinberg collect upon?

21         MR. LITTLE:  For JTM or generally?

22         MR. HATZIDIMITRIADIS:  Correct.  I'm sorry.  For

23    JTM.

24         THE WITNESS:  They were doing credit card and

25    retail card business, I believe.

1  BY MR. HATZIDIMITRIADIS:

2  Q. Okay.  Let me have you real quick flip to page JTM

3     0007.

4  A. Okay.

5  Q. And then there is a section 2.8.4, call recording, and

6     it says, the agency shall record one hundred percent

7     of calls with consumers and preserve the call

8     recordings for a minimum of two years following

9     closure of the account at the agency.  Do you see

10    that?

11 A. Correct.

12 Q. So how does JTM monitor whether or not its third-party

13    collection agencies are recording every conversation?

14 A. By our random call monitoring.

15 Q. What steps are taken by JTM if a third-party

16    collection agency fails to record every single call?

17         MR. LITTLE:  Object to the form.  Improper

18    hypothetical, outside the scope of the 30(b)(6)

19    notice.  Your answer is not going to bind the company,

20    but you can answer if you know.

21         THE WITNESS:  That would be situational on their

22    reasoning for it.

23 BY MR. HATZIDIMITRIADIS:

24 Q. Have you ever seen an instance in which that has

25    occurred?

1  A. Yes, I have.

2  Q. And what has happened in that instance?

3  A. By that question, are you asking if there was

4     remediation required?

5  Q. Correct.

6  A. So the instance was that the server that was holding

7     the calls had crashed and was completely lost, so

8     there was no remediation.

9  Q. Was that the only instance that you recall?

10 A. To the best of my recollection, yes.

11 Q. If we could go to page 9, there is a section there

12    2.1.0, and it's titled, rights of inspection.  Do you

13    see that?

14 A. Yes.

15 Q. And again, I rather not have anyone read that, but

16    based on that clause, does it mean that JTM can

17    inspect Weinberg's premises and records at any time of

18    JTM's choosing?

19        MR. LITTLE:  Object to the form.  The document

20    speaks to itself, but you can answer, if you know.

21        THE WITNESS:  Yes.

22        MR. HATZIDIMITRIADIS:  Isn't that a form of

23    control that JTM has over Weinberg?

24        MR. LITTLE:  Object to form.  Calls for a legal

25    conclusion, if you know the answer, you can answer.

1          THE WITNESS:  My opinion would be, no, because

2      it's for auditing purposes.

3          MR. HATZIDIMITRIADIS:  So even if a third-party

4      collection agency has done nothing unlawful, would JTM

5      still have the ability to enter the premises and

6      search that third-party collection agency's records?

7          MR. LITTLE:  Object to the form.  Calls for

8      improper hypothetical.  Outside the scope of the

9      30(b)(6) notice.  Your answer is not going to bind the

10     company.  You can answer, if you know.

11         THE WITNESS:  Again, if they haven't done

12     anything wrong, we would still go in for an annual

13     audit.

14  BY MR. HATZIDIMITRIADIS:

15  Q. And that is a clause that is in all of those contracts

16     between JTM and a third-party collection agency?

17  A. Yes.

18  Q. Okay.  If we can go to page 11, and there is a section

19     there titled 3.6, authority to endorse and deposit

20     checks.  Do you see that one?

21  A. Yes.

22  Q. So I'm going to read the first sentence, it says, the

23     agency is authorized to endorse and deposit any

24     instrument made payable to the company or a prior

25     account owner/creditor that the agency receives in

1     connection with an account, provided no termination

2     event or account return has previously occurred.  Do

3     you see that?

4  A. Yes.

5  Q. So based on what I just read, does this mean that

6     Weinberg can sign a check that is actually made

7     payable to JTM?

8  A. They can deposit that check.

9  Q. What does endorse mean to you?

10          MR. LITTLE:  Object to the form.

11          MR. HATZIDIMITRIADIS:  In reference to a check.

12          THE WITNESS:  To sign the back of the check.

13  BY MR. HATZIDIMITRIADIS:

14  Q. Okay.  So based on this sentence would Weinberg have

15     the ability to sign the check that is made payable to

16     JTM?

17  A. To endorse it on the back, correct.

18  Q. Okay.  And if we can, one last question on the

19     document.  You can go to page 17, there is a section

20     there titled, 7.4, illegal activities.  And this one

21     states, in the event the company believes, for any

22     reason, that the agency is engaging in illegal

23     activity or is not fully complying with all compliance

24     regulations, the company shall have the right, in its

25     sole discretion, to terminate this agreement

1    immediately upon oral or written notice to the agency.

2    Do you see that?

3  A. Yes.

4  Q. So this kind of ties in to what we talked about

5    earlier.  But again, if this third-party collection

6    agency, Weinberg for instance, engages in unlawful

7    conduct, JTM has the ability to terminate the

8    contract?

9  A. Correct.

10  Q. And what steps would JTM have to go through in order

11    to terminate that contract with Weinberg?

12        MR. LITTLE:  You want him to outline the steps

13    that are set forth in the agreement?

14        MR. HATZIDIMITRIADIS:  I guess, I can ask it

15    this way.  You're referring to 7.5, I'm assuming.  But

16    is there anything other than what is listed in section

17    7.5 that JTM has to do upon severing ties with a

18    third-party collection agency?

19        THE WITNESS:  Other than written or oral

20    communication, no.

21  BY MR. HATZIDIMITRIADIS:

22  Q. Has there ever been an instance in which JTM has

23    terminated a relationship with a third-party

24    collection agency but has later contracted with that

25    third-party collection agency once again?

1    A. No.

2    Q. So as you sit here today JTM and Weinberg do not have

3       a contractual relationship?

4    A. Correct.

5    Q. The last question I have is kind of more inquisitive

6       because I'm not sure what it is.  But if we could look

7       at Exhibit G.  Have you seen this document before?

8    A. Yes, I have.

9    Q. Can you just please explain briefly what this document

10      is?

11   A. This is a line off of a placement report from the

12      issuer.

13   Q. So in this instance would the issuer be Mid-America

14      Bank and Trust?

15   A. Via total card, yes.

16   Q. And this was the account that was contracted -- that

17      was the subject of the contractual agreement with

18      Weinberg, correct?

19   A. Correct.

20          MR. LITTLE:  Object to the form of the last

21      question.

22   BY MR. HATZIDIMITRIADIS:

23   Q. How was this information provided to JTM?

24   A. This is provided via a secured website of the issuers.

25   Q. Okay.  Was this directly printed off of that website?

1   A. Well, it goes through that portal as an Excel sheet

2      and the Excel sheet is then converted into our system,

3      so this is off of the archive Excel sheet.

4           MR. HATZIDIMITRIADIS:  Okay.  I have no further

5      questions.  Brendan, do you have anything on that?

6           MR. LITTLE:  You said you're all finished?

7           MR. HATZIDIMITRIADIS:  Yeah, I'm all done.

8           MR. LITTLE:  Okay.  No, I don't have any

9      questions for the witness.

10          MR. HATZIDIMITRIADIS:  You guys going to waive

11     or --

12          MR. LITTLE:  No, I'm going to read and sign,

13     please.  Thank you.

14

15          (Deposition ended at 12:30 P.M.)

16

17

18

19

20

21

22

23

24

25

1

2          WITNESS SIGNATURE CERTIFICATION

3

4          I, MICHAEL HYLA, the witness whose testimony

5     appears hereinbefore do hereby certify

6     and sign my name saying that I have read my

7     foregoing testimony of the official transcript of

8     proceedings in this action, and that I agree

9     with the content and accuracy of said testimony.

10

11          IN WITNESS WHEREOF, I have hereunto

12     subscribed my name.

13

14

15     _____
                    SIGNATURE OF WITNESS
16

17

18     _____
       SIGNATURE OF NOTARY PUBLIC
19

20

21     _____
       DAY          MONTH          YEAR
22

23

24

25

1                          **ERRATA SHEET**

2     **PAGE LINE**

3     _____ _____
      change:_____
4     reason:_____

5     _____ _____
      change:_____
6     reason:_____

      _____ _____
      change:_____
7     reason:_____

8     _____ _____
      change:_____
9     reason:_____

      _____ _____
      change:_____
10    reason:_____

11    _____ _____
      change:_____
      reason:_____
12
      _____ _____
      change:_____
13    reason:_____

14    _____ _____
      change:_____
      reason:_____
15
      _____ _____
      change:_____
16    reason:_____

17    _____ _____
      change:_____
      reason:_____
18
      _____ _____
      change:_____
19    reason:_____

20    _____ _____
      change:_____
      reason:_____
21
      _____ _____
      change:_____
22    reason:_____

23    _____ _____
      change:_____
      reason:_____
24
      _____ _____
      change:_____
25    reason:_____

1                          **ERRATA SHEET**

2     PAGE LINE

      _____ _____
3     change:_____
      reason:_____
4     _____ _____
      change:_____
5     reason:_____
6     _____ _____
      change:_____
      reason:_____
7     _____ _____
      change:_____
8     reason:_____
9     _____ _____
      change:_____
      reason:_____
10    _____ _____
      change:_____
11    reason:_____
12    _____ _____
      change:_____
      reason:_____
13    _____ _____
      change:_____
14    reason:_____
15    _____ _____
      change:_____
      reason:_____
16    _____ _____
      change:_____
17    reason:_____

18    I _____ hereby
      certify that I did review and if necessary correct
19    this deposition and that the foregoing pages _____
      through _____ are a true and accurate recording of
20    said proceedings.

21                  _____

      Subscribed and sworn to before me this
22    _____day of _____, 20_____.

23    _____
            Notary Public
24

25

```
 1              C E R T I F I C A T I O N

 2    STATE OF NEW YORK
      COUNTY OF ERIE:
 3

 4           I, JULIA MATTERS, Notary Public in and for the

 5      State of New York do hereby certify:

 6           That the transcript appearing hereinbefore was

 7      taken pursuant to notice at the time and place as

 8      herein set forth; that said transcript was

 9      stenographically recorded through machine shorthand by

10      me and thereafter computer transcribed into laser

11      printing.

12           I HEREBY CERTIFY, that the foregoing transcript

13      is a full, true and correct transcription of my

14      machine shorthand notes so taken.

15           IN WITNESS WHEREOF, I have hereunto subscribed

16      my name and affixed my stamp this 18th day of November

17      2019.

18

19
                      BY: Julia Matters
20
                          JULIA MATTERS
21

22

23

24

25
```

**Exhibits**

**Exhibit A** 3:5 10:3

**Exhibit B** 3:6

**Exhibit C** 3:7

**Exhibit D** 3:8

**Exhibit E** 3:9 23:1,11,16,18,21
40:7,18 47:15

**Exhibit F** 3:10 19:24 20:7 26:14
27:9 28:5,6 29:10,19

**Exhibit G** 3:11 58:7

**0**

**0003** 48:4

**0007** 53:3

**1**

**1/2/2018** 28:16

**11** 55:18

**12:30** 59:15

**138** 24:15

**14221** 24:15

**14227** 5:16

**17** 5:15 56:19

**18** 28:3

**18-2008** 6:3

**19** 28:3

**1979** 7:20

**1981** 7:21

**2**

**2** 10:11

**2.1.0** 54:12

**2.3.1** 48:5

**2.4.2** 50:14

**2.6** 52:7

**2.8.4** 53:5

**2017** 12:21 24:12

**2018** 28:21

**2C** 24:18

**2nd** 28:21

**3**

**3** 10:12

**3.6** 55:19

**30** 5:23

**30(b)(6)** 8:11 38:7 39:11 40:1
44:15 53:18 55:9

**31st** 12:20

**4**

**4** 50:13

**5**

**5/30/2017** 29:13

**6**

**6/11/2018** 28:7

**6000** 24:18

**6400** 24:14

**7**

**7.4** 56:20

**7.5** 57:15,17

**7th** 24:12

**9**

**9** 54:11

**9/5** 30:13

**9/5/2018** 30:15

**A**

**a.m.** 28:8

**abide** 34:4 40:19 42:10 51:13

**ability** 7:13 32:1,2 39:17 41:13
50:21 55:5 56:15 57:7

**able** 34:16 47:13

**about** 7:5,15,17 8:15 11:18
23:13 28:16 33:18 34:24 36:11,
17 38:16 48:13 57:4

**access** 31:17,19,21,23,24 41:17,
19,20 42:1

**account** 9:25 12:23 13:7,12,22
14:4,5,11,15 16:23,24 17:6,10,
14,16,20 19:7 20:3 21:1,10 26:19
28:18,21,22,23 30:2 31:17,19
32:3,4,14 33:5,17 34:7,22,24
41:17,21,24 46:9,15,16,18,21,25
47:3 48:6,14 49:15 53:9 55:25
56:1,2 58:16

**accounts** 14:23 15:6,10 16:4,
14,20,22 17:1,12 21:11 25:8,12,
20 37:6 44:2,11,22,23 45:3 46:7
50:3,20 51:20 52:5

**accurate** 6:18 14:6 50:4

**acquires** 21:25

**acquisition** 14:18 21:20,21

**Act** 34:5 35:7

**action** 36:24 37:13,16 45:17

**activities** 46:3,11 56:20

**activity** 56:23

**actual** 41:13

**actually** 24:10 27:20 30:20
38:11 47:11 56:6

**added** 28:8

**address** 19:10,12 24:14,17
32:13

**Adia** 6:1 17:4,12

**administration** 25:7

**administrator** 47:9

**admission** 38:20

**admit** 13:22

**admitted** 18:7

**after** 5:16 21:21 27:23 38:5
41:22 51:11

**afterwards** 46:5

**again** 9:4 11:8 15:17 21:6 22:19 25:22 26:8 30:21 35:25 36:15 44:17 47:18 54:15 55:11 57:5,25

**agencies** 11:3 18:13 23:9 27:11 28:25 29:5,20,24 31:12,18,20,25 32:8,18,24 33:10 35:18 39:17 40:10,15,23 41:10 42:20,22 43:16,23 44:1,4,20 47:24 50:23 52:2 53:13

**agency** 9:11 21:14,18 22:3,6 23:6,7 24:19,24,25 25:5,11,12, 16,19,20 26:2,4,12 28:13,23 29:17 30:1,7 31:11,14 32:1 35:9, 14 37:2,5,16,19 38:1,5,12,13 39:8,9,18,22,24 40:5 41:2,14,17, 25 42:5,6,7,9,23,24 43:6,7 44:7, 8,9,10,12,24 45:2 48:9,13 49:5, 13,19 50:9,20,21 51:3,9,12,15,19 52:11,13,16,17,18 53:6,9,16 55:4,16,23,25 56:22 57:1,6,18, 24,25

**agency's** 32:3 39:19 41:5,21 55:6

**agent** 19:19 22:16,19 24:1,5 25:23 26:10

**agents** 22:21

**agree** 25:16 41:8

**agreement** 5:25 23:5,23 24:11 26:11 34:3 39:16 40:6,8,14,16 41:13 47:19,23 51:11,15,22,25 56:25 57:13 58:17

**agreements** 40:4

**ahead** 8:20 10:25 14:9

**alcohol** 7:9

**allow** 40:9 51:5,6 52:2

**already** 16:24

**also** 9:16 18:22 19:19 29:10 39:11 42:1

**always** 28:15

**Amherst** 28:8,11

**among** 24:13

**amount** 43:25

**analogy** 15:23

**annual** 42:1 55:12

**another** 13:13 27:5 29:16 30:1 32:19 44:7,11 50:21

**answer** 6:25 8:12,13,17 10:17, 25 11:13 13:6,10 14:9 15:13,16 16:9 21:9 24:3,4 27:6,7 30:5 38:8 39:12,13 40:1,17,25 43:11,18 44:15,16 45:6 48:25 53:19,20 54:20,25 55:9,10

**answered** 39:6 45:5

**answers** 33:2

**anticipate** 6:21

**any** 6:23 7:4,9,12 8:1 11:4 12:19 14:17,18 17:5 22:6,17 31:24 33:4 34:5 35:20 37:1,17,23,25 38:1,7 42:8,14 43:15,22 44:3,6,23 45:16 51:10,19 54:17 55:23 56:21 59:8

**anyone** 54:15

**anyone's** 11:17

**anything** 7:5 9:8,24 21:12 33:8 46:18 55:12 57:16 59:5

**anyway** 39:4

**anywhere** 27:17 29:11

**apologies** 23:20 27:22

**apologize** 30:14

**appreciated** 7:18 9:7 10:19

**approximately** 28:2,3 36:1

**archive** 59:3

**are** 5:7,8 7:8,11 9:21 10:11,14, 15,22 12:5,15 13:23 14:6 16:20 17:1,15 18:10 19:6 22:5,16,21 23:1,7 27:2,4 29:5,6,25 30:21,24 32:6 33:15,16 35:20 37:1,8,16 38:15 40:4 42:16 44:2,21 45:13, 24 53:13,15 54:3 57:13

**area** 28:4 30:23

**arises** 41:23 42:2

**ARM** 14:10

**around** 26:15

**arrested** 8:4

**ask** 6:24 7:15 8:13 9:1,4 10:2 15:21 16:10 38:24 48:12 49:17 57:14

**asked** 33:18 45:4

**asking** 7:2 11:10 16:1 17:12 37:22,25 46:14 54:3

**assess** 9:15

**assign** 26:20 50:20

**assigned** 22:13,21 27:5,11 28:21

**assigns** 21:24

**assist** 9:16

**assisted** 9:19

**assists** 25:6

**associated** 34:6

**assume** 18:21

**assumed** 51:15

**assuming** 37:20 57:15

**attempt** 33:13,22 36:25 48:17

**attended** 7:20,21

**attorney** 9:25 11:9 43:13

**audit** 42:1 55:13

**auditing** 49:25 55:2

**audits** 9:10,11

**August** 12:20

**authority** 52:7 55:19

**authorized** 55:23

**auto** 12:10

**automatically** 52:13

**Avenue** 24:18

**average** 14:24

**aware** 12:15 16:20,22 17:15 19:6 29:25 33:16 35:20 37:1,9 45:13, 16,24 46:4,10

**away** 21:3

### B

**B-E-A-M** 20:14

**back** 26:14,15 47:11,15 56:12,17

**Bailey** 24:18

**balance** 31:9 52:15

**Bank** 58:14

**bankruptcy** 21:11

**based** 10:9 23:21,25 25:18 27:9 29:19 41:5 54:16 56:5,14

**Beam** 20:13 33:8

**beamed** 28:18

**became** 27:25 28:1

**because** 11:12 36:24 37:9 39:5, 8 47:2 52:4 55:1 58:6

**become** 27:23

**been** 6:10,12 8:1,4,23 9:2,17 10:3 28:15 36:2,3,6 37:9,12 39:21,22 41:22 44:20 45:16 51:18 57:22

**before** 6:10,20,25 7:2,4 8:6 10:7 11:12 20:1,4 27:24 46:4,7 58:7

**begin** 16:17 21:2

**begins** 48:9

**being** 5:16,24

**belief** 12:18

**believe** 6:12 12:14 35:9 36:18, 23 37:8 45:1 52:25

**believes** 56:21

**below** 25:16

**besides** 14:18

**best** 10:19 12:18 45:21 54:10

**between** 5:4 21:23 22:16 33:9 34:3,9 40:5 47:19 55:16

**bind** 8:12 38:8,25 39:12 44:15 53:19 55:9

**bit** 7:1

**blank** 47:25

**blanket** 52:9

**both** 5:2 33:2 34:7 45:20

**bottom** 48:4 52:6

**break** 6:22,25

**Brendan** 15:23 38:11,20 59:5

**brief** 7:21

**briefly** 7:17 19:2,24 58:9

**broad** 10:18

**Buffalo** 7:22

**business** 7:25 11:5 13:17 25:5 39:7 52:25

**buyer** 9:15 10:22 14:16

—————

**C**

—————

**call** 6:8 8:8 22:20,23 23:7 46:13 47:5 49:18,21 53:5,7,14,16

**called** 5:16 22:19

**calls** 17:23 18:3,5,6,9,10,11,12, 14 24:2 33:22,25 35:12 40:24 43:10 44:13 48:15,23,24 49:7,9 50:6,8 53:7 54:7,24 55:7

**came** 47:3

**can** 7:3 8:12,17 9:12 10:25 11:11 12:13 13:6,9 15:5,15,24 16:7,10, 11,13,16 19:24 21:6,8 24:3,7 26:15 27:9,10 31:22 33:2,15 34:9 35:25 38:2,8,18,24 39:1,4,13 40:1,17,18,23,25 41:4 43:11,17 44:16 47:15 48:3,25 49:7 50:18, 23,25 51:2,3 52:13 53:20 54:16, 20,25 55:10,18 56:6,8,18,19 57:14 58:9

**can't** 15:4 16:12 17:18 51:5

**capacity** 6:14 8:15 44:25

**Capital** 5:22 6:3 24:13,22

**capture** 20:8

**card** 12:9 52:24,25 58:15

**case** 6:1,3 45:24 46:2

**cases** 9:17 37:18,23,25

**certain** 25:12 27:2,4 32:20 34:16 38:4 42:19 52:12

**certification** 5:6

**cetera** 27:4

**change** 38:3

**changed** 27:18

**charge** 34:12,14

**charged** 8:1

**check** 50:4 56:6,8,11,12,15

**checks** 55:20

**Cheektowaga** 5:16

**choosing** 54:18

**circumstances** 44:6

**Civil** 5:23

**claims** 37:21

**clarify** 46:20

**clause** 31:13 50:19 51:7,22 54:16 55:15

**clear** 7:3 49:18

**Cleveland-hill** 7:19

**client** 12:21 20:18

**close** 52:15

**closure** 53:9

**collect** 11:3 12:8 18:16,22 25:12 28:25 29:20 30:8 31:13 32:8 33:13,22 34:16 35:14 36:25 37:6 39:24 40:23 52:20

**collecting** 17:6 21:3 29:6 35:10 42:24 44:2,21 49:20 52:4

**collection** 11:5 13:13,17,23 14:6,7 17:25 18:19,21 21:14,18 23:5,9,23 24:11 25:6,7,20 26:4, 10,20 27:11 28:13,23 29:5,17,19 30:7 31:12,14,18,20 32:3,8,18,24 33:9 34:5 35:6,9,18 37:2,5,18 38:1,4,5 39:17,18,19,22,24 40:5, 10,14,23 41:5,10,17,21,24,25 42:9,20,21,24 43:6,7,16,22 44:1, 4,7,10,12,20 45:2 46:3,7 47:18, 24 48:6,18 49:4,19 50:9,23 51:3, 18 52:2,16 53:13,16 55:4,6,16 57:5,18,24,25

**collections** 34:11 39:8,9

**collector** 8:6,9 21:23 22:10,12, 14 23:8 27:5 35:11 36:18 37:10, 14 38:21

**collectors** 22:20 37:24

**collects** 26:5 43:25 45:2

**college** 7:16,20,24

**column** 30:22,23 31:1,2

**columns** 30:24

**combat** 38:10

**comes** 20:16,21

**comfortable** 10:14

**coming** 9:23 20:4

comment 33:18

comments 30:20,21

committed 39:9

communicate 32:19,23

communication 32:25 33:4,9
57:20

Community 7:20,23

company 8:12 24:14,16,17,21
25:11,16 26:4,9,20 28:14 36:2,3,
4,5,8,9 38:8,12 39:1,12 44:15
48:15 53:19 55:10,24 56:21,24

company's 51:11

compel 19:19

compensation 34:9

complaint 12:22 42:5,6,7

complaints 9:9

completely 54:7

compliance 8:22,24 16:2,18
35:5 44:25 47:9 48:19 56:23

complying 56:23

components 18:25

computer 20:8

Concerning 30:2

conclusion 24:3 35:13 40:25
54:25

conditions 25:15 51:14

conduct 37:2 39:8,19 41:6 57:7

conducted 5:24

conference 7:8

confidence 15:24

confirm 33:15

connection 56:1

consent 51:12

consideration 25:14

considered 20:18,19

consists 9:8

consumer 9:9 29:11 31:11
34:17 36:24 42:5 45:18,19 48:16

consumers 18:3,9,10,13,19
29:16 33:22 40:10 42:9,22 48:18

53:7

contact 36:24 48:16,17

content 42:15

context 25:23 26:10

continually 48:10,14

continue 25:9

continued 39:23

contract 18:2,18 21:3,16,17,20,
23,24 22:13 28:25 29:20 31:25
34:4 57:8,11

contracted 37:6 43:7 44:21 45:2
57:24 58:16

contracts 18:8 22:5,8,9,16
31:12,14,20 32:7 43:20 55:15

contractual 58:3,17

control 38:12 40:22 41:9,13,14
42:14 51:2,5 54:23

controls 50:22

conversation 53:13

converted 59:2

copy 31:10 33:19

corporate 8:14 10:10

corporative 6:14

correct 11:24,25 17:21,22
18:15,22 20:6,15 21:18,19 22:4,
15 24:23 25:1 27:8 28:6,10 30:3
31:6 32:6 33:11 35:1,7,15 36:14
37:7 41:6,7,18,19 42:12,13 46:12
47:19 48:2 49:8 50:5 52:22 53:11
54:5 56:17 57:9 58:4,18,19

correctly 18:12 28:4

could 6:5 7:17 9:5 10:4,17,19
20:24 21:6 22:23 25:2,3,10 26:13
43:8 54:11 58:6

couldn't 16:17 51:24

counsel 5:5

couple 6:13

covenants 25:14

covers 14:12

crashed 54:7

create 22:12 51:25

credit 12:9 52:24

crimes 8:1

current 8:21 34:7

currently 7:12 8:22 16:1,21

customers 17:23,25 25:6 33:13

D

daily 9:6

data 19:6 20:16,21 21:2 31:1

date 12:21 24:12

dated 28:7

dates 30:25

day 9:8

day-to-day 9:6

dealing 34:20

deals 18:25

debt 8:6,9 10:22 11:2,5,23 12:2
13:13,18,22 14:6,7,16,19 16:2
17:21 18:16,22 19:1,3,11 20:17
21:5,21,23,24,25 22:2,9,12,13,20
23:8,12,14,17 25:5,12 26:5,20,21
27:5,10,11 28:23 29:1,5,6,16,19,
21,22 30:7,8 31:13,19 32:3,8,12
34:5 35:6,9,10 36:18 37:3,5,10,
14,24 38:4,21 39:24 40:23 41:5
52:15

debts 12:1,5,6,7 22:21 27:2,3,4,
5 33:13,23 49:20 52:20

deceased 21:11

December 28:3

decide 26:19

decides 21:5

default 16:24 17:2

define 26:2 38:2 48:23

definition 26:6

degree 7:23

degrees 15:25

Delaware 24:13

delay 11:16

delinquent 12:23 13:7 14:3

**depend** 47:3

**deposed** 6:10,12

**deposit** 55:19,23 56:8

**deposition** 5:22,24,25 6:17 9:23
  59:15

**designated** 10:10

**desirous** 25:13

**detailed** 9:5

**determine** 27:10 29:9

**did** 7:22 9:22,24 13:21 27:23
  29:20 33:20 37:18 38:1,3,4 41:4
  46:2,10,17 47:1,21,23 51:24

**different** 15:21 29:24 37:25
  42:19,25 43:4 45:5

**differently** 44:3

**direct** 31:21,24 36:24 41:19

**directly** 12:2 58:25

**disclosures** 43:4

**discontinue** 38:4

**discovery** 9:16,20 28:18,22,23

**discretion** 56:25

**disservice** 48:10

**District** 6:1

**document** 10:7,9 20:1,7,11
  23:2,4,25 27:10 47:21 54:19
  56:19 58:7,9

**Documents** 5:11

**doubt** 12:20

**Drive** 5:15 24:15

**drugs** 7:9

**duly** 5:16

**dunning** 31:8,10,15

**during** 33:25 42:1 46:6

---

**E**

**e-mail** 32:21 33:4

**earlier** 14:2 20:4,10 27:3,16
  32:13 33:8 41:4,16 42:2 50:2
  57:5

**easier** 7:1 31:23

**educational** 7:18

**effective** 24:11,12

**effectuate** 48:18

**eighty** 52:13

**employed** 9:2

**ended** 59:15

**endorse** 55:19,23 56:9,17

**engage** 50:23 51:3 52:3

**engaged** 25:5 51:19

**engages** 51:9 57:6

**engaging** 56:22

**enough** 16:13

**enter** 30:21 55:5

**entered** 5:2 21:24 23:23 39:16

**entire** 36:5,8

**entity** 20:17 21:20 51:13

**entry** 28:7 30:13,15 31:7

**Erie** 7:20,23

**establish** 20:20

**establishes** 38:13

**estimate** 15:1 16:10,14 36:1

**estimates** 16:7

**even** 42:24 51:22 55:3

**event** 51:9 56:2,21

**eventually** 35:4

**ever** 6:10 8:1,4,6,8 10:7 17:1,23,
  25 34:1 35:17 36:2 39:7,21 43:22
  44:6 45:16 50:8 51:18 53:24
  57:22

**every** 22:13 23:6 40:8 45:1
  49:10,13,15,19 53:13,16

**everybody** 5:21

**everyone** 50:18

**exact** 7:11 15:16

**exactly** 26:4 33:18

**EXAMINATION** 5:19

**Excel** 59:1,2,3

**except** 5:8

**exhibit** 10:3,15 19:24 20:7 23:1,
  11,16,18,21 26:14 27:9,17 28:5
  29:10,19 30:12 40:7,18 47:15
  58:7

**Exhibits** 5:12

**expecting** 15:16

**experiences** 8:15

**explain** 21:6 31:22 34:9 49:24
  50:18 58:9

**explained** 27:3

**extent** 39:1

**extract** 30:25

---

**F**

**fails** 53:16

**fair** 16:13 22:14,20 23:11 26:11,
  13 32:5 34:5 35:6

**familiar** 6:17 23:2 35:6

**fault** 11:17

**FDCPA** 35:11,22 36:7,13,19
  37:2,11 38:21 39:23 40:20 42:10,
  17

**federal** 5:23 43:8

**fee** 34:12,14

**feel** 6:23

**file** 52:11

**filed** 12:21

**filing** 5:6

**fill** 47:25

**filled** 31:5

**fine** 16:8,11 47:14

**finished** 59:6

**firms** 11:3

**first** 6:6 25:3 30:13 47:25 48:1
  55:22

**five** 15:6,9 16:3 36:16 37:15,18,
  23

**flip** 23:1 50:13 53:2

**floor** 21:6

**following** 5:1 53:8

**follows** 5:17 25:17

**forgot** 11:9

**form** 5:8 10:21,25 11:7 12:25
13:9,14,19,24 14:8,20 15:2,11
17:7 19:21 21:8 22:1,22 24:2
25:24 29:2 35:12,23 36:20 37:4
38:6 39:10,25 40:11,16,24 41:9,
11 43:2,17 44:13 45:4 48:25
49:11,23 51:23 53:17 54:19,22,
24 55:7 56:10 58:20

**forth** 57:13

**forward** 6:20 44:12

**found** 39:22

**four** 29:24

**four-twenty-eight** 30:16

**free** 6:23

**front** 26:17

**full** 7:2 31:9 52:15

**fully** 12:16 56:23

**function** 14:13

**functional** 12:16

**further** 59:4

---

**G**

**general** 19:13 32:15,25 33:4
38:20 46:19

**generally** 19:8 23:14 32:10
37:23 38:18 45:19 46:24 52:21

**generated** 20:7,12

**give** 7:17 12:13 15:23 16:7,11,12
21:6 32:9 33:2 34:18,21

**gives** 38:8

**Global** 27:21 28:1

**Good** 5:21

**graduate** 7:19,22

**graduated** 7:21

**great** 6:10 7:7 10:17 16:11 33:3
47:15

**greatly** 9:7

**Group** 6:2 23:12,22,25 24:17,25
27:21 29:11,16

**guess** 9:1 12:4 15:3,4 20:10
23:1 29:13 31:22 49:17 51:7
57:14

**guys** 19:4 59:10

---

**H**

**half** 47:12

**hand** 10:2

**handles** 47:9

**happened** 54:2

**happens** 49:25

**harass** 40:10 49:2

**hash** 39:2

**HATZIDIMITRIADIS** 5:19 8:16,
19 10:23 11:4,8,19,22 12:19
13:5,12,16,21 14:2,17,22 15:5,9,
14,22 16:13,19 17:11 18:7,15,17
19:9,15,23 21:15 22:4,7,25
23:15,19 24:6 26:1 27:14,15 29:4
30:3,6 32:11,17,22 35:1,3,15,17,
20,25 36:5,10,22 37:7,17,22
38:3,10,17 39:3,15,21 40:4,9,13,
21 41:3,15 43:5,14,21 44:19
45:8,20,23 46:6,12,23 49:3,14
50:1 51:1 52:1,22 53:1,23 54:22
55:3,14 56:11,13 57:14,21 58:22
59:4,7,10

**he** 8:12,14 11:12 15:11,12,15
16:2,5,6,7,9,10,11,12 18:7 36:3,7
38:8 39:1 46:14

**head** 17:18

**heard** 23:7

**heart** 38:11

**her** 12:21

**here** 7:3 8:14 10:11 13:5 16:6
33:17 38:22 58:2

**hereby** 5:4 25:16

**high** 7:16,19

**him** 11:11 27:13 57:12

**his** 8:11,14,15 11:7 14:9 15:19
16:8,11 37:8 38:25 39:12 44:15

**history** 7:18 30:25 36:6,9

**hold** 15:19

**holder** 34:7

**holding** 54:6

**honestly** 20:20

**hour** 47:12,13

**hundred** 15:6 16:4 53:6

**Hyla** 6:7

**hypothetical** 43:11 44:14 53:18
55:8

---

**I**

**idea** 15:15 16:3,5 36:8 45:7

**identical** 40:8 45:3

**identification** 5:13

**illegal** 56:20,22

**imagine** 21:17 35:5

**immediately** 57:1

**impair** 7:13

**import** 19:4

**imported** 20:21 21:2

**imposed** 51:14

**improper** 44:14 53:17 55:8

**included** 19:6 42:21

**including** 14:12

**indemnification** 43:20

**indicated** 15:11

**industries** 12:24 13:8

**industry** 14:1,10,12,14,15,18

**influence** 7:8

**information** 9:14 14:25 19:4,11,
14,17,20 26:22,23 32:9,15 33:1,5
35:2 48:17 58:23

**initial** 31:10

**inquisitive** 58:5

**inspect** 54:17

**inspection** 54:12

**instance** 24:22 26:8 29:10 39:22

47:1 51:18 53:24 54:2,6,9 57:6, 22 58:13

**instances** 35:21 37:1 45:16

**instant** 34:20,23,24 35:21

**instruct** 11:12

**instrument** 55:24

**insulate** 43:15

**intent** 49:2

**interrogatories** 38:19

**involved** 41:1

**issue** 23:14,15,17 34:25 38:21, 22 41:22,23 42:2

**issuer** 9:15 12:3 19:12,13 32:14 42:6 58:12,13

**issuers** 9:10 14:13 58:24

**items** 42:16

---

**J**

**January** 28:3,21

**JTM** 5:22 6:3,15 8:21 9:2,17 10:10,20,24 11:4,23 12:1,7,11,22 13:6 14:3,7,16,17,23 16:3,14,23 17:1,6,13,15,21,23,25 18:2,8,18 19:1,3,16,19 20:16,22 21:1,2,17, 23,25 22:9,12,13,16,20,21 23:12, 22 24:1,13,22 26:9,19 27:11 28:25 29:9,20,25 30:8,21 31:5,8, 12,15,16,17,18,24,25 32:2,7,9, 18,23 33:9,14,23 34:1,3,10,12, 14,18,21 35:10,17,21 36:18 37:1, 3,5,6,9,12,18 38:1,3,4 39:7,16, 17,23 40:5,9,21 41:4,8,16,20,23 42:8,11,14,19 43:8,14,22 44:2,21 45:1,2,9 46:2,8,10 47:19 48:4 49:4,7,18 50:8,22 51:2,20 52:2, 21,23 53:2,12,15 54:16,23 55:4, 16 56:7,16 57:7,10,17,22 58:2,23

**JTM's** 13:17 20:22 49:20 54:18

**JTMCM.COM** 12:15

**Jtmcm.com.** 12:14

**JTMCM.COM/INDEX** 12:22

**Julia** 10:2

**Julia's** 7:1

**July** 24:12

**jumping** 26:15

---

**K**

**kind** 8:13 12:1,7 19:6 57:4 58:5

**know** 6:4 7:11 9:19 10:4 11:1,17 12:17,25 13:1 14:23 15:2,12,17, 20,23 16:7 17:7 22:19 24:3 25:24 26:23 28:2 33:25 36:1 38:9 39:13 40:2,25 43:12 44:16,23 45:20 52:4 53:20 54:20,25 55:10

**knowledge** 17:4 19:5 33:12,21

**knows** 16:6 36:7 39:1

---

**L**

**labeled** 6:1 48:3,5

**language** 40:13

**large** 30:23

**last** 6:6 30:7,13,15 56:18 58:5,20

**lasting** 6:22

**later** 39:2 57:24

**law** 11:3 43:3,8

**laws** 34:6

**lawsuit** 30:11 34:25 35:21 42:4 43:9 45:12 46:4,7,10

**least** 9:12 15:5 26:10

**leave** 49:4

**left** 47:12 48:9

**legal** 24:3 35:13 40:25 45:17 54:24

**less** 52:14

**letter** 30:18,25 31:11,15 33:19 34:8 42:15,25

**letters** 17:25 18:19,22 33:12 42:8,11,21

**level** 33:5 52:12

**liability** 24:14,17 43:15

**life** 7:1

**like** 10:18 11:15 22:24 32:20 42:17

**limitation** 51:16

**limited** 24:13,17

**line** 18:24 25:3 58:11

**list** 8:11,14 42:11

**listed** 57:16

**listen** 47:5,8

**little** 7:1 8:10,17 10:21,25 11:7, 15,21 12:17,25 13:9,14,19,24 14:8,20 15:2,7,11,19 16:5,16 17:7 18:6,12 19:8,21 20:24 21:8 22:1,22 23:13,17 24:2 25:24 27:13 29:2 30:2 32:10,20 34:23 35:12,23 36:2,20 37:4,8,13,20 38:6,15,23 39:10,25 40:11,16,24 41:11 43:2,10,17 44:13 45:4,19 46:4,8,14,17,20 48:25 49:11,23 50:25 51:23 52:21 53:17 54:19, 24 55:7 56:10 57:12 58:20 59:6, 8,12

**lives** 31:23

**LLC** 5:22 6:2,3

**local** 43:8

**location** 28:14 48:16

**logic** 14:4

**long** 6:22 8:23 9:2 13:3 49:1

**look** 10:4 19:24 20:4 27:9 30:13 40:18 48:9 52:6 58:6

**looked** 13:2

**looking** 21:4 26:14 28:5 31:8 40:7

**looks** 41:23

**lost** 54:7

**lot** 18:25 50:17

---

**M**

**made** 18:13 24:11 34:11 55:24 56:6,15

**main** 38:22

**make** 7:1 14:17 17:20 31:23 36:24 46:20 48:15

**makes** 50:9

**manage** 26:25

**management** 5:22 6:3 7:25
12:24 13:8,13,22 14:4,5,11,15
24:13,22 27:21

**mandates** 43:3

**manner** 40:22

**many** 6:12 9:4 14:23 16:14,20
17:12 29:19 36:1,6 37:16

**marked** 5:12 10:3

**Mary** 20:14

**materials** 35:18

**matter** 9:20 17:5 34:20,23

**max** 47:12

**maybe** 47:12

**me** 7:17 9:5,13 10:4 12:13,20
15:22 17:20 24:7 25:2,3,8 28:6
31:10 33:2,18 53:2

**mean** 10:23 15:5 28:20 30:24
31:9,22 34:24 37:5 38:3,18 42:3
49:12,24 50:22 51:2 52:10 54:16
56:5,9

**meaning** 32:20

**means** 50:19 52:11

**Mediation** 6:2 23:12,22,25
24:16,25 25:22 27:21

**mediators** 45:14

**medical** 27:4

**medication** 7:11,12

**Members** 26:24

**mention** 41:4

**mentioned** 7:5 27:16 41:16 50:2

**merit** 37:21

**Michael** 6:7

**Microsoft** 20:9

**Mid-america** 58:13

**middle** 48:8

**might** 7:13 10:18 51:8

**Mike** 6:8,10,23 7:7 8:2,20 10:3,
17 11:8,23 16:13 19:3 23:1 24:19
26:2,17 27:10 35:5 47:18 50:2

**mind** 6:8

**Mini-miranda** 42:18

**minimum** 53:8

**mischaracterizes** 14:9

**Misconstrues** 11:7

**modified** 22:17

**money** 14:17 34:17,21 44:1

**monitor** 46:3,10,17,25 49:7,9,18
50:8 53:12

**monitoring** 46:13 49:25 53:14

**monthly** 46:13,25 49:8,18,21,
24,25 50:3

**months** 8:25 9:3 36:11

**more** 6:5 12:4 18:25 20:25 30:12
36:16 44:10,11 47:16 49:17 58:5

**morning** 5:21

**most** 30:8 43:25

**move** 6:20 8:20 26:13 39:4

**multiple** 22:8,9 28:25

**mutual** 25:14

---

**N**

**name** 6:4,6 12:13 19:10 27:13,
18,19,20 28:15 29:10 32:13 34:1

**nature** 12:6 31:1

**need** 6:22 7:11

**new** 5:16 19:7 22:12 24:15

**next** 18:24 25:10 30:18 31:2
47:13 50:13

**nonperforming** 25:7

**North** 24:18

**Northern** 6:1

**notes** 9:25 10:1 17:17,18 20:3
31:2,17,19,24 32:1,3 41:17,21,24

**nothing** 42:23 46:22 55:4

**notice** 8:11 38:7 39:12 40:1
42:17 44:15 53:19 55:9 57:1

**notified** 41:22

**notify** 31:14,16

**number** 6:3 16:22 19:11 38:15
44:22 45:3 48:15,22,23

**numbers** 19:12 32:14

---

**O**

**oath** 5:5

**object** 11:10 12:25 13:9,14,19,
24 14:8 15:2,11 17:7 21:8 22:22
24:2 25:24 35:12,23 36:20 37:4
38:6 39:10,25 40:11,16,24 41:11
43:2,17 44:13 45:4 49:23 51:23
53:17 54:19,24 55:7 56:10 58:20

**objection** 11:11 15:7 38:23
43:10

**objections** 5:7

**obligations** 51:14

**obviously** 38:13

**occur** 50:6

**occurred** 28:2 33:16 53:25 56:2

**offer** 52:13

**Ohio** 6:1

**once** 21:10 57:25

**one** 6:5 8:25 11:9 17:14 25:10
27:5 29:25 30:12 31:5 32:19
38:11 39:4 44:10 47:16 48:12
49:17 53:6 55:20 56:18,20

**only** 6:23 16:18 41:23 54:9

**open** 30:23

**operating** 20:13

**operational** 26:24 27:7 30:4
44:18

**operations** 11:5 16:18 41:2

**opinion** 13:20 55:1

**oral** 57:1,19

**order** 57:10

**original** 28:14 32:14

**originally** 27:25

**other** 7:4 11:4,5 14:18 17:9
35:21 42:14,16 43:19 44:3 51:13
57:16,19

**our** 20:13 28:12,14 31:23 43:20
52:4 53:14 59:2

**out** 9:13 28:18 31:5,15 39:2 43:1
44:1 47:13

outline 57:12

outlined 10:11

outlines 40:20

outlining 42:16

outside 8:10 15:23,25 38:6
39:11,25 44:14 53:18 55:8

outsource 11:2 23:10

outsourced 23:12

outstanding 12:2

over 6:20 15:1,6,9,15,18 16:3
27:5 40:22 41:9 42:14 44:7 54:23

owned 33:14,23 35:10 37:3
51:20

owner/creditor 55:25

owns 16:21 17:21 39:24

**P**

p.m. 28:17 30:16 59:15

page 30:13,15 48:1,3 50:13 52:6
53:2 54:11 55:18 56:19

pages 10:11

Paint 20:9

paragraph 48:1,5,8

parentheses 24:12,16,18,21,24
48:18

part 34:6

particular 32:4 45:24

parties 5:2,5,25

partly 45:12

pass 21:12

passive 10:22 14:16

payable 55:24 56:7,15

payment 19:13 32:15

pending 6:24

people 47:13

percent 52:14 53:6

percentage 34:11 52:12

perform 14:13 51:10,19

performance 45:12

performing 9:10

person 51:13

personal 8:15 13:20

personally 8:6,8 13:2

phone 8:8 11:16 17:23 18:8,9,11
19:11 32:13 33:22,25 34:7 49:7

phrase 48:22

pieces 19:16

place 17:23 18:2,8 22:2 33:21
44:11

placed 18:10 21:14 44:23 46:8
48:14 52:11

placement 10:1 28:12 30:25
34:19 58:11

placements 22:6

plaintiff 17:5

please 6:5,24 7:1 10:4,17 11:11
16:14 24:7 25:2,3 48:4 50:25
58:9 59:13

point 6:23 21:13 22:17 39:4

portal 33:6 59:1

portfolio 52:18,19

position 8:21 38:25

potential 9:10,15

Practices 34:5 35:7

preliminary 6:21

premises 25:14 54:17 55:5

prepare 9:24

prescription 7:12

preserve 53:7

president 8:22,23 16:1 35:5
44:25

presumably 42:11

pretty 15:24

prevent 40:15

previously 27:19 56:2

printed 27:20 58:25

prior 9:23 21:20,25 22:5 45:5
51:11 55:24

probably 31:23 46:22 47:2

problem 6:9

procedural 6:18

procedure 5:23 47:10

proceed 7:4

production 38:19

program 20:10 33:7

Proposal 9:14

provide 10:24 35:17

provided 19:12,13 25:21 32:14,
16 33:6 56:1 58:23,24

providing 25:13 32:25

purchase 11:2 12:1 14:23 16:24
17:1 19:7 21:5

purchased 16:23 17:15 22:21
49:20

purchaser 16:2

purchases 11:23 16:3,15 19:1,3
20:17 21:1 26:19

purchasing 17:20

purportedly 37:10

purpose 13:17 18:5,14,21

purposes 18:11 36:19 55:2

pursuant 5:22 39:15

**Q**

question 6:24,25 7:2 10:18 12:4
13:6 15:21 16:9,10 17:8 18:9
20:10 30:12 33:17 37:8 38:25
39:5 43:18 44:18 45:5 48:13 54:3
56:18 58:5,21

questions 5:8 7:5 9:1,5 11:10
18:24 59:5,9

queue 28:8,12

quick 26:16 53:2

**R**

random 47:2,4 49:16,22 50:3
53:14

read 24:7,10 25:2,3,10,18 48:12

54:15 55:22 56:5 59:12

**reading** 50:17,18

**real** 26:16 53:2

**reason** 12:20 46:24 50:11,12 56:22

**reasonable** 48:15,22,23

**reasoning** 53:22

**reassign** 50:21

**recall** 54:9

**receivable** 25:8

**receivables** 12:23 13:7,12,22 14:4,5,11,15

**receive** 21:11 42:4,5

**received** 5:12 8:8 30:10

**receives** 42:6 55:25

**receiving** 51:11

**recent** 30:9

**recitals** 24:8 25:3

**recollection** 13:3 45:21 54:10

**record** 6:5,6 7:3 11:12 24:10 49:18 53:6,16

**recording** 49:8 50:4 53:5,13

**recordings** 47:6,8 53:8

**records** 54:17 55:6

**refer** 24:22,25 29:13 45:13

**Referee** 5:6

**reference** 33:17 34:1 56:11

**referenced** 20:3 33:7

**references** 38:24

**referencing** 31:3

**referring** 17:17 23:8,9 57:15

**regardless** 14:13

**regards** 32:12,25

**regular** 48:17

**regulations** 48:19 56:24

**regulatory** 42:4

**related** 37:3

**relationship** 41:5 45:9 57:23

58:3

**remediation** 54:4,8

**remember** 28:4

**removed** 21:13

**repeat** 21:22 50:25

**rephrase** 23:21 31:18 32:23 39:5

**report** 58:11

**representations** 25:15

**representative** 6:15 45:17

**representatives** 45:13

**reprimand** 37:18 38:1,2

**request** 9:14 32:1 38:19 41:20

**requested** 31:8

**requesting** 31:10 33:19 43:19

**requests** 9:17,20

**require** 40:19 42:10 51:12

**required** 33:15 34:18,21 54:4

**requirements** 42:19

**reread** 9:25

**reserved** 5:8

**respect** 51:20

**respective** 5:5

**respond** 7:3

**responded** 9:19

**responding** 9:8,9,16,20

**response** 15:19 16:8,11,12 38:7,25

**result** 39:18

**retail** 12:9 52:25

**retain** 25:11

**return** 56:2

**reward** 43:22 44:9

**rewarded** 44:7

**RFI** 9:12

**RFI's** 9:9

**RFP** 9:12

**RFP's** 9:9

**right** 5:21 7:7 18:24 21:3 26:2 30:22,23 31:1 36:17 37:21 47:15, 20 48:4 56:24

**rights** 54:12

**room** 7:8

**rough** 15:1

**Rule** 5:23

**Rules** 5:23

**run** 6:20 11:9 19:16,19

**rundown** 7:17 9:6

---

**S**

**safe** 13:16

**said** 11:23 12:20 14:2 24:21,24 42:2 46:24 47:2,18 59:6

**same** 15:7 22:9 29:1,6,7 31:7 37:24 42:25 44:22 45:3 47:23 50:6 51:13

**sampling** 47:2,4

**save** 7:15 50:17

**say** 9:12 10:20 13:17 14:7,10 15:17 23:11 25:22,25 30:9 34:16, 23 36:17 37:4 40:21 41:12 42:8 43:25 47:23 49:24

**saying** 14:5 46:6

**says** 23:20 24:8 28:8,17 29:13 30:15,18 31:8 48:13 51:7,9 52:7 53:6 55:22

**school** 7:16,19

**scope** 8:10 38:7 39:11 40:1 44:14 53:18 55:8

**SCRA** 21:12

**screen** 20:8

**scrub** 21:12,13

**scrubs** 19:16,19

**search** 55:6

**second** 11:15

**section** 30:20 50:14 53:5 54:11 55:18 56:19 57:16

**secured** 33:6 58:24

**security** 19:11

**see** 24:7,19 27:17 28:6,7,8,17 29:10,14 30:18 32:3 38:24 48:6, 10,20 50:15 51:16,17 52:7 53:9 54:13 55:20 56:3 57:2

**seeing** 28:5 30:24,25

**seen** 10:7 17:17 20:1 53:24 58:7

**selection** 50:3

**seller** 20:19,21 21:1

**sellers** 9:10 14:12

**send** 17:25 18:18 33:12,20 42:22

**sends** 31:15 42:9

**sense** 17:20

**sent** 31:11 43:1

**sentence** 48:12,20 51:8 55:22 56:14

**series** 9:1

**server** 54:6

**service** 23:5 48:14

**services** 10:24 23:23 24:11 25:13 38:5 40:14 47:19 50:14 51:10,20

**servicing** 14:19 25:20

**set** 57:13

**settlement** 52:9,12

**Seven** 5:11

**seventeen** 10:14

**seventy** 15:25

**sever** 38:12 39:17 41:4

**severing** 57:17

**SFTP** 33:6

**shall** 48:10,13 51:12 53:6 56:24

**she** 17:5

**sheet** 59:1,2,3

**Sheridan** 24:14

**should** 16:2 34:2

**show** 33:20

**side** 48:9

**sign** 47:21 56:6,12,15 59:12

**signature** 47:22

**signed** 22:5

**similar** 40:6

**since** 36:3

**single** 45:1 53:16

**sit** 7:7 13:5 58:2

**site** 33:6

**situation** 16:1 49:10,13

**situational** 53:21

**sixty** 52:14

**snowing** 15:24

**social** 19:10

**software** 32:21

**sole** 56:25

**solely** 14:16

**Solutions** 29:11,16

**some** 6:21 7:15 11:10 12:9 31:2 37:24

**something** 43:4 51:6 52:14

**somewhere** 28:3

**sorry** 11:17 21:16,22 22:8 26:9, 15 27:14 37:20 52:22

**sound** 9:12 10:18

**speak** 11:12

**speaks** 40:17 54:20

**specialize** 13:7

**specializes** 12:23 14:3,7

**specific** 12:4 20:25 29:22 30:2,8 46:2,14,16,18,21 49:9

**specifically** 42:16 47:5

**speculate** 15:3,4,8,12,20 16:9

**speculating** 16:12

**speculation** 43:10

**spoke** 9:25

**staff** 26:24,25 27:7

**standard** 23:5

**standards** 52:9

**standpoint** 6:18

**stands** 38:23

**start** 30:1

**starts** 25:4

**state** 6:5 15:24 34:6 42:25 43:3,8 49:1

**stated** 6:4 12:22 25:15 32:13

**states** 56:21

**steps** 43:15 46:2 53:15 57:10,12

**stick** 8:13

**still** 42:25 45:9 55:5,12

**stipulated** 5:4

**stipulations** 5:1

**stop** 39:7

**stopped** 29:25

**strategy** 30:4

**strike** 20:16 21:16 29:9 30:14 43:6

**structure** 34:9

**stuff** 38:20

**subcontracting** 50:14

**subcontractor** 50:24 51:4,10, 19 52:3

**subcontractors** 51:5

**subject** 23:13 43:9 58:17

**substantially** 40:6

**successful** 44:10,12

**such** 15:16 25:13 43:4 51:13

**sued** 8:6 9:17 35:22 36:2,3,6 37:2,9,12 38:5

**Suite** 24:15,18

**sum** 34:17

**sure** 6:9 7:19 11:14,19 15:24 19:9 20:24 25:10 32:11 37:23 38:15 39:5 46:20 58:6

**sworn** 5:17

**synonymous** 13:23 14:6

**system** 19:1,4 20:11,13,22 21:2, 10 32:17,20 33:7 59:2

**Systems** 28:18,22,23

## T

**take**  6:22,25 9:5 46:2 48:16

**taken**  43:15 53:15

**taking**  7:12

**talked**  57:4

**talking**  23:13 34:24 38:16 46:19

**tasks**  9:6

**technical**  18:25

**Ted**  11:15

**Teddy**  8:13 15:19

**telecommunication**  12:6 27:3

**telephone**  18:3 48:15,22,24

**telephonically**  5:24

**tell**  7:13 17:18 51:24

**ten**  8:25 9:3 36:11

**term**  13:13,25 14:11 20:20 24:5 26:6

**terminate**  56:25 57:7,11

**terminated**  57:23

**termination**  56:1

**testified**  5:17

**testify**  8:14 15:16 16:6

**testifying**  9:21 10:14

**testimony**  11:7 14:9

**thing**  6:23 50:6

**things**  6:21 12:6 31:1

**think**  30:20 47:12 49:23 50:17

**third-parties**  18:2 32:9 37:5

**third-party**  18:8,13,18 21:4 32:7,18,24 37:10,14 39:8,9,16 40:5,10,14,22 41:9,20,24 42:9, 20,21 43:5,7,16,22 44:1,3,6,20 45:1 47:24 49:4 50:9,23 51:3 52:2 53:12,15 55:3,6,16 57:5,18, 23,25

**Thornwood**  5:15

**thousand**  15:1

**threatened**  45:17

**three**  30:24

**through**  5:12 9:5 10:4 11:9,20 21:13 28:5 33:4,6 46:13 49:7 57:10 59:1

**ties**  38:13 39:17 57:4,17

**time**  5:9 6:5 7:15,21 13:3 22:13 27:20 29:7 30:10 46:8,9 47:16 49:17 54:17

**times**  6:12,13,14 36:1,6

**timing**  21:4

**title**  50:14 52:7

**titled**  48:5 54:12 55:19 56:20

**today**  7:13 9:21,23 12:16 13:6 20:5 58:2

**together**  11:20

**top**  17:18

**topic**  8:11,14 38:15,24 39:4

**topics**  10:11,15

**total**  29:24 58:15

**Totally**  14:8

**touch**  19:3

**tough**  47:13

**towards**  38:22 48:8

**training**  35:18

**transcript**  5:7

**treat**  44:2

**trial**  5:9

**true**  14:3

**Trust**  58:14

**truth**  7:13

**twelve**  28:7

**twelve-seventeen**  28:17 29:14

**two**  6:13,14 9:3 11:16 36:11 53:8

**type**  10:23 12:7 31:22

**types**  12:4 27:2,4 52:20

**typically**  12:9 19:10 20:22

## U

**under**  7:8 15:25 25:2 35:11,22

36:6 37:2 51:10

**undergo**  50:3

**understand**  15:14 17:8,9 18:12 20:24 24:5 43:18 49:12

**understanding**  10:9 23:22 25:19

**understood**  8:16 15:22 39:3

**unilateral**  32:2

**union**  12:9

**University**  7:22

**unlawful**  55:4 57:6

**Unless**  43:3

**until**  5:9 7:2 46:9

**up**  46:9 47:3 49:4

**updated**  48:16

**upon**  16:24 17:6 18:22 29:1,6,20 30:8 33:13,23 35:10 39:24 40:23 45:17 49:20 51:14 52:20 57:1,17

**use**  26:20 32:18 39:23

**used**  30:8 47:24

**uses**  19:1

**using**  29:25 30:1 38:4

**utility**  12:5

## V

**validation**  42:17

**varies**  34:19 42:23

**variety**  12:2,24 13:8

**vary**  52:16

**versus**  6:2

**vice**  8:22,23 16:1 35:5 44:25

**violate**  39:23

**violates**  43:6,8

**violating**  37:10

**violations**  36:13

**virtue**  17:19 41:8

**volume**  44:23 49:2,7,19,21 50:6, 8

| | |
|---|---|
| **W** | **York** 5:16 24:15 |

### W

**wait** 7:1

**waive** 59:10

**waived** 5:6,7

**wanted** 20:20

**warranties** 25:15 51:14

**Washington** 6:2 17:4,12

**web** 33:6

**website** 12:11,13,16,22 13:3
58:24,25

**Weinberg** 6:2 23:12,22,25
24:16,25 25:22 26:8,9 27:16,23,
25 30:10 33:12,21,25 34:3,10,12,
14,16,18,20,21 43:25 44:3 45:9,
13,17 46:9 47:19 52:20 54:23
56:6,14 57:6,11 58:2,18

**Weinberg's** 46:3,11 54:17

**Well** 9:8 13:5,21 15:22 16:5 18:7,
24 23:1,17,20 30:24 37:22 38:23
40:19 43:14 50:2 51:7,22 59:1

**went** 7:16,19 30:1

**whole** 13:25 14:12

**wide** 12:2

**Williamsville** 24:15

**wishes** 25:11

**words** 9:13

**working** 36:11

**works** 6:17

**writing** 51:12

**written** 51:12 57:1,19

**wrong** 28:6 55:12

### X

**X-AMOUNT** 15:15

### Y

**year** 8:25 14:24 16:4,15

**years** 9:3 36:11 53:8

### Z

**ZZ** 28:18



EXHIBIT

A

11-1-19

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## TOLEDO DIVISION

ADIA A. WASHINGTON,

    Plaintiff,

v.

Case No. 3:18-cv-02008-JGC

WEINBERG MEDIATION GROUP, LLC
and JTM CAPITAL MANAGEMENT, LLC,

    Defendants.

## NOTICE OF DEPOSITION

To:   JTM CAPITAL MANAGEMENT, LLC
c/o Brendan H. Little
LIPPES MATHIAS WEXLER FRIEDMAN LLP
blittle @lippes.com

**PLEASE TAKE NOTICE** that pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, the undersigned will take the deposition by oral examination of certain designated

representatives of the following party on the date and time indicated below:

### JTM Capital Management, LLC ("JTM")

### November 1, 2019 at 10:00 a.m. CST

The deposition will take place telephonically from the offices of Sulaiman Law Group,

Ltd., 2500 South Highland Avenue, Lombard, IL 60148 on one end and a location of JTM's

choosing on the other end, currently believed to be 6400 Sheridan Drive, Suite 138, Williamsville,

New York. The deposition will be recorded by stenographic means and may also be recorded by

audio-visual means. The deposition will continue until completed. The deposition is being taken

Page 1 of 4

for the purpose of discovery, for use at trial, or for such other purposes as are permitted under the Federal Rules of Civil Procedure.

JTM is hereby notified of its duty, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, to designate one or more officers, directors, agents or other persons who will testify on its behalf and, for each person so designated, to set forth the matters upon which the person will testify. Plaintiff desires to examine JTM on the following matters:

1. In depth discussion regarding the allegations against JTM as set forth in Plaintiff's Complaint.

2. In depth discussion on the identity and duties of any third party service providers employed by JTM to assist in contacting or seeking payment from Plaintiff.

3. Claims and defenses of the parties, the parties' discovery requests and responses, and all documents disclosed, produced, or required to be produced by either party in connection with the case.

4. In depth discussion on all documentation methods, if any, whether computerized, manual, or other, of all activities undertaken by JTM or their employees surrounding its collection efforts against Plaintiff.

5. JTM's acquisition of the subject consumer debt.

6. In depth discussion of JTM's retention policies.

7. JTM's relationship with Weinberg Mediation Group, LLC as it pertains to Plaintiff.

8. In depth discussion on all documents produced to Plaintiff by JTM in the course of this case.

9. In depth discussion on all policy, procedure and training manuals, memoranda and other writings regarding collection activities of JTM which were in effect and used for a period of five (5) years prior to the date of this notice to the present, and phone billing records relating to Plaintiff's account.

10. In depth discussion on the procedures employed by JTM to comply with the Fair Debt Collection Practices Act.

11. The relationship between JTM and Plaintiff.

12. JTM's answer to Plaintiff's Complaint.

13. JTM's affirmative defense(s) as raised in its answer to Plaintiff's Complaint.

14. JTM's responses to Plaintiff's interrogatories.

15. JTM's response to Plaintiff's requests for production.

16. JTM's responses to Plaintiff's requests for admission.

17. All documents produced by JTM in this case.

Dated: September 19, 2019

> s/ Nathan C. Volheim
> Nathan C. Volheim, Esq. #66302103
> *Counsel for Plaintiff*
> Sulaiman Law Group, Ltd.
> 2500 South Highland Avenue, Suite 200
> Lombard, Illinois 60148
> (630) 575-8181 x110 (phone)
> (630) 575-8188 (fax)
> thatz@sulaimanlaw.com

## **CERTIFICATE OF SERVICE**

The undersigned, one of the attorneys for Plaintiff, certifies that on September 12, 2019, he caused a copy of the foregoing Notice of Deposition, to be served by electronic mail on JTM CAPITAL MANAGEMENT, LLC via its counsel as follows:

Gingo Palumbo Law Group LLC
Attn: Michael J. Palumbo
Attn: Anthony J. Gingo
Summit One
4700 Rockside Road, Suite 440
Independence, Ohio 44131
michael@gplawllc.com
anthony@gplawllc.com

Brendan H. Little
LIPPES MATHIAS WEXLER FRIEDMAN LLP
Email: blittle@lippes.com

*Counsel for Defendant*

s/Nathan C. Volheim



EXHIBIT

B

11-1-19

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## TOLEDO DIVISION

| | | |
|---|---|---|
| ADIA A. WASHINGTON | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.: 18-cv-02008 |
| | ) | |
| v. | ) | THE HONORABLE |
| | ) | JAMES G. CARR |
| WEINBERG MEDIATION GROUP, LLC | ) | UNITED STATES DISTRICT JUDGE |
| JTM CAPITAL MANAGEMENT, LLC | ) | |
| | ) | THE HONORABLE |
| Defendants. | ) | JAMES R. KNEPP, II |
| | ) | UNITED STATES MAGISTRATE JUDGE |

## DEFENDANT JTM CAPITAL MANAGEMENT, LLC'S
## RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSION

Pursuant to Fed. R. Civ. P. 36, Defendant JTM Capital Management, LLC serves these

Responses to Plaintiff's Requests for Admission as follows:

### RESPONSES

1.    Admit that You are in the business of using the mail system to collect consumer debts originally owed to others.

**ANSWER:**    Denied.


2.    Admit that You are a business whose principal purpose is the collection of debts.

**ANSWER:**    Denied.


3.    Admit that You are a debt collector as defined by the Fair Debt Collection Practices Act ("FDCPA").

**ANSWER:**    Denied.


4.    Admit that You caused the Collection Letter discussed in Plaintiff's complaint to be sent to Plaintiff.

**ANSWER:**    Denied.

5.    Admit that the Collection Letter sent to Plaintiff is a form letter that is substantially similar regardless of the consumer to whom it is sent, save for the demographic and individual account(s) information reflected in the collection letter.

**ANSWER:**    Defendant lacks knowledge as to this Request because it was not the author of the letter referenced in the Complaint. Accordingly, Defendant denies this Request.

6.    Admit that You were not the creator of the obligation which resulted in the creation of the subject debt.

**ANSWER:**    Admitted.

7.    Admit that You had oversight or otherwise controlled the nature of the information contained in the Collection Letters.

**ANSWER:**    Denied.

8.    Admit that You attempted to collect the subject debt from Plaintiff through Weinberg Mediation Group, LLC.

**ANSWER:**    Denied.

Dated: August 13, 2019

Respectfully submitted by:

*s/ Michael J. Palumbo*

Michael J. Palumbo, Esquire
Ohio Attorney Registration #0081718
Anthony J. Gingo, Esquire
Ohio Attorney Registration #0085669
Gingo Palumbo Law Group LLC
Summit One
4700 Rockside Road, Suite 440
Independence, Ohio 44131
Telephone: (216) 503-9512
Facsimile: (888) 827-0855
E-Mails:      michael@gplawllc.com
              anthony@gplawllc.com

*Counsel for JTM Capital Management, LLC*

## CERTIFICATE OF SERVICE

I, Michael J. Palumbo, one of the attorneys for Defendant, JTM Capital Management, LLC, do certify that a true and accurate copy of Defendant JTM Capital Management, LLC's Responses and Objections to Plaintiff's Requests for Admission was served on August 13, 2019 via email United States regular mail, postage prepaid, upon the following:

Nathan C. Volheim, Esquire
Sulaiman Law Group, Ltd.
2500 South Highland Ave., Suite 200
Lombard, IL 60148
*Counsel for Plaintiff*

*s/ Michael J. Palumbo*

Michael J. Palumbo, Esquire
Anthony J. Gingo, Esquire
*Counsel for JTM Capital Management, LLC*



## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## TOLEDO DIVISION

| | |
|---|---|
| ADIA A. WASHINGTON | ) |
| | ) |
| Plaintiff, | ) CASE NO.: 18-cv-02008 |
| | ) |
| v. | ) THE HONORABLE |
| | ) JAMES G. CARR |
| WEINBERG MEDIATION GROUP, LLC | ) UNITED STATES DISTRICT JUDGE |
| JTM CAPITAL MANAGEMENT, LLC | ) |
| | ) THE HONORABLE |
| Defendants. | ) JAMES R. KNEPP, II |
| | ) UNITED STATES MAGISTRATE JUDGE |

## DEFENDANT JTM CAPITAL MANAGEMENT, LLC'S
## RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant JTM Capital Management, LLC ("JTM") for its response to Plaintiff's

Interrogatories herein, alleges upon information and/or knowledge and/or belief:

### RESPONSES

Defendant is required to provide a written response to the following interrogatories:

1.      State the name, address and title of each and every party or individual providing
any information or documents with respect to the answers to these Interrogatories, Requests to
Produce, and Requests to Admit.

**Response:**      Michael Hyla, Vice President of Compliance, may have assisted in

responding to the subject Interrogatories.

2.      Please identify by name, case number, and jurisdiction, any and all cases where
Defendant has been found to have violated and/or has been alleged to have violated the Fair Debt
Collection Practices Act ("FDCPA") or where Defendant settled an FDCPA violation or alleged
violation by way of payment of any United States currency. This question relates to any such
actions taken within five (5) years of the date of the filing of the underlying lawsuit.

**Response:**      Defendant objects to this Interrogatory as it seeks information outside the

allegations of the Complaint and not related to the proportional needs of the case. Specifically,

the Fair Debt Collection Practices Act is a strict liability statute and whether Defendant has been named in prior litigation has no bearing on whether Defendant violated the Fair Debt Collection Practices Act herein. *See* <u>Stanecki v. Turning Point Capital, Inc.</u>, 2013 WL 1966917 (D. Co. May 13, 2013). In addition, this Interrogatory is overly broad as to time. Finally, the information requested is confidential that would preclude Defendant from discussing same.

3.   State the name, address, title, and job description of each of Your employee(s) who had oversight of or otherwise controlled the creation of the Collection Letter(s) sent to Plaintiff.

   **Response:**   Defendant has never sent any written communication to Plaintiff.

4.   State the name, address, title, and job description of each individual who authorizes or approves the content, nature, and/or structure of the Collection Letter(s) sent in connection with debts said to be owed to You.

   **Response:**   Defendant has never sent any written communication to Plaintiff. Defendant does not send written communication to consumers.

5.   Identify the nature of Your role in creating or otherwise controlling the information contained in the Collection Letter(s) sent to Plaintiff.

   **Response:**   Defendant has never sent any written communication to Plaintiff.

6.   Identify the nature of Your role as it relates to sending of the Collection Letter(s) to Plaintiff.

   **Response:**   Defendant has never sent any written communication to Plaintiff.

7.   Please state the number of Collection Letters You have sent, caused to be sent, or have otherwise directed a third party to send in connection with account(s) owed to you, to any accounts that You own, service, or upon which You were collecting or attempting to collect a debt, during the relevant time period.

   **Response:**   Defendant does not send letters to consumers.

8.     Please state in detail the transactions and/or any and all agreements relating to Your acquisition of the rights to collect upon the subject debt.

**Response:**     Defendant acquired the subject debt from Total Card on or about May 18,

2017.


9.     Please list any and all agreements, assignments, and/or insurance policies that You have in place either to indemnify/insure or be indemnified/insured for Your activities relating to Plaintiff, including but not limited to all agreements by and between You and any third parties relating to the instant matter.

**Response:**     Defendant does not have insurance coverage for allegations in the

Complaint.


10.     Identify any system, computer software, application, or other form of technology used by You or any third parties to generate the Collection Letters sent to Plaintiff.

**Response:**     Defendant has never sent written communication to Plaintiff.


11.     To the extent not previously done, identify all documents relevant, related to, or reflecting any aspect of any efforts undertaken by You to collect any debt(s) from Plaintiff, or to any debt(s) purportedly owed by Plaintiff to You.

**Response:**     Defendant has not taken any steps to collect on the subject debt from

Plaintiff.


12.     Identify the nature of Your relationship to co-defendant Weinberg Mediation Group, LLC.

**Response:**     Defendant contracted with third party Weinberg Mediation Group, LLC

for the collection debts.


13.     State the name, title or position, address and phone number of each and every witness that Defendant plans to call to testify at trial in this case and state the substance of the testimony expected from each witness.

**Response:**     At this juncture, Defendant is unsure who it will call as a witness at trial.

Defendant reserves the right to supplement this response.

14.  Explain the basis for any claim that any violation alleged in the complaint was unintentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid such error. Identify what procedures are maintained and how they are adapted to avoid the matters complained of.

**Response:**  Defendant withdraws its affirmative defense related to bona fide error.


15.  Identify the individuals working for co-defendant Weinberg Mediation Group, LLC that You have dealt with or spoken with in connection with Your utilization of Weinberg Mediation Group, LLC to collect upon debts owed to You.

**Response:**  Defendant has spoken with Jerry VerHagen, the owner of Weinberg Mediation Group, LLC.


16.  Identify how long You have used Weinberg Mediation Group, LLC's debt collection services.

**Response:**  Upon information and belief, Defendant first contracted with third party Weinberg Mediation Group, LLC in or about October 2016. On or about January 20, 2019, Defendant ceased conducting business with Weinberg Mediation Group, LLC.


Dated: August 13, 2019

Respectfully submitted by:

*s/ Michael J. Palumbo*

Michael J. Palumbo, Esquire
Ohio Attorney Registration #0081718
Anthony J. Gingo, Esquire
Ohio Attorney Registration #0085669
Gingo Palumbo Law Group LLC
Summit One
4700 Rockside Road, Suite 440
Independence, Ohio 44131
Telephone: (216) 503-9512
Facsimile: (888) 827-0855
E-Mails:     michael@gplawllc.com
             anthony@gplawllc.com

*Counsel for JTM Capital Management, LLC*

4

## CERTIFICATE OF SERVICE

I, Michael J. Palumbo, one of the attorneys for Defendant, JTM Capital Management, LLC, do certify that a true and accurate copy of Defendant JTM Capital Management, LLC's Responses and Objections to Plaintiff's Interrogatories was served on August 13, 2019 via email United States regular mail, postage prepaid, upon the following:

Nathan C. Volheim, Esquire
Sulaiman Law Group, Ltd.
2500 South Highland Ave., Suite 200
Lombard, IL 60148
*Counsel for Plaintiff*

*s/ Michael J. Palumbo*

Michael J. Palumbo, Esquire
Anthony J. Gingo, Esquire
*Counsel for JTM Capital Management, LLC*



## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## TOLEDO DIVISION

| | | |
|---|---|---|
| ADIA A. WASHINGTON | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.: 18-cv-02008 |
| | ) | |
| v. | ) | THE HONORABLE |
| | ) | JAMES G. CARR |
| WEINBERG MEDIATION GROUP, LLC | ) | UNITED STATES DISTRICT JUDGE |
| JTM CAPITAL MANAGEMENT, LLC | ) | |
| | ) | THE HONORABLE |
| Defendants. | ) | JAMES R. KNEPP, II |
| | ) | UNITED STATES MAGISTRATE JUDGE |

## DEFENDANT JTM CAPITAL MANAGEMENT, LLC'S
## RESPONSE TO PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant JTM Capital Management, LLC ("JTM"), by and through its attorneys, Gingo

Palumbo Law Group LLC, for its response to Plaintiff's Request for Production of Documents

herein, alleges upon information and/or knowledge and/or belief.

## RESPONSES

1. Any and all documents (including electronically stored information ("ESI") and tangible things relating to the claims or defenses in this action.

**Response:** Please see Defendant's Account Notes and information provided to

Defendant from the original creditor.

2. Any and all documents (including ESI) and tangible things required to be disclosed pursuant to Federal Rule of Civil Procedure 26(a)(1)(A).

**Response:** Defendant objects to this Request as Rule 26 does not obligate Defendant

to produce any information. Notwithstanding and without waiver of the foregoing, see the

response to Number 1 above.

3.    Any and all records concerning Plaintiff.

**Response:**    Please see the response to Number 1 above.


4.    All of Your account notes regarding Plaintiff.

**Response:**    Please see the response to Number 1 above.


5.    Any written correspondence(s) mailed by You or at Your direction, including email, to Plaintiff during the relevant time period.

**Response:**    Defendant is not in possession of any documents responsive to this Request.


6.    All documents regarding how You or your agents determine the layout of the Collection Letters sent to Plaintiff.

**Response:**    Given that Defendant does not send written communication to consumers, Defendant is not in possession of any documents responsive to this Request.


7.    All manuals, memoranda, instructions, and other documents that discuss, describe, or set forth standards, criteria, guidelines, policies, or practices relating to compliance with the Fair Debt Collection Practices Act ("FDCPA").

**Response:**    Given that Defendant is not subject to the Fair Debt Collection Practices Act, Defendant is not in possession of any documents responsive to this Request.


8.    Copies of each and every exhibit, known at this time, that You will seek to introduce into evidence at trial.

**Response:**    At this juncture, Defendant is unsure what documents it will mark as an exhibit at trial. Defendant reserves the right to supplement this response.


9.    Please provide all documents relating to the technology employed by You or any third parties as it relates to the sending of the Collection Letter(s) to Plaintiff.

**Response:** Given that Defendant does not send written communication to consumers, Defendant is not in possession of any documents responsive to this Request.

10. Please provide You internal procedures or manual(s) relating to Your debt collection activities.

**Response:** Given that Defendant does not attempt to collect debts, Defendant is not in possession of any documents responsive to this Request.

11. Any and all documents and communications by and between You and Mid America Bank and Trust relating to Plaintiff's account(s), including but not limited to any and all documents demonstrating Your purported purchase of the subject debt from Mid America Bank and Trust.

**Response:** Please see the response to Number 1 above.

12. Any and all agreements, assignments, and/or insurance policies that You have in place either to indemnify/insure or be indemnify/insured for Your activities relating to Plaintiff, including but not limited to all agreements between You and any other third parties as it relates to this matter.

**Response:** Defendant is not in possession of any documents responsive to this Request.

13. Any and all communications by and between You and Weinberg Mediation Group, LLC relating to Plaintiff's account(s), including but not limited to any original and/or current agreement to utilize Weinberg's services in connection with the collection of Plaintiff's debt.

**Response:** Defendant objects to this Request as it seeks information outside the allegations of the Complaint and not related to the proportional needs of the case. Specifically, the Fair Debt Collection Practices Act is a strict liability statute and its contract with Weinberg Mediation Group, LLC has no bearing on whether Defendant violated the Fair Debt Collection Practices Act herein. Notwithstanding and without waiver of same, please the agreement between Defendant and Weinberg Mediation Group, LLC.

14.    Any and all documents pertaining to Your policies and procedures as to collecting past due accounts, including any attempts to collect debts, collection of monies and/or debts and/or past due accounts.

**Response:**    Given that Defendant does not collect on accounts, Defendant is not in possession of any documents responsive to this Request.

15.    All documents You sent, or caused to be sent, to Plaintiff after this instant case was filed.

**Response:**    Defendant is not in possession of any documents responsive to this Request.

16.    Your internal servicing notes or similar documents regarding Your or any third party's efforts to collect upon the subject debt.

**Response:**    See the response to Number 1 above.

17.    All judgments against You for violations of the FDCPA.

**Response:**    Defendant objects to this Request as it seeks information outside the allegations of the Complaint and not related to the proportional needs of the case. Specifically, the Fair Debt Collection Practices Act is a strict liability statute and whether a judgment or order has determined that Defendant violated the Fair Debt Collection Practices on a prior occasion has no bearing on whether Defendant violated the Fair Debt Collection Practices Act herein. Notwithstanding and without waiver of same, Defendant is not in possession of any documents responsive to this Request.

18.    Any contracts or agreements between You and any third parties addressing the creation of the collection letters sent to Plaintiff.

**Response:**    Defendant is not in possession of any documents responsive to this Request.

4

Dated: August 13, 2019

Respectfully submitted by:

*s/ Michael J. Palumbo*

Michael J. Palumbo, Esquire
Ohio Attorney Registration #0081718
Anthony J. Gingo, Esquire
Ohio Attorney Registration #0085669
Gingo Palumbo Law Group LLC
Summit One
4700 Rockside Road, Suite 440
Independence, Ohio 44131
Telephone: (216) 503-9512
Facsimile: (888) 827-0855
E-Mails:     michael@gplawllc.com
             anthony@gplawllc.com

*Counsel for JTM Capital Management, LLC*

## CERTIFICATE OF SERVICE

I, Michael J. Palumbo, one of the attorneys for Defendant, JTM Capital Management, LLC, do certify that a true and accurate copy of Defendant JTM Capital Management, LLC's Responses and Objections to Plaintiff's Requests for Production was served on August 13, 2019 via email United States regular mail, postage prepaid, upon the following:

Nathan C. Volheim, Esquire
Sulaiman Law Group, Ltd.
2500 South Highland Ave., Suite 200
Lombard, IL 60148
*Counsel for Plaintiff*

*s/ Michael J. Palumbo*

Michael J. Palumbo, Esquire
Anthony J. Gingo, Esquire
*Counsel for JTM Capital Management, LLC*


EXHIBIT

E

11-1-19

## COLLECTION SERVICES AGREEMENT

This Collection Services Agreement ("Agreement") is made effective as of __July 7__, 20_17_ ("Effective Date") by and among JTM Capital Management, a Delaware limited liability company with an address at 6400 Sheridan Dr., Ste. 138, Williamsville, NY 14221 (the "Company") and _Weinberg Mediation Group_ a _Limited Liability Co._, with an address at _6000 N. Bailey Ave Suite 1C_ ("Agency").

### Recitals

**WHEREAS**, the Agency is engaged in the business of debt collection wherein it assists its customers in the collection and administration of non-performing accounts receivable; and

**WHEREAS**, the Company wishes to retain the Agency to collect debt on certain accounts and the Agency is desirous of providing such services.

**NOW THEREFORE**, in consideration of the premises, mutual covenants, conditions, representations and warranties stated below, the Company and the Agency hereby agree as follows:

### ARTICLE 1
### DEFINITIONS

When used herein with initial caps (whether in the singular or in the plural), the following terms shall have the meanings ascribed to them in this Article 1.

"Account" shall have the meaning ascribed to it in Section 2.1 hereof.

"Account Records" shall mean all documents and other information pertaining to an Account, whether electronic or hardcopy and regardless of origin, including, without limitation, correspondence, pleadings, credit bureau reports (CBRs), collection note lines and instructions, payment arrangements and banking information.

"Agency" shall have the meaning ascribed to it in the preamble hereof.

"Agreement" shall have the meaning ascribed to it in the preamble hereof.

"Applicable Laws" shall have the meaning ascribed to it in Section 2.8.1 hereof.

"Balance" shall mean the principal amount of the debt owed by a Consumer, plus interest, attorneys' fees and all other fees and costs allowed by Applicable Law, minus the sum of any credits attributable to the debt.

"Blanket Settlement Standards" shall have the meaning ascribed to it in Section 2.6 hereof.

"Collected Funds" shall have the meaning ascribed to it in Section 3.3.1 hereof.

"Collection Fee" shall have the meaning ascribed to it in Section 3.1 hereof.

"Company" shall have the meaning ascribed to it in the preamble hereof.

"Company Policies" shall have the meaning ascribed to it in Section 2.8.1 hereof.

"Company Questionnaires" shall have the meaning ascribed to it in Section 5.1.4 hereof.

"Compliance Regulations" shall have the meaning ascribed to it in Section 2.8.1 hereof.

"Confidential Information" shall have the meaning ascribed to it in Section 2.8.2(a) hereof.

"Consumer" shall mean any person legally responsible for payment of the Balance of an Account.

"Damages" shall have the meaning ascribed to it in Section 6.1.1 hereof.

"Due Date" shall have the meaning ascribed to it in Section 3.3.1 hereof.

"Effective Date" shall have the meaning ascribed to it in the preamble hereof.

"Nonpublic Personal Information" shall have the meaning ascribed to it in Section 2.8.2(d) hereof.

"Paying Account" shall mean an Account serviced by the Agency pursuant to which the Agency has entered into a payment arrangement with the underlying Consumer of such Account, which original payment arrangement is not past due by more than ten (10) days.

"Placement Confirmation" shall have the meaning ascribed to it in Section 2.1 hereof.

"Privacy Acts" shall have the meaning ascribed to it in Section 2.8.2(d) hereof.

"Protected Information" shall have the meaning ascribed to it in Section 7.6 hereof.

"Recall Event" shall have the meaning ascribed to it in Section 4.3 hereof.

"Remittances" shall have the meaning ascribed to it in Section 3.3.1 hereof.

"Restricted Parties" shall have the meaning ascribed to it in Section 2.11 hereof.

2

"Services" shall have the meaning ascribed to it in Section 2.1 hereof.

"Subject Paying Accounts" shall have the meaning set forth in Section 4.3 hereof.

"Trust Account" shall have the meaning ascribed to it in Section 3.7 hereof.

## ARTICLE II
## MANAGEMENT OF ACCOUNTS

**2.1.** **Placement of Accounts.** The Company will, from time to time and in its sole and absolute discretion, offer to place with the Agency responsibility for collection of certain non-performing accounts receivable, including all professional, management, labor, accounting and general services necessary to exercise that responsibility, which services are further described, without limitation, in this Article II and all relevant Exhibits to this Agreement (collectively, the "Services"). The Agency may, in its sole and absolute discretion, accept the placement with respect to all or a portion of such accounts offered by the Company, the accepted accounts being referred to in this Agreement in the singular as "Account" and in the plural as "Accounts". The offer and acceptance of each portfolio of Accounts will be confirmed by a written addendum in the form attached hereto as Exhibit A ("Placement Confirmation").

**2.2.** **Records Evidencing Accounts.** To the extent in the Company's possession, custody or control, the Company will deliver to the Agency at the time of a confirmed placement of Accounts copies of all Account Records relating to the placed Accounts, including the Balance thereof. All Account Records shall remain the property of the Company.

**2.3.** **Duties of Agency.** Without limiting the generality of Section 2.1 hereof, the Agency's Services under this Agreement shall include the following:

**2.3.1.** **Collection of Accounts.** The Agency agrees to undertake the collection of such Accounts as the Company decides to place with the Agency for the purpose of collection and to use due diligence, best efforts and to employ such lawful means, methods and procedures; which, in its reasonable judgment, it believes will best effect the collection of such Accounts. The Agency shall continually service each Account placed by the Company, make a reasonable number of telephone calls, seek updated consumer location and contact information and attempt regular contact with consumers to effectuate collection (in compliance with all Compliance Regulations). In the event the Agency has exhausted all efforts at locating a Consumer or collecting an Account or determines that an Account is uncollectable, it shall immediately notify the Company in writing and return such Account to the Company. The Agency shall be solely responsible for collection and posting of all payments, and responding to inquiries from Consumers unless otherwise agreed to by the Company in writing.

3

**2.3.2. Record Keeping.** The Agency shall maintain detailed records with respect to each Account stating the status of such Account and the amount and application of any funds received with respect to such Account, or other realization upon such Account, and shall retain complete notes and documentation of all collection efforts and activities with respect to each Account serviced by the Agency.

**2.4. Collection Standards.**

**2.4.1. Collection Standards.** The Agency shall perform the Services with respect to each Account in accordance with the degree of skill, prudence and attention that is customary and usual for institutions which regularly provide Services for companies of comparable non-performing accounts.

**2.4.2. No Subcontracting of Services.** The Agency is prohibited from engaging any subcontractors to perform any Services under this Agreement without the Company's prior written consent. In the event that the Agency engages a subcontractor to perform any of the Services under this Agreement, after receiving the Company's prior written consent, the Agency shall require in writing that such other person or entity to abide by the same conditions, obligations and warranties imposed upon and assumed by the Agency in this Agreement, without limitation. The Company shall not be obligated in any way to any such subcontractor. The Agency shall indemnify the Company in accordance with Section 6.1 below for any actions of any approved subcontractor that causes any claim or damage to the Company.

**2.4.3. Proper Identification of Company.** The Agency shall identify the current creditor of each Account on each written and verbal communication with the Consumer or the Consumer's authorized representative in accordance with the Compliance Regulations.

**2.5. Power and Authority.** The Agency is hereby granted the full power and authority to perform the Services for and on behalf of the Company as contemplated herein and, without limiting the generality of the foregoing, is authorized and empowered to (a) make all communications with Consumers relating to Accounts on behalf of the Company relating to the Services provided hereunder; or (b) endorse checks and other instruments of payment with respect to the Accounts on behalf of the Company; provided, however, that the authority granted above shall not be exercised unless consistent with Section 2.6 hereof.

**2.6. Settlement Authority.** The Company shall establish blanket settlement standards ("Blanket Settlement Standards") for the Accounts placed with the Agency hereunder, which shall be set forth in the Placement Confirmation with respect to the Accounts. The Agency may settle any Account for an amount equal to or greater than the Blanket Settlement Standard for such Account provided such payment is received within sixty (60) calendar days of any settlement agreement with the Consumer. The negotiation or acceptance of a settlement payment

4

beyond the sixty (60) day period or a settlement amount less than the Blanket Settlement Standards may only be authorized in writing by the Company.

**2.7.** **Litigation.** The Agency shall not be permitted to threaten any legal action or commence any legal action to collect any Account, without the Company's prior written consent.

**2.8.** **Compliance; Privacy Matters.**

**2.8.1.** The Agency shall perform all of its obligations under this Agreement in compliance in all material respects with (i) all Company policies and procedures that are made available to the Company, including, without limitation, the Company's IT and Security Requirements set forth on Exhibit B hereto, and the Company's Third Party Agency Manual, all as may be amended or supplemented from time to time (collectively, "Company Policies"); (ii) all applicable laws, all as may be amended or supplemented from time to time, including, without limitation, the Federal Fair Debt Collection Practices Act (FDCPA), the Fair Credit Reporting Act (FCRA), the Telephone Consumer Protection Act (TCPA), the Dodd-Frank Act and any rules and guidelines established by the Consumer Financial Protection Bureau; the United States Bankruptcy Code, and all other federal, state, and local laws, rules and regulations governing debt collection practices and procedures (collectively, "Applicable Laws"); and (iii) ACA International's, the Association of Credit and Collection Professionals, Code of Conduct, as may be amended or supplemented from time to time ("ACA Code of Conduct", and together with the Company Policies and Applicable Laws, collectively, "Compliance Regulations"). In the event of a discrepancy between this Agreement and any Company Policy, this Agreement shall prevail. The Agency shall not, under any circumstances, use any threats, intimidation, or harassment, in the collection of Accounts or violate any guidelines established by the Federal Trade Commission, Consumer Financial Protection Bureau or any Compliance Regulations. Throughout the term of this Agreement, the Agency shall maintain a compliance management system that includes, without limitation, the guidelines set forth in the Company Policies and all Compliance Regulations. Such compliance management system shall be in writing and provided to the Company upon the Company's request.

**2.8.2.** The use and disclosure of Confidential Information in the Agency's possession in will be subject to the following terms and conditions.

**(a)** As used herein, the term "Confidential Information" shall mean and include (i) the contents of this Agreement; (ii) all trade secrets and other information learned in the course of performance by the Agency of its obligations under this Agreement; (iii) any information or data which is disclosed by the Company to the Agency under or in contemplation of this Agreement, including, without limitation, information, concerning Consumers and their

5

JTM0005

respective Accounts; and (iv) the costs of Accounts, the costs of collection of Accounts, and all liquidation and other performance data, whether developed by the Company or the Agency. Notwithstanding the foregoing, Confidential Information shall not include information, which (i) is already known to the Agency when received; (ii) is obtained by the Agency from another source having a legal right to disclose that information without restrictions; or (iii) thereafter becomes publicly available other than as a result of an unauthorized disclosure by the Agency. Confidential Information shall not be deemed to be within the foregoing exceptions merely because it is (a) specific and embraced by more general information generally available to the public; or (b) a combination which can be pieced together to reconstruct the Confidential Information from multiple sources, none of which shows the whole combination, its principle of operation and method of use.

        **(b)**     The Agency shall, and shall contractually require its respective employees, agents and permitted subcontractors, to use Confidential Information only for the purposes contemplated by this Agreement. Except to the extent necessary to enable the Agency's vendors to perform services in connection with this Agreement, or as may be authorized by the Company in writing, or required by law, regulation or court order, the Agency shall not disclose Confidential Information to any third party. With respect to disclosures required by law, regulation or court order, the Agency shall (i) use its best efforts to provide the Company with sufficient time to take legal action to prevent the disclosure; and (ii) shall limit the disclosure to only that information the Agency's legal counsel advises must be disclosed. Upon the termination or expiration of this Agreement or at the Company's request, any media (electronic or physical) provided by the Company and containing Confidential Information shall be promptly returned to the Company and any electronic or physical media created by the Agency that includes Confidential Information shall be destroyed (and such destruction certified to the Company).

        **(c)**     The Agency acknowledges that Confidential Information constitutes proprietary information and trade secrets of the Company and monetary damages alone may be insufficient to protect and compensate the Company for wrongful disclosure of its Confidential Information. The Company is accordingly entitled to equitable relief, including, without limitation, injunctive relief, in addition to any other remedies to which it may be entitled, to enforce the provisions of this Section. The Agency shall promptly advise the Company in writing of any misappropriation, or unauthorized disclosure or use of Confidential Information that may come to its attention and shall take all steps reasonably requested by the Company to limit, stop or otherwise remedy such misappropriation, or unauthorized disclosure or use.

        **(d)**     The Agency shall take appropriate security measures to protect Consumer nonpublic personal information as described in Title V of the Gramm-Leach Bliley Act of 1999 and the rules and regulations thereunder, and all similar information that may be protected by corresponding applicable state or local privacy statutes and regulations ("Nonpublic Personal Information"), all as may be amended or supplemented from time to time ("Privacy Acts") against accidental or unlawful destruction and unauthorized access, tampering, and copying

6

during use, transmission, and/or storage in the Agency's computing or paper environments. During the term of the Agreement, the Agency shall collect and use Nonpublic Personal Information only to exercise its rights and perform its obligations in accordance with this Agreement. The Agency shall not retain such Nonpublic Personal Information unless it is legally required to do so or has a specific business purpose to retain it directly related to this Agreement. The Agency represents and warrants that it currently has of the date hereof, and will continue to have for so long as it retains Nonpublic Personal Information, adequate administrative, technical, and physical safeguards (i) to ensure the security and confidentiality of Nonpublic Personal Information; (ii) to protect against any anticipated threats or hazards to the security or integrity of such Nonpublic Personal Information; and (iii) to protect against unauthorized access to or use of such Nonpublic Personal Information which could result in substantial harm or inconvenience to any Consumer. The Agency shall immediately notify the Company when the Agency discovers there has been a material breach in its security safeguards required by this Section or if the security of Nonpublic Personal Information has been compromised for any reason. The Agency shall take appropriate actions to address incidents of unauthorized access to or use of Nonpublic Personal Information provided by the Company to enable the Company to expeditiously implement its response program, and the Company may take all reasonable and appropriate steps to protect such Nonpublic Personal Information in such event. The Agency shall at all times during the term of the Agreement and for at least two (2) years after the termination thereof, keep proper books and records of account, and shall maintain records and information sufficient to show its compliance with the terms of this Section.

**2.8.3. Prohibition on Charging Fees on Payments.** The Agency shall not charge a Consumer on an Account placed under this Agreement any type of fee in connection with making a payment on the Account.

**2.8.4. Call Recordings.** The Agency shall record 100% of calls with Consumers and preserve the call recordings for a minimum of two (2) years following closure of the Account at the Agency. Upon request, the Agency shall produce and any all call recordings requested by the Company, which shall be searchable by date/time, Account, telephone number dialed or caller ID of inbound call and employee of the Agency.

**2.8.5. Written Communications; Scripts.** All written communications and call scripts utilized by the Agency and intended for Consumers shall be submitted to the Company for approval prior to use.

**2.8.6. Complaints.**

(a)     The Agency shall use its best efforts to minimize complaints concerning the Accounts and shall register with the CFPB Consumer Complaint Portal on the Effective Date. The Agency shall notify the Company via ComplyArm and separately in writing of all oral and written complaints received on the Accounts, whether from a Consumer, via the CFPB

7

JTM0007

Consumer Complaint Portal, a governmental or consumer protection agency, an attorney, or any other third party, within one (1) business day of the Agency's receipt of such complaint. Such written notifications shall include:

- Method of receipt (verbal, written, etc.)
- Consumer name
- Company Account number
- Portfolio identification
- Nature of complaint
- Copy of all correspondences regarding the complaint

**(b)** The Agency shall investigate and submit an investigative report to the Company within three (3) business days of receipt of a complaint. The Agency shall immediately suspend all collection activity on the underlying Account and no response to any such complaint or further collection activity shall be made without the Company's prior written approval.

**2.8.7. Automatic Dialers.** The Agency shall not call a Consumer's cellular phone number on any Account utilizing an automatic telephone dialing system as defined in the Telephone Consumer Protection Act 47 U.S.C. § 227, unless specifically authorized pursuant to Company Policy.

**2.8.8. Credit Bureau Reporting.** The Agency shall not report any Accounts to any credit bureau agency without the Company's prior written consent.

**2.8.9. Licenses.** The Agency shall be authorized and licensed in all states and localities where required by law to perform all collection and servicing activities with respect to Accounts placed with the Agency. Upon the Company's request the Agency shall submit copies of all such licenses along with a matrix indicating license numbers and expiration dates. The Agency shall be required to advise the Company in writing of any memorandums of understanding, assurances of discontinuance or other agreements with any regulatory authority within ten (10) days of the date thereof and shall deliver to the Company copies thereof upon the Company's request.

## 2.9. **Insurance.**

**2.9.1.** During the term of this Agreement and for a period of three (3) years following termination of this Agreement, the Agency shall maintain with a licensed and reputable business entity an Errors & Omissions liability insurance policy, in the minimum amount of $1,000,000 for each occurrence and $2,000,000 as an annual aggregate, which shall identify the Company as a named insured or beneficiary of such policy. The Agency shall ensure that the Company receives a copy of said certificate showing coverage limitations and expiration date (and any renewal or extension thereof) upon the Company's request and shall ensure that the Company receives advance written notice from the insurance carrier or underwriter no later than thirty (30)

8

JTM0008

days prior to any material alterations to or cancellation of such policy. The Agency hereby assigns the Agency's right to all insurance proceeds to the Company to the extent that Company suffers damages hereunder and the Agency agrees that the insurance company may pay proceeds directly to the Company. The Agency hereby gives the Company an irrevocable power of attorney to file a proof of loss and anything else necessary to obtain insurance proceeds in the Agency's name.

**2.9.2.** In addition to the above, the Agency will maintain and provide to the Company on an annual basis or upon demand by the Company, proof, as appropriate, of the following additional measures to ensure its financial stability:

(a) General liability insurance coverage in an amount not less than $1,000,000 for each occurrence and $2,000,000 as an annual aggregate. The Company will be listed as an additional insured on such insurance policy.

(b) Statutory workers' compensation covering all state and local requirements.

(c) State bonding and licensing as required by law.

**2.10.** **Rights of Inspection.** At any time and from time to time, the Agency shall permit the Company or its designated representatives, (i) to examine or make copies or abstracts from all books, records and documents in any way relating to any Account or the Agency's collection activities with respect thereto; (ii) to visit the offices and properties of the Agency for purposes of examining such materials or the Agency's procedures, processes and activities relating to the exercise of its duties hereunder; and (iii) to discuss matters relating to Accounts or the servicing, collection or liquidation thereof or the performance by the Agency with respect thereto with any officers or employees having knowledge of any such matters. The Agency shall provide the Company, its employees, representatives and agents with access to the Company's operational systems, including, without limitation, immediate, unlimited, unrestricted and unfettered remote electronic access to the Accounts and the Agency's collection systems in order for the Company to audit the Agency's compliance with the Agency's obligations pursuant to this Agreement. The Agency understands and acknowledges that the Agency shall not be permitted to claim the Company's rights pursuant to this Section 2.10 as a defense to any claim raised by the Company with regard to the Agency's performance of its obligations under this Agreement.

**2.11** **Non-circumvention.** The Agency agrees not to contact or initiate contact at any time and for any purpose, either directly or indirectly, with any person or business entity from which the Company purchases non-performing accounts receivables or for which the Company acts as the master servicer of non-performing accounts receivables, or any officers, directors, shareholders, members, consultants, attorneys, employees, agents or other affiliates of any of the foregoing (collectively, the "Restricted Parties") without the prior written consent of the Company, which consent may be given or withheld in the Company's sole discretion. The

9

JTM0009

Agency further agrees not to undertake any transaction or any series of transactions of any kind with any of the Restricted Parties without the prior written consent of the Company, which consent may be given or withheld the Company's sole discretion.

**2.12    Bond.** The Agency shall maintain in effect a contract bond securing the Agency's performance under this Agreement and shall provide the Company evidence thereof immediately upon the Company's request. The bond required by this Section 2.12 shall be in an amount not less than $100,000 in the aggregate and specifically identify the Company as the sole obligee (party to be paid) on the bond in the event of a claim. Any cancellation and/or expiration of the Agency's bond by the surety or otherwise shall constitute a breach of this Agreement.

**ARTICLE III**
**FEES**

**3.1.    Fees.** The Company shall pay the Agency a fee which shall be a percentage of gross collections net of payments that are ultimately reversed ("Collection Fee") as set forth in each Placement Confirmation.

**3.2.    Costs.** The Agency shall be responsible for all out-of-pocket costs associated with the collection of the Account Balances and the provision of the Services hereunder.

**3.3.    Remittance of Collected Funds.**

   **3.3.1.** One hundred percent (100%) of the gross payment amounts received in connection with the Accounts ("Collected Funds") minus the Collection Fees due to the Agency in regard to such Collected Funds ("Remittances") shall be due weekly by noon on Monday (or such other day as the Company shall specify to the Agency) ("Due Date") for the previous week's Collected Funds and shall be paid to the Company via wire transfer to a bank account (or accounts) specified by the Company to the Agency. All Remittances not received on the Due Date shall be subject to a 2.5% penalty of the past due amount until such amount is paid in full.

   **3.3.2.** The principals of the Agency hereby personally guaranty all of the Agency's obligations under this Agreement, including, without limitation, the full and prompt payment of all Remittances owed to the Company, pursuant to that certain Guaranty set forth on Exhibit C hereto.

**3.4.    Waiver/Refund of Fee.** No Collection Fee shall be charged to the Company or due from the Company (i) against any Collected Funds which the Agency has not tendered to the Company for any reason; (ii) after a termination of this Agreement (except as to payments collected prior to such termination); or (iii) on any recalled Accounts other than in regard to Subject Paying Accounts in accordance with Section 4.3 hereof. In the event of a Consumer's bankruptcy or other operation of law, the Company may be required or may elect in its exclusive judgment to refund

10

JTM0010

to the Consumer or the Consumer's representative certain payment(s) made to the Agency. Within ten (10) days of receipt of notification from the Company of any type of refund, the Company shall, in the Company's sole discretion, (i) set off any such refund against any Collection Fees due to the Agency hereunder; or (ii) direct the Agency to remit to the Company any Collection Fees related to such payment(s).

## 3.5. Reporting and Payment of Fees.

**3.5.1.** On a weekly basis every Monday the Agency shall submit a written report to the Company setting forth in reasonable detail all Collected Funds and accounting to the Company on all Accounts assigned to the Agency under this Agreement, which report shall include, without limitation, total Collected Funds from the previous week, total Collection Fees due and total Remittances to be paid, and such other information as may be requested by the Company.

**3.5.2.** On a monthly basis on or before the fifth (5ᵗʰ) business day of each month the Agency shall submit a report to Company setting forth in reasonable detail (i) total Collected Funds, Collection Fees and total Remittances paid for the prior month; (ii) a status report (reconciliation) setting forth the current balance and status of each Account placed with the Agency; (iii) a complaint and litigation log detailing all complaints received and litigation commenced or threatened, the status thereof and any material incidences involved therewith; (iv) the Agency's licensing log setting forth any updates, additions or deletions; and (v) such other information as may be requested by the Company.

**3.6.** **Authority to Endorse and Deposit Checks.** The Agency is authorized to endorse and deposit any instrument made payable to the Company or a prior Account owner/creditor that the Agency receives in connection with an Account, provided no termination event or Account return has previously occurred. The Agency shall not endorse the name of the Company or a prior Account owner/creditor to any check, draft, agreement, or document of any kind which waives any rights or releases a Consumer, unless such payment is consistent with the Blanket Settlement Standards or such other settlement as has been expressly approved in writing by the Company.

**3.7** **Accounts.** The Agency shall establish and maintain a trust account solely dedicated to the Company at a financial institution approved by the Company ("Trust Account"). The Company shall be named as a joint account holder and signatory to such Trust Account. All monies the Agency receives on Accounts shall be deposited into the Trust Account and no other monies except those collected on Accounts shall be deposited into the Trust Account. No monies shall be withdrawn from such Trust Account unless withdrawn in order to forward Remittances to the Company or to pay the Agency's fee after remittance to the Company has been made. The Company shall have full right and ability to access the Trust Account at any time, both remotely through the internet and in person, and shall also have the unilateral right to freeze the Trust Account and completely restrict the Agency's access thereto. The Agency shall provide the

11

Company with a complete, full and accurate accounting of all Trust Account immediately upon the Company's request.

## ARTICLE IV
## ACCOUNT RECALL AND RETURN

**4.1.**   **Recall.** The Agency acknowledges that all Accounts are the property of the Company and the Company retains the right to recall any Account at any time for any reason.

**4.2.**   **Return.** In addition to Section 4.1 hereof, the Agency shall close and return an Account to the Company upon any of the following occurrences or events:

   **(a)**   The Consumer has filed for bankruptcy protection or state receivership or is the subject of a similar involuntary proceeding or has indicated to the Agency of the Consumer's intent to file for bankruptcy;

   **(b)**   The Consumer is deceased;

   **(c)**   The Consumer has indicated, either verbally or in written form, that the Balance, or any portion of the Balance of an Account, is disputed; and/or

   **(d)**   The Consumer resides in a state in which the Agency does not hold a necessary license or permit to seek collection of the Account.

**4.3.**   **Termination of Efforts.** Upon the recall of an Account pursuant to Section 4.1 or the close and return of an Account pursuant to Section 4.2 ("Recall Event"), the Agency shall immediately cease all collection activities related to the recalled or returned Account; provided, however, that in the event of Recall Event pursuant to Section 4.1 that is not the result of the termination of this Agreement and/or a breach of this Agreement by the Agency, the Agency shall provide the Company a complete list and accounting of all Paying Accounts and may continue to service such Paying Accounts as long as any such Paying Account remains current ("Subject Paying Accounts"). The Agency shall deliver to the Company all Collected Funds received on the Account after the Recall Event without reduction for any Collection Fee other than in regard to Subject Paying Accounts.

**4.4.**   **Waiver of Claim for Fees on Recalled Accounts.** The Company shall have no liability to the Agency for any sum of money claimed due by the Agency as a result of money paid by a Consumer on an Account or for efforts expended by the Agency on an Account after it has been returned to the Company. The Agency hereby expressly waives any claim against the Company for fees, contingent or otherwise, of any kind or nature whatsoever, no matter how designated, including, without limitation, quantum meruit, for services rendered on any Account after its recall by the Company pursuant to a Recall Event.

12

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

**5.1.** **Representations and Warranties of Agency.** As an inducement to the Company to enter into this Agreement and consummate the transactions contemplated hereby, the Agency hereby represents and warrants to the Company that the following are true and correct as of the Effective Date and shall remain true and correct throughout the term of this Agreement:

**5.1.1.** **Existence and Power.** The Agency is a duly organized and validly existing company in good standing under the laws of its state in which it was organized with all requisite power and authority to own and operate its property and assets, to conduct the businesses in which it is engaged or proposes to engage, and to execute, deliver, and perform its obligations under this Agreement.

**5.1.2.** **Authorization.** The execution, delivery and performance of this Agreement have been duly authorized by all necessary company action. The execution, delivery, and performance by the Agency of this Agreement, the consummation of the transactions contemplated herein and the compliance with the terms and provisions hereof will not contravene any material provision of any law or regulation to which the Agency is subject or any order or decree of any court or governmental authority applicable to the Agency and will not result in any material breach of or constitute a default under any indenture, mortgage, deed of trust, agreement or other instrument to which the Agency is a party or by which it or its properties are bound.

**5.1.3.** **Litigation.** There are no actions, suits, proceedings, or investigations pending, threatened against or affecting the Agency, which, either separately or in the aggregate, are reasonably likely to have a material adverse effect on the ability of the Agency to perform its duties and responsibilities under this Agreement. The Agency knows of no basis for any such suit, proceeding, or investigation.

**5.1.4.** **Company Questionnaires.** All of the Agency's statements, answers, and responses to the Agency Due Diligence Questionnaire, Third Party Business Review Questionnaire, Third Party Compliance Questionnaire and Information Security Questionnaire submitted by the Agency to the Company, which have been delivered to the Company by the Agency contemporaneous with the parties' execution of this Agreement on the Effective Date (collectively, "Company Questionnaires") are true and correct and such Company Questionnaires with all such statements, answers and responses incorporated herein as representations, warranties and covenants given by the Agency to the Company.

**5.2.** **Representations and Warranties of Company.** As an inducement to the Agency to enter into this Agreement and consummate the transactions contemplated hereby, the Company

13

hereby represents and warrants to the Agency that the following are true and correct as of the Effective Date and shall remain true and correct throughout the term of this Agreement:

**5.2.1. Existence and Power.** The Company is a duly organized and validly existing company in good standing under the laws of its state of organization with all requisite power and authority to own and operate its property and assets, to conduct the businesses in which it is engaged or proposes to engage, and to execute, deliver, and perform its obligations under this Agreement.

**5.2.2. Authorization.** The execution, delivery and performance of this Agreement have been duly authorized by all necessary company action. The execution, delivery, and performance by the Company of this Agreement, the consummation of the transactions contemplated herein and the compliance with the terms and provisions hereof will not contravene any material provision of any law or regulation to which the Company is subject or any order or decree of any court or governmental authority applicable to the Company and will not result in any material breach of or constitute a default under any indenture, mortgage, deed of trust, agreement or other instrument to which the Company is a party or by which it or its properties are bound.

**5.2.3. Litigation.** There are no actions, suits, proceedings, or investigations pending, threatened against or affecting the Company which, either separately or in the aggregate, is reasonably likely to have a material adverse effect on the ability of the Company to perform its duties and responsibilities under this Agreement. The Company knows of no basis for any such suit, proceeding, or investigation.

**ARTICLE VI**
**INDEMNITY; LIABILITY**

**6.1.    Indemnification by Agency.**

**6.1.1.** The Agency shall indemnify and hold harmless the Company and its officers, directors, managers, members, employees, agents, servants, attorneys, subsidiaries, affiliated companies, parent companies, representatives and their successors and assigns, from and against any and all losses, expenses, damages, costs or liabilities, including reasonable attorneys' fees and expenses incurred in the investigation, defense and settlement of claims asserted by third parties (collectively, "Damages") to the extent the Damages were occasioned by a breach, or alleged breach, of the Agency's representations and warranties stated in Section 5.1 above or a failure, or alleged failure, of the Agency or its employees, agents or permitted subcontractors to comply with any obligation or duty it has under any Compliance Regulation or this Agreement.

**6.1.2.** If the Company receives notice of any claim, threatened claim or the commencement of any action to which the foregoing indemnification may apply, the Company shall notify the Agency. Upon receipt of notice of any such claim, threatened claim, or action

14

against the Company, the Agency may at its option, defend said claim or action (or cause same to be defended), with counsel chosen by the Company, at its own expense and, in such event, shall pay and discharge any and all liabilities, damages, judgments, costs, and expenses (including reasonable attorney's fees and court costs) arising out of said defense; provided, however, that the Agency shall not compromise or settle any such claim or action to which this indemnification applies without the prior written consent of the Company.

**6.2.     Limitation of Liability.** To the fullest extent permitted by Applicable Law, in no event shall the Company, and its officers, directors, managers, members, employees, agents, servants, attorneys, subsidiaries, affiliated companies, parent companies, representatives and their successors and assigns, be liable for any direct, indirect, punitive, incidental, special, consequential or exemplary damages, arising out of or in connection with this Agreement, whether based on warranty, contract, tort (including negligence), product liability or any other legal theory, and whether or not the Company has been informed of the possibility of such damage. In no event will the Company's aggregate liability arising out of or in connection with this Agreement, exceed the amount the Agency has been paid under the Agreement in the two (2) months prior to the event giving rise to the liability. The limitation of damages set forth herein are fundamental elements of the basics of the bargain between the Company and the Agency and the Agency hereby acknowledges and agrees that the Company would not have entered into this Agreement if this provision was not included in the Agreement.

## ARTICLE VII
## TERM AND TERMINATION

**7.1.     Term.** This Agreement shall be effective as of the date first stated above and shall continue until terminated in accordance with the provisions of this Article VII. It is understood that the Company is not obligated and makes no commitment of any kind to the Agency as to any minimum number or dollar amount of Accounts to be assigned to the Agency under this Agreement. The Company expressly reserves the right to assign Accounts to other account agencies or collectors of the Company's choice.

**7.2.     Termination Without Cause.** Either the Company or the Agency may terminate this Agreement, for any reason whatsoever, upon thirty (30) calendar days' prior written notice to the other party.

**7.3.     Termination For Cause.**

**7.3.1.     By Company Pursuant to Written Notice.** Upon the occurrence of any of the following events, the Company shall have the right to terminate this Agreement, effective upon five (5) business days' prior written notice to the Agency:

15

JTM0015

(a)     The Agency fails to perform any legal obligation or duty owed to the Company or violates any covenant stated in this Agreement, or any representation or warranty made by the Agency shall be untrue, and such failure or violation, if curable, is not cured by the Agency within five (5) business days after receipt of written notice of same from the Company;

(b)     An involuntary proceeding is commenced or an involuntary petition is filed in a court of competent jurisdiction seeking (i) relief in respect of the Agency, or of a substantial part of the property or assets of the Agency, under Title 11 of the United States Code, as now constituted or hereafter amended, or any other federal or state bankruptcy, insolvency, receivership or similar law; (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Agency or for a substantial part of the property or assets of the Agency; or (iii) the winding-up or liquidation of the Agency; and such proceeding or petition continues undismissed for sixty (60) calendar days or an order or decree approving or ordering any of the foregoing is entered; or

(c)     The Agency: (i) voluntarily commences any proceeding or files any petition seeking relief under Title 11 of the United States Code as now constituted or hereafter amended, or any other federal or state bankruptcy, insolvency, receivership or similar law; (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in clause (b) above; (iii) applies for or consents to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Agency or for a substantial part of the property or assets of the Agency; (iv) files an answer admitting the material allegations of a petition filed against it in any such proceeding; (v) makes a general assignment for the benefit of creditors; (vi) becomes unable, admits in writing its inability, or fails generally to pay its debts as they become due; or (vii) takes any action for the purpose of effecting any of the foregoing.

**7.3.2.  By Agency Pursuant to Written Notice.**  Upon the occurrence of any of the following events, the Agency shall have the right to terminate this Agreement, effective upon five (5) business days' prior written notice to the Company.

(a)     The Company fails to perform any legal obligation or duty owed to the Agency, violates any covenant stated in this Agreement, or any representation or warranty made by the Company is untrue, and such failure or violation is not cured, if curable, by the Company within five (5) business days after receipt of written notice of same from the Agency;

(b)     An involuntary proceeding is commenced or an involuntary petition is filed in a court of competent jurisdiction seeking (i) relief in respect of the Company, or of a substantial part of the property or assets of the Company, under Title 11 of the United States Code, as now constituted or hereafter amended, or any other federal or state bankruptcy, insolvency, receivership or similar law; (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Company or for a substantial part of the

16

JTM0016

property or assets of the Company; or (iii) the winding-up or liquidation of the Company; and such proceeding or petition continues undismissed for sixty (60) calendar days or an order or decree approving or ordering any of the foregoing is entered; or

(c)     The Company: (i) voluntarily commences any proceeding or files any petition seeking relief under Title 11 of the United States Code as now constituted or hereafter amended, or any other federal or state bankruptcy, insolvency, receivership or similar law; (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in clause (b) above; (iii) applies for or consents to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Company or for a substantial part of the property or assets of the Company; (iv) files an answer admitting the material allegations of a petition filed against it in any such proceeding; (v) makes a general assignment for the benefit of creditors; (vi) becomes unable, admits in writing its inability or fails generally to pay its debts as they become due; or (vii) takes any action for the purpose of effecting any of the foregoing.

**7.4     Illegal Activity.** Notwithstanding the foregoing, in the event the Company believes, for any reason, that the Agency is engaging in illegal activity or is not fully complying with all Compliance Regulations, the Company shall have the right, in its sole discretion, to terminate this Agreement immediately upon oral or written notice to the Agency.

**7.5.     Actions upon Termination.** Upon the termination of this Agreement in accordance with this Agreement, the Agency shall take the following actions:

(a)     Report and remit to the Company all Collected Funds received on the Accounts before the effective date of termination in accordance with Article III of this Agreement;

(b)     As of the effective date of the termination, cease all collection activities related to all Accounts and return all Accounts to the Company;

(c)     Within ten (10) business days after the effective date of termination; (i) deliver or cause to be delivered to the Company, at the Agency's expense, all Account Records; and (ii) implement adequate internal procedures for responding to telephone inquiries from Consumers and informing Consumers telephonically of the name and telephone number of the person designated by the Company for further handling of their respective Accounts; and

(d)     Weekly, (i) deliver to the Company all Collected Funds received on the Accounts after the effective date of termination but without reduction for any Collection Fees; and (ii) forward to the address designated by the Company all correspondence concerning the Accounts received by the Agency after the effective date of the termination.

**7.6.     Survival.** Upon termination of this Agreement, the rights and obligations of the Agency and the Company, which by their nature must survive termination of this Agreement in order to

17

achieve their fundamental purposes, including, without limitation, the provisions of sections addressing legal compliance, non-circumvention, Confidential Information and Nonpublic Personal Information (collectively, "Protected Information"), representations and warranties, and indemnities, shall survive such termination without time limitation.

## ARTICLE VIII
## GENERAL PROVISIONS

**8.1.** **Entire Agreement.** This Agreement, any and all Addenda and all Exhibits hereto as well as all Company Policies, constitute the final, full and exclusive expression of the agreement of the Company and the Agency regarding the management and servicing of Accounts and supersede all prior agreements, understandings, writings, proposals, representations and communications, oral or written, with respect to the subject matter hereof and the transactions contemplated hereby.

**8.2.** **Modification and Waiver.** Except as otherwise expressly stated herein, this Agreement may only be modified or amended by a writing duly executed by both parties hereto.

**8.3.** **Notices.** Whenever either party hereto shall be required or have the right to give notice to the other party, such notice, unless otherwise specified herein, shall be sent via an overnight delivery service. Such notices shall be deemed to have been duly given one (1) calendar day after being tendered to an overnight delivery service to the address set forth above, or at such address as either party may designate in writing.

**8.4.** **Further Assurances.** Each party shall execute such other documents as may be requested by the other party and reasonably necessary to implement this Agreement.

**8.5.** **Independent Contractor Status.** This Agreement shall not be construed as creating an employee/employer, agency, partnership, or joint venture relationship between the parties. Each party shall be responsible to supervise, manage, contract, direct, procure, perform or cause to be performed, all its obligations under this Agreement and shall be liable for all acts or omissions of its employees and agents in performing its respective obligations hereunder.

**8.6.** **Retention of Records.** The Agency shall maintain, at no additional expense to the Company and in a reasonably accessible location, all records related to Services under this Agreement. Such records shall include, without limitation, invoices, correspondence, records, logs, notes and any other data or documents related to provision of Services under this Agreement by the Agency. The Agency shall maintain such records for each Account for a period of not less than two (2) years from the Agency's receipt of the Account or for such longer period of time if so required by law or this Agreement.

18

JTM0018

**8.7.** **Governing Law; Jurisdiction.** The parties agree that any dispute arising out of or relating to this Agreement (each, a "Claim") will be governed by and construed in accordance with the laws of the State of **[New York OR Colorado]** without regard to its conflict of law provisions and shall be litigated solely and exclusively in state or federal courts located in the **[State of New York, County of Erie, OR State of Colorado, County of Arapahoe].**

**8.8.** **Assignment.** The Agency may not assign this Agreement or any of its rights or obligations under this Agreement without the prior written consent of the Company and any such attempted assignment shall be void.

**8.9.** **Third Party Beneficiaries.** Except as specifically stated in this Agreement, the parties do not intend the benefits of this Agreement to inure to any third party, and nothing contained herein shall be construed as creating any right, claim or cause of action in favor of any such third party against either of the parties hereto.

**8.10.** **Location.** All Services provided by the Agency hereunder shall be performed exclusively in the United States and all Protected Information shall be stored, maintained, accessed from and utilized only in the United States. The Agency shall provide written notice to the Company not less than sixty (60) days in advance of opening a new office location or relocating any existing branch to the extent that such opening or relocation impacts in any manner the handling of Accounts assigned by the Company.

**8.11.** **Prohibited Use of Accounts.** The Agency is permitted to use and maintain Accounts only for the purposes and in the manner stated in this Agreement. The Agency is expressly prohibited from and agrees not to use Accounts assigned by the Company as collateral for any loan or to satisfy any indebtedness of the Agency.

**8.12.** **Severability.** If any part of this Agreement is determined to be illegal, unconstitutional, invalid or otherwise unenforceable, such offending part or provision shall be deemed void and severable and the remainder of the Agreement shall remain in effect, provided such result does not materially alter the respective rights and obligations of the parties to this Agreement.

**8.13** **Attorneys Fees.** The Agency shall pay to the Company each cost and expense (including, without limitation, reasonable attorneys' fees) hereafter incurred by the Company in endeavoring to enforce any obligation of the Agency pursuant to this Agreement or preserve or exercise any right or remedy of the Company pursuant to this Agreement.


[SIGNATURE PAGE FOLLOWS]

JTM0019

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first stated above.

COMPANY:

**[JTM CAPITAL MANAGEMENT, LLC]**

By: _____

Name: Michael Hyer

Title: Director of Compliance

**AGENCY:**

| Weinberg Mediation Group LLC |

By: _____

Name: Jody Verhagen

Title: President

20

[SIGNATURE PAGE TO COLLECTION SERVICES AGREEMENT]

21

## EXHIBIT A

### PLACEMENT STATEMENT

This Placement Statement is being issued pursuant to that certain Collection Services Agreement ("Agreement") dated _____ __.___, 20__, between JTM Capital Management, LLC ("Company") and _____ ("Agency") and specifies the Collection Fee and Blanket Settlement Standards in regard to the Accounts indicated below that have been placed with the Agency by the Company pursuant to the Agreement. All capitalized terms used but not otherwise defined herein shall have the meaning assigned thereto in the Agreement.

Name of File:

Date of Placement:

Number of Accounts:

Total Value of Accounts:

Collection Fee:

Blanket Settlement Standards:      _____ ___ ____ ___ _____ _____

                                   _____ _____ . _____

                                   _____ _____ _____

By signing below, the undersigned accepts the placement of the Accounts set forth herein in accordance with the Agreement and acknowledges and agrees that the Agency shall collect the Accounts indicated herein diligently within the terms set forth above and in compliance with the Agreement and all Compliance Regulations.

**AGENCY:**

|_____|

By: _____  _____ ___
Name:
Title:

22

JTM0022

**EXHIBIT B**

**IT AND SECURITY REQUIREMENTS**

These IT and Security Requirements require that the Agency maintain at minimum the following:

1) **SECURITY PROGRAM AND POLICY**

   a) **Security Program.** The Agency shall have an established formal security program that addresses the management of security and the controls employed within the organization. The security program shall include:

      i) A documented information security policy that the Agency formally approves, internally publishes, communicates to appropriate personnel, and reviews at least annually;

      ii) Documented, clear assignment of responsibility and authority for security-related activities; and

      iii) Regular testing of the key controls, systems and procedures of the security program, using independent third-parties when possible.

   b) **Security of Confidential Information.** The Agency shall have administrative, technical and operational measures in place designed to ensure that Protected Information is secure. The Agency shall also secure Protected Information through reasonable means and according to industry standards and the controls described herein and otherwise.

2) **RISK & ASSET MANAGEMENT**

   a) **Risk Management.** The Agency shall have an information security risk assessment program that performs regular risk assessments, undergoes evaluation annually, and includes controls for risk identification, analysis, and monitoring, reporting and corrective action.

   b) **Asset Management.** The Agency shall have an asset management program that appropriately does the following:

      i) Controls hardware and software assets, including identification and inventory of key assets.

        ii)      Assigns ownership of assets to ensure appropriate classification of information, determination of access restrictions, and review of access controls.

        iii)     Ensures assets are sanitized of information prior to their redeployment, removal or disposal.

        iv)     Includes a process for authorizing, logging and tracking the removal of equipment, information or software to any off-site location.

   c)     **Information Classification and Handling.** The Agency shall have an information classification standard in place for appropriately classifying, labeling, and handling information during receipt, creation, processing, in transit, in storage, and on backup media.

## 3)    HUMAN RESOURCES

   a)     **Acknowledgements.** The Agency shall ensure that all employees, agents, and contractors (collectively "Staff") acknowledge their responsibility to: maintain the confidentiality of Protected Information; comply with the Agency's internal information security and acceptable use requirements; and comply with the requirements herein.

        i)      The Agency agrees to maintain documentation of these acknowledgements and to review such documentation at least annually.

   b)     **Personnel.** The Agency shall not hire, retain or engage Staff who have been convicted of or entered into a court-supervised diversion program for fraud, embezzlement, larceny, perjury, terrorism, or breach of trust or fiduciary duty to perform any responsibilities or functions in connection with creating, processing, receiving, accessing, transmitting, or storing Protected Information.

        i)      The Agency shall conduct background checks on all current or prospective Staff who have accessibility or contact with Protected Information.

   c)     **Security Awareness Training.** At least annually, the Agency shall conduct security awareness training regarding the security requirements herein for all Staff who will handle Protected Information.

        i)      The Agency shall maintain records showing the names of Staff in attendance and date of each security awareness training/testing session. The Agency shall also routinely review and update its security awareness training.

JTM0024

**d)** **Violations.** The Agency shall have a formal disciplinary process that is applied to Staff who violate the security requirements herein and/or any other obligation related to Protected Information.

**e)** **Return of Information Assets.** Upon termination or role change Staff shall return all Protected Information and any Agency assets used to access Confidential Protected to the Agency.

**f)** **Termination/Reassignment.** Upon termination or reassignment, Staff access to Protected Information shall be removed promptly.

**4)** **PHYSICAL AND ENVIRONMENTAL SECURITY**

**a)** **Physical Security Controls.** The Agency's facilities shall employ security zones and physical controls that are commensurate to the risk for Protected Information and the Agency equipment used to hold and process such information, including, as appropriate, physical barriers, employee access badges, visitor logs, visitor access badges, card readers, video surveillance cameras, alarms, and security personnel.

    **i)** Video surveillance and other records of physical access shall be kept for a minimum of three months.

**b)** **Environmental Controls.** The Agency shall have in place appropriate environmental controls for hardware and media to mitigate the risks of environmental threats and hazards as appropriate to the geographic region, including fire, flood, environmental disasters and other natural disasters.

**c)** **High Risk Security Zones.** The Agency shall ensure that Staff in high-risk security zones are trained in the physical security controls designed and applied to their work environment. While in high-risk security zones, all visitors must be escorted.

**d)** **Supporting Utilities.** The Agency shall protect facilities containing Protected Information and systems from failures of power, telecommunications, water supply, sewage, heating, ventilation and air-conditioning.

**e)** **Cabling Security.** The Agency shall protect its network and telecommunication systems from interception and damage.

**f)** **Offsite Equipment.** Any offsite equipment storing Protected Information must be protected by security equivalent to that used for on-site equipment used for the same purpose.

**g)** **Physical Access Records.** The Agency shall retain records of Staff authorized to have physical access for one year.

25

**h) Revoke Physical Access.** The Agency shall remove access to facilities where Protected Information and systems reside upon termination of Staff's employment or contract.

**i) Physical Access Restricted.** The Agency shall restrict physical access to facilities that handle Protected Information to those Staff that have a business need for such information. The Agency shall have an approval process for authorizing and tracking physical access requests.

**j) Repairs and Modifications.** The Agency shall record all repairs and modifications to any physical components of secure areas within the facility related to security, including hardware, walls, doors and locks.

## 5) COMMUNICATIONS AND OPERATIONS MANAGEMENT

**a) Device Configuration Standards.** The Agency's standardized configurations for devices such as servers, routers, switches and other network equipment shall include security hardening procedures consistent with industry best practices.

**b) Change Control.** The Agency shall have a formal change management request process in place and the Agency's change requests shall be documented, tested, and approved prior to implementation of any new information processing capabilities, system patches or changes to existing systems.

**c) Segregation of Duties.** The Agency shall segregate duties and areas of responsibility so that no one person has sole access to Protected Information or processes which could lead to unauthorized modification or misuse of Protected Information or assets.

**d) Separation of Development and Production Facilities.** The Agency's development, test and production environments must be logically or physically separated.

**e) Technical Architecture Management.** The Agency shall establish a configuration management process to define, manage, and control the components of the service and technical infrastructure.

**f) Intrusion Detection.** The Agency shall continually monitor systems and processes for security intrusions or violations and notify the Company if suspicious conditions or activities are detected indicating an actual or potential security violation or intrusion.

**g) Network Security.** The Agency shall ensure the following are in place:

JTM0026

i)        Network intrusion detection system (IDS)/ intrusion prevention sensors (IPS) alert events that are logged and reviewed at least daily for necessary intervention;

ii)       IDS/IPS that are updated at least daily and run the latest threat signatures or rules;

iii)      High-risk ports on externally-facing systems are not accessible from the internet;

iv)      The Agency's network connections are logged and recorded in log files;

v)       Firewall(s) designed to protect and inspect all inbound and outbound network services traffic between defined network points;

vi)      Inbound and outbound network service traffic that accesses the Company systems are documented and authorized within the information security program;

vii)     Network and diagnostic ports are properly secured;

viii)    Policies, procedures and technical controls that prevent, detect and remove malicious code or covert channel attacks on the Agency's information systems.

**h)**    **Encrypted Authentication Credentials.** The Agency shall ensure that authentication credentials transmitted to network devices are secured (e.g., encrypted) in transit.

**i)**     **Secure Network Administration.** Networks must be adequately managed and controlled to protect from threats, and to maintain security for all applications and data on the network or in transit over the network. Technical controls and secure communication protocols shall be implemented to prohibit unrestricted connections to untrusted networks or publicly accessible servers.

**j)**     **Virus Protection.** The Agency shall ensure a virus management program is in place and signature files are up-to-date for servers and workstations used to house or access Protected Information.

**k)**    **Website - Encryption.** The Agency shall ensure that its website(s) Secure Sockets Layering (SSL) is enabled and contains a valid SSL certificate for each website requiring confidentiality, authentication or authorization controls.

**l)**     **Email Relaying.** The Agency shall ensure that automatic email relaying/forwarding is disabled on the Agency's Internet email servers.

**m)**    **Information Backup.** The Agency shall create appropriate back-up copies of system files and Protected Information. The Agency shall keep an inventory of

27

backup media. The Agency shall periodically restore backups to test system and data restoration techniques.

**n)** **Media Controls.** The Agency shall have media controls that include the following:

    **i)** Operating procedures and technical controls to protect documents, computer media, input/output/backup data, and system documentation from unauthorized disclosure, modification and destruction.

    **ii)** Procedures for the secure disposal of electronic or physical media containing Protected Information.

    **iii)** An established process to track all physical media used for transporting Protected Information from pre-shipment through destruction.

    **iv)** Procedures and technical controls to protect electronic and physical media containing nonpublic information from unauthorized disclosure, modification, removal, or destruction during transportation beyond the Agency's physical boundaries.

    **v)** Procedures to ensure backup media containing Protected Information is accounted for, encrypted, and placed in a lockbox prior to being transported offsite.

**o)** **Electronic Information in Transit.** The Agency shall protect Protected Information that passes over public networks from unauthorized disclosure and modification.

**p)** **Data Integrity.** The Agency shall have appropriate testing and protection controls in place to protect the integrity of information made available, to the Agency, from unauthorized modification.

**q)** **Cryptographic Controls.** The Agency shall follow a documented policy on the use of cryptographic controls. The Agency's cryptographic controls shall:

    **i)** Protect the confidentiality and integrity of Protected Information being processed, transmitted or stored in any shared network environments; and

    **ii)** Be applied to Protected Information in transit across or to "untrusted" networks, i.e., networks that the Agency does not have management responsibilities for; and

    **iii)** Include documented and appropriate encryption key management practices to support the security of cryptographic technologies.

**r)** **Logging Requirements.** The Agency shall ensure the following:

    **i)** Significant security and systems events are logged to a central event log for review;

28

JTM0028

      **ii)**    Audit logs are retained for a minimum of one year;

      **iii)**   System audit logs are regularly reviewed for anomalies;

      **iv)**   Log facilities, systems, information are protected against tampering and unauthorized access.

**s)**   **Network Time Synchronization.** The Agency shall synchronize the system clocks of all information processing systems using a common authoritative time source.

**t)**   **Wireless Networks.** The Agency's wireless networks shall:

      **i)**    Use only approved and managed wireless access points on its network with periodic scans being performed to confirm that no rogue/unapproved wireless access points have been installed; and

      **ii)**   Require both encryption and strong authentication to connect to each of its approved wireless access points.

**u)**   **Segregate in Networks.** The Agency shall appropriately segregate related groups of information services, users, and information systems on networks.

## 6) ACCESS CONTROL

**a)**   **Access Control Policy.** The Agency shall have an access control policy that the Agency formally approves, publishes and implements.

**b)**   **Logical Access Authorization.** The Agency shall have an approval process for logical access requests to Protected Information.

      **i)**    The Agency must retain a record of system access for one year.

**c)**   **Privileged Access Control.** The Agency shall have an authorization process for privileged access. Such access shall only be granted when required, logged, strictly controlled and regularly monitored for compliance.

**d)**   **Risk-Based Access Control and Access Review.** The Agency agrees to grant access to Protected Information only to Staff that need such access in order to perform their job function. All authorized access, including privileged access, must be reviewed, confirmed to be consistent with current job role and documented at least quarterly.

**e)**   **Control of Third Party Access.** Prior to granting access, the Agency shall ensure that external parties, with access to the Agency's information systems that include Protected Information, are identified and appropriate controls are in place.

**f)**   **Wireless Network Access.** The Agency will design wireless network technology to address security considerations, including industry standards, internal policies, and business requirements.

**g)**   **Operating Systems Access Control.** The Agency shall control access to operating systems (both software and hardware based operating systems) by requiring a secure log-on process that uniquely identifies the individual who is accessing the operating system.

**h)**   **Mobile Computing Devices.** The Agency will have a policy or procedure in place to ensure mobile devices are secure from unauthorized access. Such policies or procedures shall address physical protection, access control and security controls such as encryption, virus protection and device backup.

**i)**   **Authentication.** The Agency must authenticate each Staff's identity through appropriate authentication controls such as strong passwords, token devices or biometrics.

**j)**   **Passwords.** Passwords shall be unique, known only to the Staff member, and changed upon initial issue and every 90 days. Passwords may not be shared or written down.

**k)**   **Accounts.** The Agency shall do the following with respect to accounts:

    **i)**   Prohibit the use of shared accounts, or accounts with generic identifications, to access Company information or systems.

    **ii)**   Require that all account IDs, including privileged accounts, be tied directly to a person.

    **iii)**   Require the use of temporary passwords, check out IDs, or similar controls for default administration account access.

    **iv)**   Require that inactive accounts are locked or disabled after 90 days of inactivity

**l)**   **Controls for Unattended Systems.** The Agency must use one of the following controls to protect systems that are left unattended and have had no activity for 15 minutes - 1) password protected screensaver; or 2) session timeouts (forced logout) after 15 minutes of inactivity.

**m)**   **Teleworking.** The Agency shall maintain and follow a defined policy, operational plans and procedures for all teleworking activities including physical security of the teleworking site.

**n)**   **Work Area Data Security.** The Agency shall require Staff to adhere to a clear desk (for paper and removable storage media) and clear work station screen

requirements (for information systems). Such requirements must be documented, approved, and implemented.

7) **INFORMATION SYSTEMS ACQUISITION DEVELOPMENT AND MAINTENANCE**

   a) **Systems Development Security.** The Agency shall ensure that security is part of all information systems development and operations and shall publish and adhere to internal secure coding methodologies based on application development security best practices.

      i) The Agency's development process shall include application functionality that prevents errors, losses, unauthorized modifications or misuse of information.

      ii) Production information shall not be used in test environments unless sanitized of Protected Information. Test data must be erased after testing is complete.

      iii) Access to system files and program source code must be controlled. Information technology development, implementation and support project activities must be assigned to responsible individuals, documented, and conducted in a secure manner.

      iv) The Agency shall formally approve application changes and such changes will be controlled by a documented change control process.

   b) **Software Security Management.** The Agency's information systems (including operating systems, infrastructure, business applications, off-the-shelf products, services and user-developed applications) shall be designed to be in compliance with information security standards.

      i) The Agency shall maintain the security of production application system software and information.

      ii) The Agency's outsourced software development activities shall be appropriately supervised and monitored.

      iii) The Agency shall have policies and technical controls to prevent non-administrative users from installing software on operations systems.

   c) **Network Diagrams.** The Agency shall develop, document, and maintain physical and logical diagrams of networking devices and traffic.

31

JTM0031

**d)** **Application Vulnerability Assessments/Ethical Hacking.** The Agency shall at least annually perform vulnerability assessments and network penetration testing on applications that process or store Protected Information.

**e)** **Change Testing and Review.** The Agency shall review and test changes to applications and operating systems prior to deployment to ensure there is no adverse effect on Protected Information or systems.

**8)** **INFORMATION SECURITY INCIDENT MANAGEMENT**

**a)** **Incident Management Program.** The Agency shall have an information security incident management program (the "Program") in place that provides a consistent and effective response to managing information security incidents and system weaknesses once they are reported.

**b)** **Incident Notification.** The Agency shall have policies and procedures in place requiring Staff and third party's to promptly report any actual or potential security incidents involving Protected Information (including, without limitation, customer data, employee data or business data) to designated Agency personnel. Incidents include, without limitation, any potential or actual misuse of or unauthorized access to any Protected Information and any violations or potential violations of federal or state law (the "Incident").

**c)** **Incident Reporting.** The Agency must immediately provide the Company with notice of an Incident. Such notice must be sent to the Company immediately in the form of an e-mail **[compliance@Agencyinc.com]** and shall include the following information: (a) the nature of the Incident, (b) the estimated impact on Protected Information; (c) designation of a senior level person at the Agency responsible for communicating with the Agency regarding the Incident, and (d) the investigative action taken or planned.

**d)** **Incident Response.** The Agency must conduct a prompt investigation of all Incidents involving Protected Information to determine the nature and scope of the Incident, the likelihood that Protected Information has been or will be misused and to identify, if applicable, the individuals affected.

**e)** **Investigation Report.** Upon completion of the investigation, the Agency will provide the Agency with a final comprehensive, written report that fully describes the Incident and any corrective or remedial action taken. The Agency will provide all supporting technical documentation to the Agency as part of the final written report.

32

**f)**   **Investigation Updates.** The Agency must cooperate fully with all Company requests for information regarding the Incident and the Agency must provide regular updates to the Company on each Incident.

**g)**   **Notification.** Except as may be required by law, the Agency agrees to take no action with respect to notification of an Incident without the Company's express written consent and according to the Company's specific instruction.

## 9)   AUDITS AND MONITORING

**a)**   **Reviews and Assessments.** The Company or its designated representative shall have the right to monitor, review and assess the handling of Protected Information by the Agency, including, without limitation, the Agency's compliance with its obligations and responsibilities in this Agreement ("Information Security Assessment").

   **i)**   Information Security Assessments shall be reasonable in scope and length and shall not unreasonably interfere with the Agency's business and operations.

**b)**   **Third Party Audits and Certifications.** The Agency shall provide the Company upon execution of this Agreement on the Effective Date and annually upon request with an Information Security Assessment performed by a qualified third party

   **i)**   SSAE16 reports, PCI DSS or ISO certifications or compliance reports are acceptable.

33

# EXHIBIT C

## GUARANTY

**GUARANTY** (the "Guaranty"), dated as of _____ __, 20__, by _____, an individual with an address at _____ and _____, an individual with an address at _____ (each a "Guarantor" and jointly and severally the "Guarantors") in favor of _____, a _____ with an address at _____ (together with its successors and assigns, the "Subject Party").

**WHEREAS**, the Guarantors are equity holders of _____ (the "Agency"), which entered into that certain Collection Services Agreement dated as of the same date hereof with the Subject Party ("Collection Agreement"), and are directly and materially interested in the financial success of the Agency, and maintain significant business relationships with the Agency;

**WHEREAS**, the Subject Party's willingness to enter into the Collection Agreement is conditioned upon the Guarantors executing and delivering this Guaranty; and

**WHEREAS**, the Collection Agreement will be beneficial to the Guarantors inasmuch as the funds received by the Agency thereunder will benefit the Guarantors.

**NOW, THEREFORE,** in order to induce the Subject Party to enter into the Collection Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each of the Guarantors, the Guarantors hereby agree as follows:

1. **Guaranty of Payment and Performance.** The Guarantors hereby jointly and severally guarantee to the Subject Party the full and punctual payment when due (whether at maturity, by acceleration or otherwise), and the performance, of all liabilities, agreements and other obligations of the Agency to the Subject Party, whether direct or indirect, absolute or contingent, due or to become due, secured or unsecured, now existing or hereafter arising or acquired, under the Collection Agreement, including, without limitation, all obligations in regard to full and prompt payment of all Remittances (as such term is defined in the Collection Agreement) due thereunder (collectively, the "Obligations"). This Guaranty is an absolute, unconditional and continuing guaranty of the full and punctual payment and performance of the Obligations and not of their collectability only and is in no way conditioned upon any requirement that the Subject Party first attempt to collect any of the Obligations from the Agency or resort to any security or other means of obtaining their payment. Should the Agency default in the payment or performance of any of the Obligations, the obligations of each Guarantor hereunder shall become immediately due and payable to the Subject Party, upon written notice to each Guarantor by the Subject Party. Payments by each Guarantor hereunder may be required by the Subject Party on any number of occasions.

34

**2.     Guarantors' Agreement to Pay.**  Each Guarantor further agrees, as the principal obligor and not as a guarantor only, to pay to the Subject Party, on demand, all reasonable costs and expenses (including court costs and reasonable legal expenses) incurred or expended by the Subject Party in connection with enforcement of this Guaranty, together with interest on amounts recoverable under this Guaranty from the time such amounts become due under this Guaranty until payment, at the rate per annum equal to the prime rate as set forth in the *Wall Street Journal* plus ten percent (10%); provided that if such interest exceeds the maximum amount permitted to be paid under applicable law, then such interest shall be reduced to such maximum permitted amount.

**3.     Unlimited Guaranty.**  The liability of each Guarantor hereunder shall be unlimited to the extent of the Obligations and the other obligations of each Guarantor hereunder (including, without limitation, under Section 2 above).

**4.     Waivers by Guarantors.**  Each Guarantor agrees that the Obligations will be paid and performed strictly in accordance with their respective terms regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Subject Party with respect thereto. Each Guarantor waives presentment, demand, protest, notice of acceptance, notice of Obligations incurred and all other notices of any kind, all defenses which may be available to the Agency by virtue of any valuation, stay, moratorium law or other similar law now or hereafter in effect, any right to require the marshalling of assets of the Agency, and all suretyship defenses generally. Without limiting the generality of the foregoing, each Guarantor agrees to the provisions of any instrument evidencing, securing or otherwise executed in connection with any Obligation and agrees that the obligations of each Guarantor hereunder shall not be released or discharged, in whole or in part, or otherwise affected by (i) the failure of the Subject Party to assert any claim or demand or to enforce any right or remedy against the Agency; (ii) any extensions or renewals of any Obligation; (iii) any rescissions, waivers, amendments or modifications of any of the terms or provisions of any agreement evidencing, securing or otherwise executed in connection with any Obligation (provided that the obligations of each Guarantor hereunder shall be appropriately modified to reflect any amendment or modification of the Obligations); (iv) the substitution or release of any entity primarily or secondarily liable for any Obligation; (v) the adequacy of any rights the Subject Party may have against any collateral or other means of obtaining repayment of the Obligations; (vi) the impairment of any collateral securing the Obligations, including without limitation the failure to perfect or preserve any rights the Subject Party might have in such collateral or the substitution, exchange, surrender, release, loss or destruction of any such collateral; or (vii) any other act or omission which might in any manner or to any extent vary the risk of any Guarantor or otherwise operate as a release or discharge of any other Guarantor, all of which may be done without notice to any Guarantor.

**5.     Unenforceability of Obligations Against Agency.**  If for any reason the Agency has no legal existence or is under no legal obligation to discharge any of the Obligations, or if any of the

35

Obligations have become irrecoverable from the Agency by operation of law or for any other reason, this Guaranty shall nevertheless be binding on each Guarantor to the same extent as if each Guarantor at all times had been the principal obligor on all such Obligations. In the event that acceleration of the time for payment of the Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Agency, or for any other reason, all such amounts otherwise subject to acceleration under the terms of any agreement evidencing, securing or otherwise executed in connection with any Obligation shall be immediately due and payable by each Guarantor upon written notice from the Subject Party.

**6.**     **Subrogation; Subordination.**     Until the payment and performance in full of all Obligations, no Guarantor shall exercise any rights against the Agency arising as a result of payment by any Guarantor hereunder, by way of subrogation or otherwise, and will not prove any claim in competition with the Subject Party or its affiliates in respect of any payment hereunder in bankruptcy or insolvency proceedings of any nature; no Guarantor will claim any set-off or counterclaim against the Agency in respect of any liability of any Guarantor to the Agency; and each Guarantor waives any benefit of and any right to participate in any collateral which may be held by the Subject Party or any such affiliate. The payment of any amounts due with respect to any indebtedness of the Agency now or hereafter held by any Guarantor is hereby subordinated to the prior payment in full of the Obligations. Each Guarantor agrees that after the occurrence of any default in the payment or performance of the Obligations, after the expiration of any applicable cure period, it will not demand, sue for or otherwise attempt to collect after such time any such indebtedness of the Agency to such Guarantor until the Obligations shall have been paid in full. If, notwithstanding the foregoing sentence, any Guarantor shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Guarantor as trustee for the Subject Party and be paid over to the Subject Party on account of the Obligations without affecting in any manner (other than by reducing the outstanding amount of the Obligations) the liability of any Guarantor under the other provisions of this Guaranty.

**7.**     **Further Assurances.** Each Guarantor agrees to do all such things and execute all such documents as are reasonably necessary or desirable to give full effect to this Guaranty and to perfect and preserve the rights and powers of the Subject Party hereunder.

**8.**     **Termination; Reinstatement.** This Guaranty shall remain in full force and effect until the earlier of: (i) the Obligations are paid in full (other than contingent indemnity obligations) and not subject to any recapture or preference in bankruptcy or similar proceedings, and the Agency has no further commitments to the Subject Party; or (ii) the Subject Party is given written notice of each Guarantor's intention to discontinue this Guaranty, notwithstanding any intermediate or temporary payment or settlement of the whole or any part of the Obligations. No such notice under (ii) above shall be effective unless received and acknowledged by an officer of the Subject Party at its head office. No notice under (ii) above shall affect any rights of the Subject Party or of any affiliate hereunder with respect to any Obligations incurred prior to such notice. This Guaranty shall continue to be effective or be reinstated, notwithstanding any notice of termination, if at any time

36

JTM0036

any payment made or value received with respect to an Obligation is rescinded or must otherwise be returned by the Subject Party upon the insolvency, bankruptcy or reorganization of the Agency, or otherwise, all as though such payment had not been made or value received.

**9.** **Successors and Assigns.** This Guaranty shall be jointly and severally binding upon each Guarantor and its successors and assigns, and shall inure to the benefit of and be enforceable by the Subject Party and its successors, transferees and assigns. Without limiting the generality of the foregoing sentence, the Subject Party may assign or otherwise transfer any agreement or any note held by it evidencing, securing or otherwise executed in connection with the Obligations, or sell participations in any interest therein, to any other person or entity, and such other person or entity shall thereupon become vested, to the extent set forth in the agreement evidencing such assignment, transfer or participation, with all the rights in respect thereof granted to the Subject Party herein.

**10.** **Amendments and Waivers.** No amendment or waiver of any provision of this Guaranty nor consent to any departure by any Guarantor therefrom shall be effective unless the same shall be in writing and signed by the Subject Party. No failure on the part of the Subject Party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

**11.** **Notices.** Whenever a party hereto shall be required or have the right to give notice to the other party, such notice, unless otherwise specified herein, shall be sent via an overnight delivery service. Such notices shall be deemed to have been duly given one (1) calendar day after being tendered to an overnight delivery service to the address set forth above, or at such address as a party may designate in writing.

**12.** **Governing Law; Jurisdiction.** The parties agree that any dispute arising out of or relating to this Agreement (each, a "Claim") will be governed by and construed in accordance with the laws of the State of **[New York OR Colorado]** without regard to its conflict of law provisions and shall be litigated solely and exclusively in the state or federal courts located in the **[State of New York, County of Erie, OR State of Colorado, County of County of Arapahoe]**, if it has or can acquire jurisdiction, in the United States District Court for the Western District of New York. Each Guarantor and the Subject Party, by its acceptance of this Guaranty, hereby agrees that the prevailing party in any suit, action or proceeding arising out of or relating to this Guaranty shall be entitled to reimbursement for reasonable legal fees from the non-prevailing party.

**13.** **WAIVER OF JURY TRIAL. EACH GUARANTOR AND, BY ITS ACCEPTANCE OF THIS GUARANTY, THE SUBJECT PARTY, HEREBY WAIVES TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF: (A) THIS GUARANTY, THE COLLECTION AGREEMENT, OR**

JTM0037

**ANY OTHER INSTRUMENT OR DOCUMENT DELIVERED IN CONNECTION WITH THE OBLIGATIONS; (B) THE VALIDITY, INTERPRETATION, COLLECTION OR ENFORCEMENT THEREOF; OR (C) ANY OTHER CLAIM OR DISPUTE HOWEVER ARISING BETWEEN ANY GUARANTOR AND THE SUBJECT PARTY.**

**14.** **Miscellaneous.** This Guaranty, together with the Collection Agreement, constitutes the entire agreement of the Guarantors with respect to the matters set forth herein. The rights and remedies herein provided are cumulative and not exclusive of any remedies provided by law or any other agreement, and this Guaranty shall be in addition to any other guaranty of the Obligations. The invalidity or unenforceability of any one or more sections of this Guaranty shall not affect the validity or enforceability of its remaining provisions. The obligations of each Guarantor shall be joint and several.

38

**IN WITNESS WHEREOF**, each party hereto has caused this Guaranty to be executed as of the date first written above.

**GUARANTORS:**

_____

_____

STATE OF _____   )
                      )    SS:
COUNTY OF_____  )

On the ___ day of _____ in the year 20__, before me, the undersigned, personally appeared _____, known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
                                          Notary Public

STATE OF _____   )
                      )    SS:
COUNTY OF_____  )

On the ___ day of _____ in the year 20__, before me, the undersigned, personally appeared _____, known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the

instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

[SIGNATURE PAGE TO GUARANTY]

40

JTM0040

EXHIBIT
F
11-1-19
PENGAD 800-631-6989



Account    ADIA A WASHINGTON

Name: ADIA A WASHINGTON
SSN/Gov ID:
Language: Unknown
Date of Birth:                    Age
Email: ADIA_WASHINGTON@YAHOO.COM
Gender:

Address:
Phone 1: (419) 261-4340 (Home) [HOT]
Phone 2: (419) 932-1240 (Home)
Alias:
Case Note:

Call    Edit    New
(419) 261-4340 (Home) [HOT]
Phone details
Phone number: (419) 261-4340
Associated: ADIA A WASHINGTON
Phone Type:
Line Type:
Status:
Added by: Unknown on 12/26/2017 4:54 PM

Second Obligated Party
Name:
SSN/Gov ID:
Language:
Date of Birth:                    Age
Phone:

Address:
Phone 1:
Phone 2:
Alias:
Case Note:

Contacts
Latest:
# Contacts:
# Attempts:
Source:

Account Origination

Owner: JTM Capital Management, LLC
Original Acct #: 4057793029379621
Originator: Mid America Bank and Trust
Product: VP Credit Card Master Trust/Total Card
Open Date: 4-12-2015
Open Amount:

Date of Occurrence: 10/20/2016
Last Pay Date: 10/18/2016
Last Pay Amnt: 111.00
Chargeoff Date: 2-28-2017
Chargeoff Amount: 497.49
CBR Report:
CBR Delete:

Settings
Consent:
Time Zone:
Jul 26 2019 1:38 PM

| Date | EventType | Description |
|---|---|---|
| 7/11/2019 10:55 AM | Extract Data | User 'penpau' ran extract/export 'Base Export' to export this accounts data |
| 3/13/2019 1:45 AM | Extract Data | User 'rowand' ran extract/export 'Base Export' to export this accounts data |
| 1/16/2019 4:39 PM | Extract Data | User 'rowand' ran extract/export 'Base Export' to export this accounts data |
| 1/11/2019 9:56 AM | Extract Data | User 'jacobsdemo' ran extract/export 'Base Export' to export this accounts data |
| 12/31/2018 12:21 PM | Other | [roeand]: Other: Portfolio Owner has changed from JTM Capital Management, LLC to JTM Capital Management, LLC |
| 5/14/2018 3:19 PM | Extract Data | User 'jacobsdemo' ran extract/export 'Base Export' to export this accounts data |
| 9/11/2018 12:05 PM | Information | [kerbs]: No Call Placed. Account Stamp. Viewed account for 12 seconds without entering a call note. |
| 9/5/2018 4:44 PM | Placement History | [kylmc] Added to queue Legal Action by kylmc () |

Owned and Serviced by Us Fee Rate: $0.00

(call)
User 'penpau' ran extract/export 'Base Export' to export this accounts data



| | | | |
|---|---|---|---|
| | ACCOUNT | | Count: LUCAS |
| | | | Number: TM |
| | | | Debtor local time 3:15 M |

Main | Promise | Balance | Decl | Exceptions | Blocks/Restrictions | Legal | Collateral

Move Account | Call Note | Bee-Mail | Letter | Callback | Exception | WATCH

First Obligated Party
Name: ADIA A WASHINGTON
SSN/Govt ID:
Language: Unknown

Call | Edit | New
(419) 261-4340 (Home) [HOT]
Phone details

Phone 1: (419) 261-4340 (Home) [HOT]

| Date | Type | Description |
|---|---|---|
| 9/5/2018 4:44 PM | Placement History | [hylesc] Added to queue : Legal Action by hylesc () |
| 9/5/2018 4:26 PM | Letter | hylesc: Requested 'JTM Dunning Balance in Full' [Sent To : Mail Manager] |
| 9/16/2018 3:16 PM | Placement History | [@Global Mediation Group] Added to queue : Complaints |
| 7/26/2018 3:35 PM | Extract Data | User 'jacobadsmo' ran extract/export 'Base Export' to export this accounts data |
| 7/11/2018 6:17 PM | Media Request | [Delivered] Request for [Statements 02/01/2017 - 02/28/2017] Delivered Requested by : kerbri |
| 6/11/2018 2:47 PM | Placement History | [conjse] Beamed out to Global Mediation Group 866-625-6104 |
| 6/11/2018 12:00 AM | Placement History | [conjse] Added to queue : Amherst Q by conjse [Initiated by User] |
| 4/27/2018 9:28 AM | Extract Data | User 'SeamCentral' ran extract/export 'Base Export' to export this accounts data |
| 4/4/2018 10:22 AM | Extract Data | User 'conjse' ran extract/export 'Base Export' to export this accounts data |
| 4/4/2018 10:21 AM | Placement History | [conjse] Beamed out to zz Consumer Solutions Group 866-827-5678 |
| 5:04 PM | Placement History | [@Account Discovery Systems] Added to queue : Amherst Q |
| ...8/2018 10:57 AM | Extract Data | User 'conjse' ran extract/export 'Base Export' to export this accounts data |
| 2/19/2018 10:22 AM | Extract Data | User 'conjse' ran extract/export 'Base Export' to export this accounts data |
| 1/2/2018 12:12 PM | Placement History | [conjse] Beamed out to zz Account Discovery Systems 866-412-2734 |
| 1/1/2018 5:22 PM | Placement History | [@Armin O'Conner & Boch] Added to queue : Amherst Q |
| 10/19/2017 11:26 AM | Other | [zlptisi] Other Accounts FlexTag value were modified from : to JTM by Workflow : JTM Portfolio Flex Check |
| 10/5/2017 11:23 AM | Placement History | [zlptisi] Beamed out to Armin O'Conner & Boch 806-971-2237 |
| 10/5/2017 12:00 AM | Placement History | [zlptisi] Added to queue : Amherst Q by lptisi [Initiated by User] |
| 8/24/2017 3:47 PM | Extract Data | User 'conjse' ran extract/export 'Base Export' to export this accounts data |
| 8/5/2017 6:03 PM | Extract Data | User 'kerbri' ran extract/export 'Base Export' to export this accounts data |
| 5/30/2017 12:37 PM | Extract Data | User 'conjse' ran extract/export 'Base Export' to export this accounts data |
| 5/30/2017 12:17 PM | Placement History | [conjse] Beamed out to zz Consumer Solutions Group 866-827-5678 |
| 4/30/2017 10:23 AM | Extract Data | User 'conjse' ran extract/export 'Base Export' to export this accounts data |
| 5/29/2017 12:00 AM | Placement History | [jacobadsmo] Added to queue : Amherst Q by jacobadsmo |
| 5/29/2017 12:00 AM | Placement History | [rosanq] in Preview |
| 5/24/2017 5:44 PM | Extract Data | User 'kerbri' ran extract/export 'Base Export' to export this accounts data |
| 5/24/2017 3:31 PM | Extract Data | User 'kerbri' ran extract/export 'Base Export' to export this accounts data |

Duration: 05:37
Owned and Serviced by Ut: Fee Rate: 50.00

[all]
User 'purosu' ran extract/export 'Base Export' to export this accounts data



EXHIBIT

G

11-1-19

PENGAD 800-631-6989

| LotNo | Seller AccountID | Client Accnt ID1 | Issuer AcctNo | Name | SSN | Address 1 | Address 2 |
|-------|------------------|------------------|---------------|------|-----|-----------|-----------|
| LOT501 | | | | WASHINGTON, ADIA A | | | |

JTM043

| City | State | Zip | HomePh | Line Type | WorkPh | Line Type | CellPh | Line Type | OtherPh | DOB | OrigFICO |
|------|-------|-----|--------|-----------|--------|-----------|--------|-----------|---------|-----|----------|

| ProdSubProd | Soft Costs | Current Balance | CO Amt | CO Date | CO IntRate | Orig Int Rate | FirstDelqDate | OpenDate | LastPayAmt |
|---|---|---|---|---|---|---|---|---|---|
| M121505 | 0.00 | 497.49 | 497.49 | 2/28/2017 | 0 | 0.2999 | 10/20/2016 | 6/12/2015 | 111.00 |

| LastPayDate | LastPurchDate | Out Agy Plc | Num Out Plc Agys | Acct Status | Acct Type | DueDil Acct ID | Charge-off Creditor |
|---|---|---|---|---|---|---|---|
| 10/18/2016 | 6/2/2016 | No | 0 | Normal | CreditCard | | VP Credit Card Master Trust |

JTM046

| Originating Creditor | JTM Purchase Date | Flex Tag | Seller | Product |
|---|---|---|---|---|
| Mid America Bank and Trust | 5/30/2017 | | VP Credit Card Master Trust | VP Credit Card Master Trust/Total Card |

**Owner**
JTM Capital Management, LLC

JTM048